UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| E.R. SMITH ASSOCIATES, INC., Plaintiff | : | |
| vs. | : | C.A. No.: 05-CV-45-T |
| THE COLONIAL PRESS, INC., Defendant | : | |

**E.R. Smith Associates, Inc.'s Objection to Plaintiff's Motion to Dismiss**

NOW COMES plaintiff E.R. Smith Associates, Inc. ("E.R. Smith"), by and through counsel, and hereby objects to plaintiff The Colonial Press' ("Colonial Press") motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction in connection with the above-entitled action.

In support of the within objection, E.R. Smith submits the accompanying memorandum, and Affidavit of Frank Andaloro.

15

Respectfully submitted,

E.R. Smith Associates,

By its Attorneys,

W. Mark Russo (#3937)
Christopher M. Mulhearn (#5188)
**Ferrucci Russo P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778

George A. Comolli, Esq. (# 2730)
**Comolli & LaMountain, Ltd.**
15 Franklin Street
Westerly, RI 02891
Tel: (401) 348-6020
Fax: (401) 348-0999

**Certification**

I hereby certify that on this 6th day of May, 2005, I served a true and accurate copy of the within upon **Barbara S. Cohen, Esq.**, Goldenberg & Muri, LLP, 10 Weybosset Street, Providence, Rhode Island, 02903, by first-class, postage prepaid mail.

Darlene Morris

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| E.R. SMITH ASSOCIATES, INC., | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | C.A. No.: 05-CV-45-T |
| | : | |
| THE COLONIAL PRESS, INC., | : | |
| | : | |
| Defendant | : | |

**E.R. Smith Associates, Inc.'s Memorandum in Support of its Objection to Plaintiff's Motion to Dismiss**

NOW COMES plaintiff E.R. Smith Associates, Inc. ("E.R. Smith"), by and through counsel, and hereby submits the within memorandum in support of its objection to plaintiff The Colonial Press' ("Colonial Press") motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction in connection with the above-entitled action.

In further support of its objection, E.R. Smith submits the accompanying Affidavit of Frank Andaloro.

**<u>Pertinent Facts</u>**

E.R. Smith is a duly organized and existing corporation pursuant to, and in accordance with, the laws of the State of Rhode Island. E.R. Smith is routinely, and continuously, engaged in the business of distribution, inspection, manufacture and/or repair of printing equipment, and related components and accessories. Any and all of E.R. Smith's commercial transactions and/or services originate from its principal place of business, Rhode Island, and, further, are directed and/or controlled from Rhode Island. All of E.R. Smith's operations are based in Rhode Island. E.R. Smith's principal place of business is located at 83 Tom Harvey Road, Westerly, Rhode Island, 02891.

In or about 2003, Colonial Press was referred to E.R. Smith by a so-called "used" printing equipment broker located in California, Q.A.M., Inc. ("QAM"), with respect to the possible availability of a certain printing press located in the State of New Jersey, in which Colonial Press had some interest. QAM recommended to Colonial Press that E.R. Smith perform certain services for Colonial Press regarding the New Jersey printing press, namely inspecting the same for Colonial Press and providing Colonial Press an assessment regarding this press equipment. E.R. Smith had never previously transacted business of any nature whatsoever with Colonial Press, prior to being contacted by Colonial Press regarding the New Jersey press.

Colonial Press contacted E.R. Smith. After an initial introduction and some discussion, which occurred exclusively by and through E.R. Smith's principal place of business, Rhode Island, Colonial Press engaged the professional services of E.R. Smith to perform an inspection of the New Jersey printing press in or about October, 2003. The terms and conditions of E.R. Smith's engagement were memorialized in an agreement/purchase order agreed-upon by and between E.R. Smith and Colonial Press at or about that same time.

E.R. Smith substantially performed, and completed, the inspection services for which it was engaged by Colonial Press relative to the New Jersey printing press, which included providing Colonial Press with an assessment of the New Jersey printing press. E.R. Smith's press inspector relative to the New Jersey press was dispatched from E.R. Smith's Rhode Island location. After reviewing E.R. Smith's report and considering the same, Colonial Press declined to purchase this press equipment. .

In exchange for performing its inspection services and providing an assessment to Colonial Press, Colonial Press paid E.R. Smith the value of the inspection services performed.

In or about 2004, Colonial Press was exploring the possibility of purchasing a certain printing press located in the State of Texas, and, in the course of doing so, made E.R. Smith aware of the same.

In or about May, 2004, E.R. Smith advised Colonial Press with respect to the availability of a certain Harris M-110B web offset press (the "Harris Press"), which was available for purchase in Leeds, England. E.R. Smith specifically made Colonial Press aware that the

Harris Press was a "later model" press; however, E.R. Smith advised Colonial Press that if the press was in "good condition" it may be an "ideal" press to purchase. Upon being so advised, E.R. Smith and Colonial Press began to engage in an ongoing and continuous dialogue regarding the Harris Press, and Colonial Press' possible purchase of the same.

E.R. Smith instructed Colonial Press to contact the owner of the Harris Press, Graphic Web Services, with offices in New York and Holland, in order to purchase the Harris Press directly. Colonial Press declined E.R. Smith's advice, and instead requested that E.R. Smith purchase the Harris Press for Colonial Press, and then sell the same to Colonial Press for a sum certain. After dialogue and negotiation, E.R. Smith agreed to Colonial Press' proposal and/or terms.

