UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| E.R. SMITH ASSOCIATES, INC. | : | |
| | : | |
| v. | : | C.A. No. 05-45T |
| | : | |
| THE COLONIAL PRESS, INC. | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

This matter is presently before the Court on a Motion to Dismiss (Document No. 8) (the "Motion") filed by Defendant, The Colonial Press, Inc. ("Defendant" or "Colonial"). Colonial seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(2) on the ground that this Court lacks personal jurisdiction over it. Plaintiff, E.R. Smith Associates, Inc. ("Plaintiff" or "Smith"), filed a timely Objection to Colonial's Motion to Dismiss (the "Objection") (Document No. 15).

The Motion has been referred to me for preliminary review, findings and recommended disposition. See 28 U.S.C. § 636(b)(1)(B); D.R.I. Local R. 32(c). A hearing was held on June 2, 2005. After reviewing the Motion and the Objection, in addition to performing independent research, this Court recommends that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2) (Document No. 8) be DENIED.

**Facts**

Smith is a Rhode Island corporation with its principal place of business in Westerly, Rhode Island. See Compl. ¶ 1. It has more than eighty employees and routinely handles special engineering projects for press manufacturers and printers around the world. See Ex. A to Def.'s Motion.

Colonial, a commercial printer and lithographer, is a Nebraska corporation, having a principal place of business in La Vista, Nebraska. Compl. ¶ 2.

Colonial was initially referred to Smith in 2003 by Q.A.M., Inc. ("QAM"), a "used" printing equipment broker located in California. This referral was in connection with the possible acquisition by Colonial of a printing press located in New Jersey. See Affidavit of Frank Andaloro ("Andaloro Aff.") ¶ 5. After Colonial contacted Smith and discussed the New Jersey press, Colonial engaged the services of Smith to perform an inspection of the New Jersey press in October 2003. See id. ¶¶ 7-8. The terms and conditions of the agreement were memorialized in a contemporaneous agreement/purchase order. See id. ¶ 8. After reviewing Smith's report, Colonial decided not to purchase the New Jersey press. See id. ¶ 9.

In 2004, Colonial was considering purchasing a printing press located in Texas and contacted Smith to make it aware of this interest. See id. ¶ 12. After some preliminary discussions, the Texas press was apparently not pursued any further. In or about May 2004, however, Smith advised Colonial that a Harris M-110B web offset press (the "Harris Press") was available for purchase in Leeds, England. See id. ¶ 13. Smith and Colonial then engaged in an "ongoing and continuous dialogue" regarding Colonial's possible purchase of the Harris Press. See id. ¶ 14. Smith instructed Colonial to contact the seller of the Harris Press in order to purchase it directly. See id. ¶ 15. Colonial declined Smith's suggestion and requested that Smith purchase the Harris Press directly from the seller, and then sell the Harris Press to Colonial for a sum certain. See id.

After some discussion, Smith agreed to Colonial's proposal. See id. On or about June 3, 2004, at Colonial's request, Smith sent Colonial information regarding the Harris Press, including "an outline of scope of services/engagement and pricing," and the proposed transaction between the

two companies. See id. ¶ 16. Colonial agreed to purchase the Harris Press from Smith "as is where is." See id. ¶ 17. Approximately one week later, a representative of Smith traveled to England with Colonial's President to inspect the Harris Press. See id. ¶ 18.

Ultimately, Smith contracted with Colonial for the sale of the Harris Press on a "used" and "as is where is" basis for $275,000.00. Smith was also hired to remove, insure, containerize and transport the Harris Press from England to Colonial's plant in Nebraska. See id. ¶ 20. Colonial agreed to the terms and conditions of the proposal, and the parties signed a contract dated June 3, 2004. See id. ¶ 21. The contract provided that ownership of the Harris Press would remain with Smith until Smith received "full and clear payment" from Colonial. Pl.'s Ex. C. Colonial wired payment under the contract to an account at Smith's Rhode Island bank. Andaloro Aff. ¶ 22.

During the installation of the Harris Press in Nebraska, the parties had a disagreement concerning the condition of the Harris Press and work which had to be done prior to the installation. See Compl. ¶ 10. After a delay, the Harris Press is currently operating in Colonial's facility in Omaha, Nebraska. Id. ¶¶ 11, 12. Smith alleges that there is an outstanding balance of $82,500.00 owed to it by Colonial that, despite demands, remains unpaid. See id. ¶ 13.