On or about June 3, 2004, at Colonial Press' request, E.R. Smith forwarded certain information, including an outline of scope of services/engagement and pricing, to Colonial Press regarding the Harris Press, and the contemplated or proposed transaction involving Colonial Press and E.R. Smith in connection with the purchase of the Harris Press.

Colonial Press agreed to purchase the Harris Press from E.R. Smith "as is where is", and, further, engaged E.R. Smith with respect to the mobilization, transportation, and installation of the Harris Press at a location to be determined by Colonial Press. (Per the parties' agreement, E.R. Smith was to purchase the Harris Press from Graphic Web Services, and, in turn, immediately sell the same to Colonial Press.)

Approximately one week later, at the direction of Colonial Press, and per the terms of E.R. Smith's engagement, E.R. Smith, by and through its then representative, Robert Tucker, traveled to England with Colonial Press' President, Thomas A. Visty ("Visty"), to "view" the Harris Press. Mr. Tucker was dispatched to service Colonial Press by and through E.R. Smith's principal place of business, Rhode Island. E.R. Smith was paid for these services, as well as reimbursed the travel expenses associated with Mr. Tucker's travel.

Notwithstanding that Mr. Tucker traveled to England, at the Colonial Press's request, to "view" the Harris Press, Colonial Press declined to expand the scope of E.R. Smith's engagement to include an inspection of the Harris Press. (E.R. Smith had offered to "inspect" the Harris Press for Colonial Press for $5,000.00.)

E.R. Smith contracted with Colonial Press for the sale of the Harris Press on a "used" and "as is where is" basis for the total sum of $275,000.00. Additionally, Colonial Press engaged E.R. Smith to perform an additional certain scope of work, which included the removal, insurance, containerization and transport of the Harris Press from England to Nebraska, the cost of installation of the same at Colonial Press's facility in La Vista, Nebraska, and a brief explanation to representatives of Colonial Press regarding the operation of the press systems once installation was completed.

The Colonial Press agreed to the terms and conditions of E.R. Smith's proposal, and, further, executed a contract reflecting the same, dated June 3, 2004.

Additionally, as part of its agreement with E.R. Smith, Colonial Press committed to fund its purchase of the Harris Press, including its transaction with E.R. Smith, by wiring funds to, and/or through, a Rhode Island banking institution, The Washington Trust Company, and directly into E.R. Smith's bank accounts at that institution. Upon the execution of the parties' agreement, Colonial Press wired funds sufficient to satisfy its initial payment requirements under the parties' contract to The Washington Trust Company for the benefit of E.R. Smith.

Thereafter, E.R. Smith dispatched appropriate personnel to Leeds, England to oversee certain of the disassembly, disassemble the remaining portion of, containerization and/or transport of the Harris Press from England to La Vista, Nebraska.

Upon the Harris Press being transported to, and received in, La Vista, Nebraska, E.R. Smith, together with its installation subcontractor, Graphics & Industrial Technologies, Inc. ("GITI"), substantially performed, and completed, the installation of the Harris Press. E.R. Smith had previously advised Colonial Press that it would be subcontracting the installation work. Notwithstanding, the same was done exclusively under E.R. Smith's supervision and at its direction. All points of contact for this process were by and through E.R. Smith's principal place of business, Rhode Island.

Despite E.R. Smith's and/or GITI's best efforts, however, the installation was somewhat delayed as a result of certain circumstances beyond the control of E.R. Smith and/or GITI. Notwithstanding the foregoing, E.R. Smith successfully performed, and

completed, its scope of work relative to the containerization, transportation, and installation of the Harris Press pursuant to the parties' contract.

Colonial Press has made a partial payment to E.R. Smith, under the terms and conditions of the parties' contract, for the labor performed and materials furnished by E.R. Smith in accordance with the agreement. However, as of this date, notwithstanding the fact that E.R. Smith has substantially performed, and completed, its scope of work, as well as, invoiced the balance of the contract amount due, Colonial Press has willfully failed and/or refused to remit the sums due and owing. As of this date, the total amount due E.R. Smith as a result of the parties' contract and transaction is the sum of $82,500.00.

At all times relevant hereto, the transactions described herein were initiated and/or originated at the request of Colonial Press. Further, the same were directed, negotiated, agreed upon, supervised and/or controlled by and through E.R. Smith's principal place of business, Rhode Island.

Moreover, at all times relevant hereto, E.R. Smith was located in Rhode Island, and, further, any and all of its representatives were resident to E.R. Smith's Rhode Island operation and location.

**Argument**

E.R. Smith acknowledges that in defending the subject motion to dismiss that it bears the burden of proving jurisdiction exists. See *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). It is incumbent upon E.R. Smith to make a *prima facie* showing of personal jurisdiction by "proffering evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Id*; see also, *Sawtelle v. Farrell*, 70 F.3d 381, 1386 n.1 (1st Cir. 1995). Generally, the record should contain specific allegations of jurisdictional facts, which the Court must construe in the plaintiff's favor. See *Scott v. Jones*, 984 F.Supp. 37, 42 (D.Me.1997), citing *Archibald v. Archibald*, 826 F.Supp. 26, 28 (D.Me.1993). Judicial analysis of personal jurisdiction is a "fact-sensitive inquiry". *Sawtelle*, 730 F.3d at 1388.

In the instant action, E.R. Smith submits that there are, in fact, the requisite predicates that compel this Court to exercise specific personal jurisdiction over Colonial Press in this matter.