**Standard of Review**

It is well established that the burden rests with the plaintiff to make a prima facie showing to withstand a challenge to personal jurisdiction. Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001) (citing Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83-84 (1st Cir. 1997)). See also, Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002). In assessing the Plaintiff's prima facie case, the Court must accept as true the "plaintiff's (properly documented) evidentiary proffers" and construe them "in the light most congenial to the plaintiff's

jurisdictional claim." See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34, 51 (1st Cir. 1998). See also Trio Realty, Inc. v. Eldorado Homes, 350 F. Supp. 2d 322, 325 (D.P.R. 2004) (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)) (the court "draws the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff.") In setting forth the prima facie case, the plaintiff is required to bring to light credible evidence and "cannot rest upon mere averments, but must adduce competent evidence of specific facts." Barrett, 239 F.3d at 26 (citing Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995)).

Because Colonial is not present in Rhode Island, it is subject to personal jurisdiction in this Court only if it has certain minimum contacts with the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citation omitted). Whether sufficient minimum contacts exist depends on the quality and nature of Colonial's activity, but it is essential that there be some act by which Colonial purposefully availed itself of the privilege of conducting business with the forum state, thus invoking its benefits and protections. Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995). The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random', 'fortuitous', or 'attenuated' contacts..." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1984). In applying the minimum contacts analysis, the courts recognize two types of jurisdiction – specific and general.

**A. General and Specific Jurisdiction**

The initial inquiry is whether the Court has general or specific jurisdiction. In this case, there is no general jurisdiction over Colonial. In order for a court to find that there is general jurisdiction over a defendant, a court must find the defendant's contacts with the forum to be "continuous and systematic." See Barry v. Mortgage Servicing Acquisition Corp., 909 F. Supp. 65, 74 (D.R.I. 1995). Smith does not argue that this Court has general jurisdiction over Colonial, and upon reviewing the facts, it is clear that Colonial has not had continuous or systematic contacts with Rhode Island.

Although there is no general jurisdiction over Colonial, Smith contends the Court should find that there is specific jurisdiction over Colonial. The Supreme Court has stated that: "where plaintiff's claims 'arise out' of or are 'directly related' to defendant's contacts with the forum state, a court exercises specific jurisdiction." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, n.8 (1984). In the analysis of specific jurisdiction, the court applies two general rules. First, the forum in which the federal district court sits must have a long-arm statute that grants jurisdiction over the defendant. See Barrett, 239 F.3d at 26. Second, "the plaintiff must...show sufficient minimum contacts such 'that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution.'" LaVallee v. Parrot-Ice Drink Prod. of Am., Inc., 193 F. Supp. 2d 296, 302 (quoting Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994)). Rhode Island's long-arm statute, R.I. Gen. Laws § 9-5-33, authorizes a court to exercise jurisdiction over non-resident defendants to the fullest extent permitted by the United States Constitution. See Donatelli v. Nat'l Hockey League, 893 F.2d 459, 461 (1st Cir. 1990); see also Morel ex rel. Moorehead v. Estate of Davidson, 148 F. Supp. 2d 161 (D.R.I. 2001). Accordingly, the Court need only decide whether the assertion of personal jurisdiction over Colonial comports with due process principles.

### B. Due Process Considerations

Where specific jurisdiction is asserted, the First Circuit has developed a three-prong test for analyzing the due process considerations for the existence of specific personal jurisdiction:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992). In order for a court to exercise specific personal jurisdiction, all three factors – relatedness, purposefulness and reasonableness – must be satisfied.

As part of the minimum contacts analysis, the First Circuit "distinguishes between active and passive out-of-state purchasers." Howell Labs., Inc. v. Clear Channel Communications, Inc., 751 F. Supp. 258, 260 (D. Me. 1990). The First Circuit has also stated the importance of: "evinc[ing] a special concern for formulating a jurisdictional rule that would protect wholly passive purchasers, who do no more than place an order with an out of state merchant and await delivery." Id. (quoting Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 931-32 (1st Cir. 1985)). Merely ancillary activity by a defendant would not allow a court to exercise personal jurisdiction. It must "...rise above that of a purchaser who simply places an order and sits by until the goods are delivered." Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1084 (1st Cir. 1973). As part of its analysis, this Court will consider whether Colonial acted as an active or passive purchaser.

**1. Relatedness**

The first prong of the due process test is a consideration of relatedness. To meet the relatedness requirement of specific personal jurisdiction, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." United Elec., 960 F.2d at 1089. Relatedness is intended to be a "flexible, relaxed standard." Sawtelle, 70 F.3d at 1389 (citing Pritzker, 42 F.3d at 61). In a contract case, relatedness is established if the defendant's contacts with the forum "were instrumental either in the formation of the contract or in its breach." Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999).