Initially, this Court must assess whether Rhode Island's long-arm statute authorizes the exercise of jurisdiction. Thereafter, the Court must determine whether the exercise of jurisdiction under the long-arm statute complies with the constraints of due process required by the United States Constitution. *Hahn v. Vermont Law School*, 698 F.2d 48, 49–50 (1st Cir. 1983).

Rhode Island's long-arm statute provides, in pertinent part:

> Every foreign corporation...that shall have the necessary minimum contacts with the State of Rhode Island, shall be subject to the jurisdiction of the State of Rhode Island, and the courts of the state shall have such foreign corporations...amenable to suit in Rhode Island in every case not contrary to the provisions of the Constitution or the laws of the United States.

R.I. Gen. Laws § 9-5-33(a).

The Rhode Island long-arm statute is "co-extensive" with the due process clause of the United States Constitution[1]. See, generally, *CVS Corp. v. Taubman Ctrs., Inc.*, 225 F.Supp.2d 120, 123 (D.R.I. 2002); *Morel v. Estate of Davidson*, 148 F.Supp.2d 161, 166 (D.R.I. 2001).

Due process generally mandates that a forum's exercise of personal jurisdiction over a non-resident defendant be predicated upon "certain minimum contacts" with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1940). The applicable minimum contacts standard depends on whether the forum is exercising general or specific jurisdiction. *Scott*, 984 F.Supp. at 43.

In this particular matter, the facts require this Court to deny Colonial Press' motion to dismiss, sustain E.R. Smith's objection thereto, and assert specific personal jurisdiction over Colonial Press. Specific jurisdiction may be asserted in cases where the cause of action arises

---

[1] R.I. Gen. Laws § 9-5-33(a) permits the exercise of jurisdiction over non-resident defendants to the fullest extent allowed by the United States Constitution. *Rose v. Firstar Bank*, 819 A.2d 1247, 1250 (R.I. 2003) (citing *McKenney v. Kenyon Piece Dye Works, Inc.*, 582 A.2d 107, 108 (R.I. 1990)).

directly out of, or relates to, a defendant's forum-based contacts. *United Electrical, Radio & Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 - 1089 (1st Cir. 1992) (citing *Helicopteros Nacionales de Columbia v. Hall* 466 U.S. 408, 414 (1984)). The existence of specific jurisdiction "turns on an evaluation of the relationship between the defendant, the forum, and the litigation". *Helicopteros*, 466 U.S. at 414. The Court must examine this relationship to determine if it "forms a fair and reasonable foundation for the exercise of jurisdiction over the defendant." *Scott*, 984 F.Supp. at 43.

The First Circuit has developed the following tripartite test to evaluate the exercise of specific jurisdiction:

> First, the claim underlying the litigation must directly *arise out of, or relate to* the defendant's forum state activities. Second, the defendant's in-state activities must represent a *purposeful availment* of the privilege of conducting activities in the forum state, thereby evoking the benefits and protections of that state's laws and making the defendant's involuntary presence for the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the gestalt factors, be *reasonable*. (Emphasis supplied.)

*163 Pleasant Corp.*, 960 F.2d at 1089.

These three factors: relatedness, purposefulness, and reasonableness - must be satisfied for a court to exercise specific jurisdiction over a defendant. *Scott*, 984 F.Supp. at 43.

Generally, as E.R. Smith's claims do in this case, the plaintiff's claim(s) must arise out of or relate to the defendant's forum state contacts. The First Circuit has interpreted this requirement to be one of proximate cause, albeit to be applied with a flexible approach. See *Nowak v. Takhow Investments, Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996), *cert. denied*, 117 S. Ct. 1333 (1997). "This relatedness requirement is not met merely because a plaintiff's cause of action arose out of a general relationship between the parties; rather, the action must arise directly out of the specific contacts between the defendant and the forums state." *Sawtelle*, 730 F.3d at 1389. It is beyond dispute that Colonial Press' contacts with Rhode Island arise directly out of its discrete and specific transactions with E.R. Smith, all of which were negotiated, entered into, supervised, directed and/or controlled in and from this jurisdiction. Even more, each of the business dealings were initiated and/or prompted by Colonial Press.

In the instant matter, Colonial Press' contact with Rhode Island, and, more particularly, E.R. Smith, arise primarily by and through its regular and routine discussions, negotiations and/or the providing of business-related information, whether solicited or not, to a Rhode Island corporation by telephone, electronic communications and/or facsimile. Even more, Colonial Press consistently conferred and/or communicated with E.R. Smith using these mediums, including funding the transaction(s) electronically by and through a Rhode Island banking institution located in Rhode Island. "The transmission of information into [the forum state] by way of telephone or mail is unquestionably a contact for purposes of [personal jurisdiction] analysis. *Sawtelle*, 730 F.3d at 1389–1390. As such, it is clear that the communications that Colonial Press transmitted into Rhode Island are not ancillary to E.R. Smith's claim; rather, they "form an 'important [at least] material element of proof' in the plaintiff's case." *163 Pleasant Street Corp.*, 960 F.2d at 1089 (quoting *Marino v. Hyatt Corp.*, 793 F.2d 427, 430 (1st Cir. 1986)). For this reason, the first part of the First Circuit's three-part test is met in this case.