In the present case, it appears that Colonial's contacts with this District were instrumental in the formation of its contract with Smith. Colonial engaged in an "ongoing and continuous dialogue" with Smith concerning the purchase of the Harris Press. Andaloro Aff. ¶ 14. At the hearing, Colonial's counsel indicated that this dialogue "consisted of...facsimile communication, telephone communication, and electronic communication." The Supreme Court has held that "[t]he transmission of information into [the forum state] by way of telephone or mail is unquestionably a contact for purposes of [personal jurisdiction] analysis." Sawtelle, 70 F.3d at 1389-1390. These communications resulted in the acquisition of the Harris Press by Smith and a contract between Smith and Colonial for the purchase, sale, transport and installation of the Harris Press. In addition, the alleged breach of contract arose directly out of Colonial's above-mentioned contacts with Smith occurring in this District. As such, this Court is satisfied that Colonial has made sufficient contacts with this District and that these contacts directly relate to the claim.

**2. Purposeful Availment**

The second prong of the due process test considers whether a defendant has "engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable." Id. at 1391 (quoting Rush v. Savchuk, 444 U.S. 320, 329 (1980)). Two factors are considered in the purposeful availment analysis: voluntariness and foreseeability. See Ticketmaster, 26 F.3d at 207. "To demonstrate purposeful availment, the plaintiff must proffer 'evidence that the defendant[s] actually reached out to the plaintiff's state of residence to *create* a relationship – say, by solicitation, – the mere fact that the defendant[s] willingly entered into a tendered relationship does not carry the day.'" PFIP, LLC v. Planet Fitness Enter., Inc., No. 04-250-JD, 2004 WL 2538489, at *7 (D.N.H. Nov. 10, 2004) (quoting Phillips Exeter, 196 F.3d at 292). The requirement "depends upon the extent to which the defendants voluntarily took action that made it foreseeable they might be required to defend themselves in court in [the forum state]." Id. (citing Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 11 (1st Cir. 2002)).

Colonial argues that it "did not solicit or otherwise reach out to Smith in connection with the services in dispute." Def.'s Mem. at 10. This is not entirely accurate. Colonial reached out to Smith in the first place to create a working relationship between them. The initial contact concerning the New Jersey Press was initiated by Colonial to Smith in this District. See Andaloro Aff. ¶ 5. This initial contact created a business relationship between the two parties whereby it became appropriate for Smith to inform Colonial of any available presses it might discover. In accordance with this, the record states that at a later date, when Colonial was considering the possibility of acquiring a press in Texas, it "made [Smith aware] of the possibility." Andaloro Aff. ¶ 12. This action by Colonial is highly indicative of the kind of business relationship described above. Based on the prior dealings

between the parties and in light of the nature of the business, it is apparent that Colonial reached out to Smith in order to create a business relationship to assist in its search for and acquisition of an appropriate printing press, and not vice versa. Smith has proffered sufficient evidence to meet the voluntariness requirement.

Another element to consider is whether or not Colonial's "participation in the economic life of [Rhode Island]" rose above that of a passive purchaser "who simply place[d] an order and [sat] by until the goods were delivered." WPI Electronics, Inc. v. Super Vision Int'l, Inc., No. C-90-426-B, 2000 WL 1466118, at *6 (D.N.H. Jan. 27, 2000) (citing Whittaker, 482 F.2d at 1084 (citing In-Flight Devices Corp. v. Van Dusen Air, Inc., 466 F.2d 220, 232-233 (6th Cir. 1972)). This Court finds that the facts in this case indicated that Colonial acted as more than just a passive purchaser. The contract at issue was the result of a negotiation process between the parties. The record reflects a series of communications between the parties that led to Colonial's acquisition of the Harris Press. In fact, after engaging in an "ongoing and continuous dialogue," Andaloro Aff. ¶ 14, Smith advised Colonial to purchase the Harris Press directly from the owner. Id. ¶ 15. Colonial declined, and "requested that E.R. Smith purchase the Harris Press, and then sell the same to Colonial Press for a sum certain." Id. Smith agreed after "dialogue and negotiation" and entered the chain of ownership of the Harris Press. Id.