The second requirement for specific jurisdiction is purposefulness. The court must determine if "[the] defendant has 'engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just or reasonable'." *Sawtelle,* 70 F.3d at 391 (quoting *Rush v. Savchuk,* 444 U.S. 320, 329 (1980)). "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon defendants "random, isolated or fortuitous contacts with the forum state". *Id.* (quoting *Keeton v. Hustler Magazine, Inc.* 465 U.S. 770, 774 (1984)). In assessing the purposefulness of Colonial Press' contacts in Rhode Island, the Court must focus on two elements, voluntariness and foreseeability. See *Nowak*, 94 F.3d at 716.

The element of voluntariness ensures that the defendant's contacts with the forum state are not based on "the unilateral actions of another party or a third person." See *Nowak,* 94 F.3d at 716. It is plain on the facts that on more than one occasion Colonial Press intentionally and knowingly "came" to Rhode Island to transact business with a Rhode Island

company, and, in doing so, solicited E.R. Smith to transact business and/or engaged E.R. Smith to perform certain scopes of services on its behalf and/or for its benefit.

The element of foreseeability guarantees that "the defendant's contacts with the forum state [are] such that he should reasonably anticipate being hauled into court there." *Nowak*, 94 F.3d at 716. Colonial Press, on its own volition, came to Rhode Island to do business with a Rhode Island corporation. As such, it is both absolutely reasonable and foreseeable that should a dispute arise as a result of its business dealings in this forum that Colonial Press should expect to have any dispute adjudicated in a Rhode Island court. Colonial Press benefited from its Rhode Island contacts. As such, it must now have disputes arising out of those contacts determined by a Rhode Island court.

The third requirement for the exercise of jurisdiction is reasonableness.[2] The court assesses the reasonableness of subjecting a non-resident defendant to specific jurisdiction by weighing the so-called Gestalt factors, which include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting substantive social policies.

*163 Pleasant Street*, 960 F.2d at 1088 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

These five factors aid the Court in determining whether the exercise of specific personal jurisdiction "comports with notions of 'fair play and substantial justice'." *Nowak*, 94 F.3d at 717 (quoting *International Shoe*, 326 U.S. at 320).

In its papers, Colonial Press argues that its burden of appearing in Rhode Island in this matter is significant insofar as other than its business transactions with E.R. Smith, Colonial Press purportedly has no other relationship with Rhode Island. However, simply because

[2] "[W]here the defendant 'deliberately'...has created 'continuing obligations' between himself and residents of the forum,...he manifestly availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King v. Rudzewicz*, 471 U.S. 462, 475-476 (1985).

litigation in an out-of-state forum is usually a costly and inconvenient undertaking, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden". *Pritzker v. Yari* 42 F.3d 53, 64 (1st Cir. 1994). Colonial Press has not demonstrated nor is it capable of demonstrating any such special or unusual burden. Moreover, Colonial Press "appeared" in Rhode Island to transact business with a Rhode Island company, ostensibly for its benefit. Accordingly, it is both fair and reasonable to now compel Colonial Press to submit to the jurisdiction of a Rhode Island court insofar as given that Colonial Press has realized a measurable and appreciable benefit as a result of E.R. Smith's efforts, it must also be held accountable in Rhode Island for its own failings and/or breach arising out of those specific dealings.

The interest of the forum state weighs in favor of exercising jurisdiction. In analyzing this factor, the Court must determine whether or not Rhode Island has an interest in adjudicating this dispute. The determination is not a comparison between the forum state's interests and the interest of other jurisdictions; rather, it is "to determine whether the forum state has an interest". *Nowak*, 94 F.3d at 718. Rhode Island has a significant interest in determining this dispute. A non-resident corporation came to Rhode Island, unsolicited, to engage in business dealings with a Rhode Island company. Colonial Press benefited from its relationship with E.R. Smith. It would be patently unfair and highly prejudicial to E.R. Smith, a locally based business, to require E.R. Smith to go to another jurisdiction to enforce the very agreement under which it conferred a benefit upon another and it did not realize the benefit of its bargain as a result of the other party's failings and/or breach. Accordingly, Rhode Island has a significant interest in adjudicating the matter. Colonial Press availed itself to the protections of this forum. As such, it now must submit to its dispute resolution processes.

Finally, the third and fourth Gestalt factors also weigh in E.R. Smith's favor. In analyzing personal jurisdiction, the court does not engage in "judicial second-guessing" and defers to plaintiff's choice of forum as the best indicator of his own convenience. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 151 (1st Cir. 1995). A Rhode Island company has filed an action in Rhode Island to enforce its agreement with a non-resident defendant

arising out of a transaction born in Rhode Island. E.R. Smith should not now be advised that after substantially completing its performance under the parties' agreement, and conferring a benefit upon the non-resident that it must now go elsewhere to enforce its rights and seek protection(s) under the same agreement.

As for the fifth factor, given the facts in this matter, the interests of the sovereigns in the promotion of social policies favor the exercise of jurisdiction and the advancement of Rhode Island's policies and the protection of its residents. Notwithstanding, even if this Court were to determine that there exists a common interest of sovereigns in the promotion of social policies, which cuts in favor of either party, the Gestalt factors counsel in favor of exercising specific personal jurisdiction over Colonial Press. See, generally, *Scott*, 984 F.Supp. at 46.

In summary, E.R. Smith has met its burden of a *prima facie* showing of specific personal jurisdiction by alleging jurisdictional facts, which satisfy the requisite factors of relatedness, purposefulness, and reasonableness. As such, the exercise of specific personal jurisdiction is both fair and reasonable to Colonial Press in the instant matter, and, as such, Colonial Press' motion to dismiss for lack of personal jurisdiction must be denied.