In In-Flight Devices, 466 F.2d at 233, the Sixth Circuit stated that "to the extent the buyer vigorously negotiates, perhaps dictates, contract terms, inspects production facilities and otherwise departs from the passive buyer role it would seem that any unfairness which would normally be associated with the exercise of long-arm jurisdiction over him disappears." (emphasis added). This Court agrees and considers Colonial's action to be an affirmative move to take an active role in the

purchase and to dictate the structure of the transaction to Smith. Colonial did not merely "sit back" and buy the Harris Press from Smith. Instead, it took an active role in negotiating the terms of the purchase by requesting that Smith itself buy the Harris Press and then sell it back to Colonial. Colonial further engaged Smith "with respect to the mobilization, transportation, and installation of the Harris Press at a location to be determined by Colonial." Id. ¶ 17. Smith contracted with Colonial to then purchase the Harris Press on a "used" basis for the sum of $275,000.00. Id. ¶ 20. Accepting all of these facts in the light most favorable to Smith as required, the Court finds Colonial acted as an active, rather than passive, purchaser. The parties' contract involved the sale of a complex piece of machinery costing more than a quarter of a million dollars and was the product of a significant amount of negotiation. Colonial actively and voluntarily participated in the economic life of this District by seeking out Smith and directing it to purchase the Harris Press for resale to Colonial.

The issue of foreseeability "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." Burger King, 471 U.S. at 475. There must be evidence of "a voluntary decision by the defendant to inject itself into the local economy as a market participant." Microfibres, Inc. v. McDevitt-Askew, 20 F. Supp. 2d 316, 321 (D.R.I. 1998). This analysis involves looking at essentially the same facts as the analysis for the purposeful availment prong. Here, the contacts were clearly not "random" or "attenuated." Colonial took an active role in the purchase of expensive and complex equipment through a Rhode Island party, even negotiating the terms of its contract. They did so over an extended period of time. The possibility of having to litigate in a Rhode Island court should not come as a surprise to Colonial.

**3. Gestalt Factors**

The third prong of the test involves a determination of whether or not the Court's exercise of jurisdiction over Defendant is reasonable. United Elec., 960 F.2d at 1089. In making this determination, the Court considers the following "Gestalt" factors. See, e.g., World-Wide Volkswagen v. Woodson, 444 U.S. 286, 292 (1980).

**(a) Defendant's Appearance**

In order for Defendant to show that he is unduly burdened by appearing in the forum state, he must "...demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. Courts have recognized, however, that it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction. See id. at 64. Thus, absent a showing of an undue burden, mere economic considerations are insufficient. Colonial alleges no special burden. As such, this factor weighs in favor of this Court exercising jurisdiction over Colonial.

**(b) Forum State's Interest**

In order to determine the forum state's interest in hearing the dispute, this Court should "not...compare [its] interest to that of some other jurisdiction...." Foster, 46 F.3d at 151 (citing Burger King, 471 U.S. at 483 n.26. Accordingly, even though Nebraska may have some interest in litigating this case, this Court is not called on to weigh the forums' respective interests. Here, Rhode Island does have interest in seeing that a financial dispute involving a long-time resident company performing services for an out-of-state defendant is resolved in this forum. This factor weighs in favor of exercising jurisdiction over Colonial.

**(c) Plaintiff's Interest in Relief**

This factor clearly weighs in Smith's favor. The goal is to ensure that a plaintiff is able to obtain "convenient and effective relief." Pritzker, 42 F.3d at 64. Central to this goal is that the court "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." Id. (citing Ticketmaster, 26 F.3d at 211. Here, it is readily apparent that Smith wishes to litigate in this forum.

**(d) Judicial System's Interests**

The focus of this factor is on the "judicial system's interest in obtaining the most effective resolution of the controversy." Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 718. Even though the Harris Press and some of the potential witnesses are located in Nebraska – which would weigh in favor of litigation in that forum – some of the potential witnesses and records are also located in Rhode Island and North Carolina. Therefore, wherever this case is litigated, someone will have to travel. Accordingly, although this factor tips slightly in Colonial's favor, it does not outweigh the other factors weighing heavily in Smith's favor.

**(e) States' Common Interest**

The last Gestalt factor "addresses the interests of the affected governments in substantive social policies." Id. at 719. In considering this factor, "the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." Sawtelle, 70 F.3d at 1395 (quoting Burger King, 471 U.S. at 473). Rhode Island does have an interest in ensuring that its resident companies / employers are protected from harm by out-of-state defendants. Accordingly, this factor weighs in favor of this Court exercising jurisdiction over Colonial.

None of the Gestalt factors weigh heavily enough in Colonial's favor to suggest to this Court that they outweigh the analysis with regard to the first two prongs of the jurisdictional test. On the whole, the Gestalt factors support the exercise of personal jurisdiction over Colonial.

**Conclusion**

For the reasons discussed above, this Court finds that all prongs of the three-factor test for specific personal jurisdiction are satisfied and that this Court may properly exercise personal jurisdiction over Colonial. Accordingly, I recommend that Defendant's Motion to Dismiss Pursuant to Rule 12(b)(2) for Lack of Personal Jurisdiction (Document No. 8) be DENIED. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

LINCOLN D. ALMOND
United States Magistrate Judge
June 24, 2005