**Conclusion**

WHEREFORE, for the foregoing reasons, E.R. Smith respectfully prays that this Court deny Colonial Press' motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, and sustain E.R. Smith's objection thereto, that this Court award to E.R. Smith any and all attorneys' fees, costs and other expenses associated with the preparation and prosecution of the within objection to Colonial Press' motion to dismiss, and that this Court award to E.R. Smith such other further relief as this Court may deem fair, just and reasonable.

Respectfully submitted,

E.R. Smith Associates

By its Attorneys,

W. Mark Russo (#3937)
Christopher M. Mulhearn (#5188)
**Ferrucci Russo P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778

George A. Comolli, Esq. (# 2730)
**Comolli & LaMountain, Ltd.**
15 Franklin Street
Westerly, RI 02891
Tel: (401) 348-6020
Fax: (401) 348-0999

**Certification**

I hereby certify that on this 6th day of May, 2005, I served a true and accurate copy of the within upon **Barbara S. Cohen, Esq.**, Goldenberg & Muri, LLP, 10 Weybosset Street, Providence, Rhode Island, 02903, by first-class, postage prepaid mail.

Darlene Morris

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| E.R. SMITH ASSOCIATES, INC., Plaintiff :<br>vs. :<br>THE COLONIAL PRESS, INC., Defendant : | C.A. No.: 05-CV-45-T |

**AFFIDAVIT OF FRANK ANDALORO**

I, Frank Andaloro, upon oath, depose and say as follows:

1. I am a domiciled resident and inhabitant of the State of Connecticut.

2. I am the President of E.R. Smith Associates, Inc. ("E.R. Smith"), the plaintiff in the above-named action. I was named as President of E.R. Smith in 1985, having first been employed by E.R. Smith in 1974. As such, I have personal knowledge of the facts stated herein, particularly those that give rise to and are the subject of the above-entitled litigation.

3. E.R. Smith is a duly organized and existing corporation pursuant to, and in accordance with, the laws of the State of Rhode Island. E.R. Smith is routinely, and continuously, engaged in the business of distribution, inspection, manufacture and/or repair of printing equipment, and related components and accessories. Any and all of E.R. Smith's commercial transactions and/or services originate from its principal place of business, Rhode Island, and, further, are directed and/or controlled from Rhode Island. All of E.R. Smith's operations are based in Rhode Island.

4. E.R. Smith's principal place of business is located at 83 Tom Harvey Road, Westerly, Rhode Island, 02891, and, further, E.R. Smith has been located at this address since 1990. This is also E.R. Smith's sole mailing address.

5. In or about 2003, defendant The Colonial Press, Inc. ("Colonial Press") was referred to E.R. Smith by a so-called "used" printing equipment broker located in California, Q.A.M., Inc. ("QAM"), with respect to the possible availability of a certain printing press located in the State of New Jersey, in which Colonial Press had some interest.

6. To the best of my knowledge, QAM recommended to Colonial Press that E.R. Smith perform certain services for Colonial Press regarding the New Jersey printing press, namely inspecting the same for Colonial Press and providing Colonial Press an assessment regarding this press equipment.

7. E.R. Smith had never previously transacted business of any nature whatsoever with Colonial Press, prior to being contacted by Colonial Press regarding the New Jersey press.

8. After an initial introduction and some discussion, which occurred exclusively by and through E.R. Smith's principal place of business, Colonial Press engaged the professional services of E.R. Smith to perform an inspection of the New Jersey printing press in or about October, 2003. The terms and conditions of E.R. Smith's engagement were memorialized in an agreement/purchase order agreed upon by and between E.R. Smith and Colonial Press at or about that same time.

9. E.R. Smith substantially performed, and completed, the inspection services for which it was engaged by Colonial Press relative to the New Jersey printing press, which included providing Colonial Press with an assessment of the New Jersey printing press. After reviewing

E.R. Smith's report and considering the same, Colonial Press declined to purchase this press equipment. A true and accurate copy of E.R. Smith's report is appended hereto as Exhibit A.

10. E.R. Smith's press inspector relative to the New Jersey press was dispatched from E.R. Smith's Rhode Island location.

11. In exchange for performing its inspection services and providing an assessment to Colonial Press, Colonial Press paid E.R. Smith the value of the inspection services performed.

12. In or about 2004, Colonial Press was exploring the possibility of purchasing a certain printing press located in the State of Texas, and, in the course of doing so, made E.R. Smith aware of the same.

13. In or about May, 2004, E.R. Smith advised Colonial Press with respect to the availability of a certain Harris M-110B web offset press (the "Harris Press"), which was available for purchase in Leeds, England. E.R. Smith specifically made Colonial Press aware that the Harris Press was a "later model" press; however, E.R. Smith advised Colonial Press that if the press was in "good condition" it may be an "ideal" press to purchase.

14. Upon being so advised, E.R. Smith and Colonial Press began to engage in an ongoing and continuous dialogue regarding the Harris Press, and Colonial Press' possible purchase of the same.

15. E.R. Smith instructed Colonial Press to contact the owner of the Harris Press, Graphic Web Services, with offices in New York and Holland, in order to purchase the Harris Press directly. Colonial Press declined E.R. Smith's advice, and instead requested that E.R. Smith purchase the Harris Press, and then sell the same to Colonial Press for a sum certain. After dialogue and negotiation, E.R. Smith agreed to Colonial Press' proposal and/or terms.

16. On or about June 3, 2004, at Colonial Press' request, E.R. Smith forwarded certain information, including an outline of scope of services/engagement and pricing, to Colonial Press regarding the Harris Press and the contemplated or proposed transaction involving Colonial Press and E.R. Smith in connection with the purchase of the Harris Press. A copy of E.R. Smith's June 3rd communication to Colonial Press is appended hereto as Exhibit B.

17. Colonial Press agreed to purchase the Harris Press from E.R. Smith "as is where is", and, further, engaged E.R. Smith with respect to the mobilization, transportation, and installation of the Harris Press at a location to be determined by Colonial Press. (Per the parties' agreement, E.R. Smith was to purchase the Harris Press from Graphic Web Services, and, in turn, immediately sell the same to Colonial Press.)

18. Approximately one week later, at the direction of Colonial Press, and per the terms of E.R. Smith's engagement, E.R. Smith, by and through its then representative, Robert Tucker, traveled to England with Colonial Press' President, Thomas A. Visty ("Visty"), to "view" the Harris Press. Mr. Tucker was dispatched to service Colonial Press by and through E.R. Smith's principal place of business, Rhode Island. E.R. Smith was paid for these services, as well as reimbursed the travel expenses associated with Mr. Tucker's travel.

19. Notwithstanding that Mr. Tucker traveled to England, at the Colonial Press's request, to "view" the Harris Press, Colonial Press declined to expand the scope of E.R. Smith's engagement to include a "full-blown" inspection of the Harris Press. (E.R. Smith had offered to "inspect" the Harris Press for Colonial Press for $5,000.00.) Even more, the Harris Press could not be operated insofar as it was electrically disconnected.

20. E.R. Smith contracted with Colonial Press for the sale of the Harris Press on a "used" and "as is where is" basis for the total sum of $275,000.00. Additionally, Colonial Press

engaged E.R. Smith to perform an additional certain scope of work, which included the removal, insurance, containerization and transport of the Harris Press from England to Nebraska, the cost of installation of the same at Colonial Press's facility in La Vista, Nebraska, and a brief explanation to representatives of Colonial Press regarding the operation of the press systems once installation was completed.

21. The Colonial Press agreed to the terms and conditions of E.R. Smith's proposal, and, further, executed a contract reflecting the same, dated June 3, 2004. A true and accurate copy of the parties' agreement is appended hereto as Exhibit C.

22. Additionally, as part of its agreement with E.R. Smith, Colonial Press committed to fund its purchase of the Harris Press, including its transaction with E.R. Smith, by wiring funds to, and/or through, a Rhode Island banking institution, The Washington Trust Company, and directly into E.R. Smith's bank accounts at that institution.

23. Upon the execution of the parties' agreement, Colonial Press wired funds sufficient to satisfy its initial payment requirements under the parties' contract to The Washington Trust Company for the benefit of E.R. Smith.

24. Thereafter, E.R. Smith dispatched appropriate personnel to Leeds, England to oversee certain of the disassembly, containerization and/or transport of the Harris Press from England to La Vista, Nebraska.

25. Upon the Harris Press being transported to, and received in, La Vista, Nebraska, E.R. Smith, together with its installation subcontractor, Graphics & Industrial Technologies, Inc. ("GITI"), substantially performed, and completed, the installation of the Harris Press. E.R. Smith had previously advised Colonial Press that it would be subcontracting the installation work. Notwithstanding, the same was done exclusively under E.R. Smith's supervision and at its

direction. All points of contact for this process were by and through E.R. Smith's principal place of business, Rhode Island.

26. Despite E.R. Smith's and/or GITI's best efforts, however, the installation was delayed as a result of certain circumstances beyond the control of E.R. Smith and/or GITI. In particular, because Colonial Press declined to engage E.R. Smith to perform an inspection of the Harris Press in advance of purchasing the same, certain equipment deficiencies and/or defects were discovered by E.R. Smith and/or GITI upon installation, which necessitated certain remedial or corrective work.

27. Notwithstanding the foregoing, E.R. Smith performed, and completed, its scope of work relative to the containerization, transportation, and installation of the Harris Press pursuant to the parties' contract.

28. Colonial Press has made a partial payment to E.R. Smith, under the terms and conditions of the parties' contract, for the labor performed and materials furnished by E.R. Smith in accordance with the agreement. However, as of this date, notwithstanding the fact that E.R. Smith has substantially performed, and completed, its scope of work, as well as, invoiced the balance of the contract amount due, Colonial Press has willfully failed and/or refused to remit the sums due and owing. As of this date, the total amount due E.R. Smith as a result of the parties' contract and transaction is the total sum of $82,500.00.

29. At all times relevant hereto, the transactions described herein were initiated and/or originated at the request of Colonial Press. Further, the same were directed, negotiated, agreed upon, supervised and/or controlled by and through E.R. Smith's principal place of business, Rhode Island.

30. Moreover, at all times relevant hereto, E.R. Smith was located in Rhode Island, and, further, any and all of its representatives were resident to E.R. Smith's Rhode Island operation and location.

31. To the extent that any representative of E.R. Smith performed any work for Colonial Press or part of any transaction(s) involving Colonial Press, he/she did so at the direction of E.R. Smith, and per the terms of its agreement with Colonial Press. At all times, E.R. Smith and its agents, representatives and/or employees were resident to E.R. Smith's principal place of business, Rhode Island.

32. E.R. Smith expressly entered into its contract with Colonial Press, and controlled or directed the parties' performance thereunder from its principal place of business, Rhode Island.

Frank Andaloro, President
E.R. Smith Associates, Inc.

State of Rhode Island
County of Providence

Subscribed and sworn to before me in the County of Providence, State of Rhode Island on this 6th day of May, 2005.

Margaret Stewart
Notary Public
My Commission Expires on: 3-23-09

(A)

October 23, 2003

Mr. Robert Wells
Colonial Press
10607 Harrison Street
Omaha, NE 68128-2900

Dear Bob:

Enclosed is our field report from Harris Edwards. Bob, he didn't see anything too earth shaking or unusual with the press. What he reports is probably standard for M110's or for that matter most press lines. The press has maintenance issues because of its age. Even the bearer grooves <u>do</u> <u>not</u> give us great concern.

What does have us concerned is the rust in the units. It is our opinion the gears should be removed and vapor blasted to remove the rust and scale. The concern is the scale would get into the bearings and major issues would start. Therefore, our recommendation at a minimum is to remove and vapor blast the gears and replace the bearings in the idler gears on the four rusted units only.

The other concern is the copper rolls in the units are worn thin. We recommend they should all be redone. Unfortunately, that tends to suggest fixing the journals, replacing the bushings, and installing double seals that prevent oil leaks. This would be costly and time consuming.

The units electrically need some cleaning up. We couldn't check for function, but the M110 unit has a simple electrical system.

The press drive is an area where you should have some concerns. That portion of the press was not tested and we don't know if the PLC logic is lost.

The folder has a number of minor issues that can be addressed easily. One major issue is a jaw cylinder that is collapsed. This cylinder should be removed and the segment reinforced and straightened. Unfortunately, this is a common problem with the M110 folder. Rust in the folder should be cleaned up. The folder needs maintenance and repairs. The chain drive assembly shows wear. You should change from chain to belt drive before making a chain repair.

Mr. Robert Wells
October 23, 2003
Page 2

We don't know what you're paying for the press, but the press is a typical M110 press with the typical problems/repairs for its age. I recommend Colonial Press should be prepared to budget approximately $100K to fix it up properly.

Please give me a call with any questions.

Respectfully,

E. R. Smith Associates, Inc.

Frank A. Andaloro
President

FAA:slg
Enclosure

cc: C. Andaloro

13344 (Ltr)

CC: file

(3)

E.R. SMITH ASSOCIATES INC.

June 3, 2004

Mr. Bob Wells
Colonial Press
10607 Harrison Street
Omaha, NE 68128

Dear Bob:

Please find the enclosed contract for the Harris M-110B Web Offset Press that is located in the UK. E. R. Smith Associates would like to propose that we send an ERSA qualified field technician along with a representative from your plant to inspect the press and review any issues at that time.

E. R. Smith Associates, Inc. would like to meet your expectations and we think the best way to do that is have a representative from Colonial present at the time of inspection. We estimate the cost to E. R. Smith Associates, Inc. to be approximately $5000.00 for the inspection. This cost would be refundable should you purchase the press.

The following is a list of services and press installation that will be included in the quotation below:

- The cost of removal, insurance, containerization and shipping the press to the USA / Nebraska for installation.
- The cost of a sixth unit purchased "as is where is". We currently have a unit available. It will need to be inspected in order to ensure that the unit conforms to the same or better integrity as the units in the UK.
- The cost of the installation includes the conversion of the services from English to USA. Convert the electrical system from 380 VAC 50 Hertz to 480 VAC 60 Hertz, Supply all new plumbing, re-wire the entire press installation, re-piping (both air and water) the entire press and Start-up of the press systems.
- Press systems will be explained to Colonial press along with the basic fundamentals of equipments operation.
- Operator training is not part of this quotation; should you not have a qualified M110 and finishing line operator on staff we strongly recommend that a qualified person be considered for hire. The skills required to run a finishing line are directly linked to experience. In other words to be successful from the start you need a knowledgeable employee to run the press system as purchased. The learning curve is substantial.

The total price (discounted) for services and the press installation as described ---------------------------------------------------------------$275,000.00

83 TOM HARVEY ROAD WESTERLY, RI 02891
PHONE 1-401-348-4000 FAX 1-401-348-4045

The price and the terms for the press sale is on a separate contract, the broker is selling it with terms that do not coincide with our standard terms. When purchasing a used press used dealers get 100% of their funds before you touch the press.

Terms of the services and press installation as described above:

10% with the purchase of the press
30% upon the start of the removal ~~and~~ installation
30% upon arrival of the press in the USA
20% upon the completion of the installation
10% 30 days from the start up

We estimate the installation time to be approximately five weeks from the day the equipment arrives at your facility. The installation is quoted with the enclosed responsibilities attached.

Thank you for the opportunity to quote, should you have any questions please call.

Regards,

E. R. Smith Associates, Inc.

Frank Andaloro
President

CC: C. Andaloro
R. Tucker

13574 (Ltr)

E. R. SMITH ASSOCIATES

June 3, 2004

Mr. Bob Wells
Colonial Press
10607 Harrison St
Omaha NE 68128

Dear Bob:

E. R. Smith Associates, Inc. is pleased to offer the following proposal for the *used as is where* is Harris M-110B Web Offset Press (Age 1988, web width 26" and a cut-off of 17.75") consisting of the following equipment:

One (1) Butler Splicer including Datamat
One (1) Harris Infeed
One (1) EST Web Guide
Five (5) Harris Printing units with Duotrol and Telecolor
One (1) QuadTech Register system RGS IV
One (1) MEG Sigma Plus 50 dryer
One (1) Harris three drum chill stand
One (1) EST Web Guide
One (1) RYCO Silicone Applicator
One (1) Harris M-110 Double Chopper Folder
One (1) Oxy Dry Sheeter Model # Serial #
One (1) Plate Bender
One (1) Technotrans Water circulation system
One (1) Scheffer Inline Pattern Glue- & Pattern Perforator Unit
One (1) Domino Ink Jet System model Solo 5/5 auto 2 print heads
One (1) Orion ink level control.
• One (1) Angle Bar on Scheffer equipment located parallel to the press line
One (1) Rotary Die cutter/Perforator.
Five (5) Plow Stations
One (1) Rotary Cutter
One (1) Conveyor to Baldwin Stacker SOV 128

The sale price is $ 275,000.00. (*As is Where is – UK*). Sales, use, excise taxes, or other applicable tariffs are the responsibility of the buyer.✓

The buyer has to provide a refundable deposit of 20% wired to the account of E. R Smith Associates, Inc. to be used as portion of the acquisition price.

Payment To Be wire Transferred 6/17/04.

FAXED

Page 2

WIRE TRANSFER INFORMATION:

Washington Trust Company
23 Broad Street
Westerly, RI 02891
Account # 202-232-1
Routing #: 011500858

Terry Asst to Wire To

The buyer or an appointed company designated by the buyer has the chance to inspect the equipment at the location in the UK. Should the above-mentioned press not be accepted after inspection, the seller will return the full refundable deposit immediately. The inspection has to take place before June 15, 2004.

TERMS OF PAYMENT:

10% refundable deposit due now
90% before dismantling in the location in the UK

Ownership of the equipment remains with the seller until the time that the seller has received the full and cleared payment of the buyer.

The above equipment is used. This equipment is being sold on an "as is where is" basis. The seller makes no warranties whatsoever, either expressed or implied, including warranties of merchantability and fitness for particular purpose and the buyer shall have no recourse whatsoever against seller, for defective or unusable parts, accessories, equipment or machinery.

In Witness whereof, the seller has caused this instrument to be executed by the proper party thereunto duly authorized and the buyer has caused this instrument to be executed by the proper party thereunto duly authorized.

| SELLER: | BUYER: |
|---|---|
| E. R. Smith Associates, Inc. | Colonial Press |
| By: ____________ | By: [signature] |
| Frank Andaloro, President | Tom Visty |
| Date: ____________ | Date: 6/16/04 |

13574 (Ltr)




MECHANICAL AND ELECTRICAL INSTALLATION

The installation includes E. R. Smith Associates, Inc., supplied equipment and the customer purchased equipment. All equipment will be installed in the manner accepted by industry standards and in accordance with the manufacturer.

The mechanical installation will consist of unloading, placing, lining up, leveling, and mounting of all the auxiliary components (web break detectors, cutoff controls, etc.).

All mechanical components and engineering drawings to be supplied and installed by E. R. Smith Associates, Inc. All mechanical components not supplied by E. R. Smith Associates, Inc., or modifications to any existing mechanical components necessary will be invoiced to the customer on a time and material basis.

The electrical installation will begin from a customer-supplied press power distribution panel and includes all 3-phase wiring from this panel to the press and auxiliary equipment. The distribution panel and all drive control cabinets to be located within 10 feet of the main drive motor. E. R. Smith Associates, Inc., will also wire all 100V control and other voltage control wiring on the press and auxiliary equipment. All wireways to the Nema 1 type with dividers. E. R. Smith Associates, Inc., is to supply all new materials to wire the machine.

All installation drawings, schematics, wire run lists, etc., to be supplied by E. R. Smith Associates, Inc.

E. R. Smith Associates, Inc. will guarantee the work performed will meet all local, national and manufacturer codes. E. R. Smith Associates, Inc., cannot be held liable for any inherent manufacturer or auxiliary manufacturer code violations, including the U.L. listing.




*PRESS INSTALLATION*
*CUSTOMER REPONSIBILITIES*

1) Schedule to allow sufficient time for installation.

2) Supply designated area or receptacle for debris disposal. Actual disposal of debris excluding hazardous waste from either job site by others.

3) Assign an on-site representative to verify in writing all levels, alignment and tram readings, as well as to make other checks pertinent to the installation and "sign-off" upon completion of the project.

4) Provide free, clear, and unobstructed access to the press, as well as proper environment for the installation. This would include adequate staging and work areas, as well as power, lights, heat and restroom facilities. Also, the press site area should be clear of any other contractors, products, equipment or any other items not associated with the installation. Provide enough doorway clearance to accommodate the rigging and installation process.

5) Any delays or interruptions caused by others, including but not limited to hindrances caused by organized labor, shipping delays, faulty manufacturing, acts of God, etc. could cause delays to the installation and/or extra charges.

6) Provide within ten feet (10') of press installation for distribution and connection by E. R. Smith Associates, Inc., of all utilities (i.e. chilled water, compressed air, main electric, medium pressure gas, low pressure air and industrial water).

7) Furnish electrical power distribution panel within ten feet (10') of the press drive controller. with Proper Voltage

8) Provide adequate dock space, minimum opening required is 10' x 14'.