UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| E.R. SMITH ASSOCIATES, INC., Plaintiff : | |
| vs. : | C.A. No.: 05-CV-45-T |
| THE COLONIAL PRESS, INC., Defendant : | |

**Plaintiff, E.R. Smith Associates, Inc.'s Pre-Trial Memorandum**

NOW COMES Plaintiff, E.R. Smith Associates, Inc. ("E.R. Smith"), by and through counsel, and hereby submits the within Pre-Trial Memorandum in accord with this Court's April 20, 2007 Pre-Trial Order.

**Parties**

1. Plaintiff, E.R. Smith is a duly organized and existing corporation pursuant to the laws of the State of Rhode Island.

   Trial Counsel: Christopher M. Mulhearn, Esq.

2. Defendant, The Colonial Press, Inc. ("Colonial Press"), is a duly organized and existing corporation pursuant to the laws of the State of Nebraska.

   Trial Counsel: Barbara S. Cohen, Esq.

**Pertinent Facts**

E.R. Smith is a Rhode Island company routinely, and continuously, engaged in the business of the distribution, inspection, manufacture and/or repair of printing equipment, and related components and accessories. E.R. Smith's operations are based in Rhode Island, and it has a principal place of business is located at 83 Tom Harvey Road, Westerly, Rhode Island, 02891.

In or about 2003, Colonial Press was referred to E.R. Smith by a so-called "used" printing equipment broker located in California, Q.A.M., Inc. ("QAM"), with respect to the possible availability of a certain printing press located in the State of New Jersey in which Colonial Press had some interest. QAM recommended to Colonial Press that E.R. Smith perform certain services for Colonial Press regarding the New Jersey printing press, namely conducting a technical inspection or audit of the same for Colonial Press, and, further providing Colonial Press a technical assessment and report regarding the condition and functionality of the subject equipment. Prior to this initial contact E.R. Smith had never previously transacted business of any type or nature with Colonial Press prior to being contacted by Colonial Press regarding the so-called New Jersey press.

After an initial introduction and some discussion with E.R. Smith regarding its qualifications, experience and a proposed scope of work, Colonial Press ultimately engaged the professional services of E.R. Smith to undertake and complete a technical inspection or audit of the New Jersey printing press in or about October, 2003. The terms and conditions of E.R. Smith's engagement and scope of work were memorialized in an agreement/purchase order entered into, and agreed-upon, by and between E.R. Smith and Colonial Press at or about that same time.

E.R. Smith dispatched a qualified technician to New Jersey to undertake and complete a technical inspection or audit of the so-called New Jersey press. E.R. Smith, by and through its qualified technician, Harris Edwards ("Edwards"), performed, and completed, the inspection services for which it was engaged by Colonial Press relative to the New Jersey printing press, which included providing Colonial Press with a technical assessment and report in regard to the condition and functionality of the New Jersey printing press. After a review of E.R. Smith's so-

called inspection report, and considering the same, Colonial Press declined to purchase the press equipment from New Jersey.

In consideration of E.R. Smith performing its inspection services, and providing a technical assessment and report to Colonial Press with respect to the New Jersey press, Colonial Press paid E.R. Smith the value of the scope of work performed with respect to the same. Thereafter, E.R. Smith's scope of engagement relative to the New Jersey press terminated.

In or about 2004, Colonial Press was exploring the possibility of purchasing a certain Harris M-110 printing press located in Texas, and, in the course of doing so, made E.R. Smith aware of the same. Notwithstanding, however, E.R. Smith had no principal involvement on behalf of Colonial Press relative to the Texas press.

Subsequently, in or about May, 2004, E.R. Smith had occasion to communicate with Colonial Press in regard to the availability of a certain Harris M-110B web offset press (the "Harris Press"), which was available for purchase in Leeds, England through its then owner, Graphic Web Services ("GWS"). E.R. Smith had reason to believe that the Harris Press was being sold as part of some type of insolvency procedure. Notwithstanding, however, E.R. Smith specifically made Colonial Press aware that the Harris Press was a "later model" press, it provided Colonial Press with the equipment list and specifications with respect to the Harris Press that were furnished by GWS, and it apprised Colonial Press as to the other relevant information and/or assessments as to level of operation and quality of product that had been provided to E.R. Smith by GWS relative to the Harris Press. Upon being so advised, GWS, E.R. Smith and Colonial Press began to engage in a dialogue with respect to the Harris Press, and Colonial Press' possible purchase of the same.

At or about the same time, E.R. Smith suggested to Colonial Press that it negotiate directly with the owner of the Harris Press, GWS, in connection with a potential purchase the Harris Press

from GWS. Notwithstanding, however, Colonial Press declined E.R. Smith's suggestion, and instead insisted that E.R. Smith purchase the Harris Press from GWS, and, in turn, sell the Harris Press to Colonial Press for a sum certain. After dialogue and negotiation, and E.R. Smith tendered to Colonial Press a proposal relative to the purchase of the Harris Press. In particular, E.R. Smith agreed to purchase the Harris Press from GWS, and then, in turn, immediately sell the same to Colonial Press.

On or about June 3, 2004, at Colonial Press' request, E.R. Smith forwarded certain information, including an outline of a purchase contract with respect to a purchase and sale of the Harris Press to Colonial Press, and the contemplated transaction involving the same.

Moreover, in agreeing to purchase the Harris Press from E.R. Smith for the total sum of $275,000.00, Colonial Press agreed to purchase the Harris Press from E.R. Smith in "as is where is" condition, without warranty covenants.

At or about the same time, E.R. Smith and Colonial Press entered into a separate agreement whereby Colonial Press engaged E.R. Smith to supervise the disassembly, containerization, transport and installation of the Harris Press at Colonial Press' Nebraska facility. The so-called "installation" contract was for a fixed sum in the amount of $275,000.00 Originally, the installation of the Harris Press was estimated to take approximately five (5) to six (6) weeks.

At or about the same time, in anticipation of Colonial Press' pending purchase of the Harris Press, E.R. Smith's sale representative, Robert Tucker, traveled to England with Colonial Press' President, Thomas A. Visty ("Visty"), to "view" or observe the Harris Press, but not to perform a technical inspection or audit. Upon arriving in England, Tucker and Visty observed the Harris Press. However, in doing so, Tucker and Visty found the Harris Press to be partially

disassembled and, further, the building that housed the Harris Press to be without any power source.

Moreover, notwithstanding that Mr. Tucker traveled to England, at the Colonial Press' request, to "view" the Harris Press, and the fact that Colonial Press was contemplating a purchase of the Harris Press, Colonial Press declined to expand the scope of E.R. Smith's engagement to include a technical inspection or audit of the Harris Press. Indeed, in its initial proposal relative to the purchase of the Harris Press, E.R. Smith had offered to "inspect" the Harris Press for Colonial Press for the sum of $5,000.00. Notwithstanding, Colonial Press neither accepted E.R. Smith's offer to perform a technical inspection or audit of the Harris Press in England, nor remitted the required $5,000.00 sum for the same. Simply put, Colonial Press wholly disregarded E.R. Smith's suggestion to perform any technical inspection or audit of the Harris Press.

It is beyond dispute that E.R. Smith contracted with Colonial Press for the sale of the Harris Press on a "used" and "as is where is" basis, without warranty covenants, for the total sum of $275,000.00. Additionally, by way of a separate sum certain contract, Colonial Press engaged E.R. Smith to perform an additional certain scope of work, which included the disassembly, removal, containerization, transport and installation of the Harris Press in Nebraska, and instruction of the operation of the press systems to appropriate personnel at Colonial Press once installation was completed, again for a fixed sum of $275,000.00.

Upon returning from England, and despite not requesting, directing or otherwise requiring E.R. Smith perform inspection of the Harris Press, even though E.R. Smith had suggested the same, Colonial Press, by and through Visty, committed to E.R. Smith for the purchase of the Harris Press for the total amount of $275,000.00, and entered into the installation services contract. Thereafter, E.R. Smith dispatched appropriate personnel to Leeds, England to

supervise certain of the remaining disassembly of the Harris Press, and containerization and/or transport of the same from England to La Vista, Nebraska.

Upon the Harris Press being transported to, and received in, La Vista, Nebraska, E.R. Smith, by and through its installation subcontractor, Graphics & Industrial Technologies, Inc. ("GITI"), substantially performed, and completed, the installation of the Harris Press. E.R. Smith had previously advised Colonial Press that it would be subcontracting the installation work. Notwithstanding, the same was done exclusively under E.R. Smith's supervision, and at its direction.

Despite E.R. Smith's, and/or its agents, GITI's, best efforts, the installation was delayed as a result of a number of unforeseen and/or unanticipated circumstances or conditions, which it is undisputed was beyond the control of E.R. Smith, and/or its agent, GITI, and could not have otherwise been learned or discovered but for a technical inspection or audit, which included, without limitation, "layout" or configuration problems, compatibility issues, wiring difficulties, electrical problems, shortages and delays in obtaining appropriate materials and/or supplies, the inability to convert certain components and/or accessories and repairing damages that occurred in the disassembly or transport phases of the project. Notwithstanding the foregoing, E.R. Smith, albeit delayed, performed, and completed, its scope of work relative to the containerization, transport, and installation of the Harris Press pursuant to the parties' installation services contract.

Colonial Press made a partial payment to E.R. Smith, under the terms and conditions of the parties' installation contract, for the labor performed and/or materials furnished by E.R. Smith, and/or its agent, GITI, in accordance with that agreement. However, notwithstanding the fact that E.R. Smith substantially performed, and completed, its scope of work, as well as invoiced the balance of the contract amount due, and made demand for the outstanding balance thereon,

Colonial Press willfully failed and/or refused to remit the remaining sum due and owing. As such, the total amount due E.R. Smith arising from the parties' installation contract is $82,500.00.

**Claims & Defenses**

1. **Claims**

**a. Breach of Contract**

In June, 2004, the parties entered into, and executed, the so-called installation services contract for the fixed sum of $275,000.00. Despite having received partial payments from Colonial Press for the labor performed and/or materials furnished under the parties' agreement, pursuant to which E.R. Smith substantially performed, and completed, Colonial Press has failed and/or refused to remit the remaining balance due in the total sum of $82,500.00.

**b. Unjust enrichment**

Alternatively, it is beyond dispute that the labor performed and/or materials furnished by E.R. Smith under the installation services contract conferred a measurable benefit upon Colonial Press, which Colonial Press appreciated and accepted, *to wit*, the Harris Press operating and/or functioning as part of Colonial Press' regular ordinary business operations.

**c. Quantum meruit**

Again, in the alternative, E.R. Smith conferred a benefit upon Colonial Press, which said benefit Colonial Press realized and it would be wholly inequitable for Colonial Press to retain the value of the same absent paying E.R. Smith the parties' full contract value.

2. **Defenses**

E.R. Smith has advanced the following defenses with respect to Colonial Press' Counterclaim:

a. Colonial Press' Counterclaim is precluded insofar as Colonial has failed to state a claim upon which relief may be granted.

b. Colonial Press' Counterclaim is precluded as a result of its own breach of contract.

c. Colonial Press' Counterclaim is precluded by its own misfeasance and/or malfeasance.

d. Colonial Press' Counterclaim is precluded by its own negligence.

e. Colonial Press' Counterclaim is precluded by its own misrepresentation.

f. Colonial Press' Counterclaim is precluded by the doctrine of waiver.

g. Colonial Press' Counterclaim is precluded by the doctrine of unclean hands.

h. Colonial Press' Counterclaim is precluded by the doctrine of laches.

i. Colonial Press' Counterclaim is precluded by the doctrine of estoppel.

j. Colonial Press' Counterclaim is precluded insofar as there was no meeting of the minds in or about December, 2004.

k. Colonial Press' Counterclaim is precluded insofar as the only agreement(s) by and between the parties occurred in or about June, 2004.

l. Colonial Press' Counterclaim is precluded by its own bad faith conduct.

m. Colonial Press' Counterclaim is precluded by its failure to mitigate its damages.

n. Colonial Press' Counterclaim is precluded by its failure to substantially perform pursuant to the parties' agreement.

**Damages**

E.R. Smith's Complaint prays the following relief:

a. A declaration by this Court that the June, 2004 installation services contract by and between E.R. Smith and Colonial Press is a legally valid, binding and enforceable agreement.

b. A declaration by this Court that Colonial Press breached the so-called installation services contract by and between E.R. Smith and Colonial Press.

c. A declaration by the Court that the alleged December, 2004 agreement was not a legally valid, binding and enforceable contract.

d. A monetary award to E.R. Smith in the amount of $82,500.00, the remaining balance due and owing E.R. Smith from Colonial Press under the parties' installation services contract.

e. An award to E.R. Smith of any and all attorneys' fees, costs, and other disbursements or expenses incurred by E.R. Smith as a result of the above-entitled action.

**Issues**

1. Whether the parties' June, 2004 installation services contract was a legally, valid, binding and enforceable contract?
2. Whether Colonial Press breached the parties' installation services contract?
3. Whether E.R. Smith substantially performed under the parties' installation services contract?
4. Whether E.R. Smith was damaged as a result of Colonial Press' breach of the parties' installation services contract?
5. Whether the alleged December, 2004 contract was a valid and enforceable contract?

6. Whether there was ever any "meeting of the minds" as to any agreement by and between E.R. Smith and Colonial Press in December, 2004?

7. Whether Colonial Press failed to mitigate its purported damages incurred as a result of E.R. Smith's alleged breach of contract?

**Arguments & Discussion**

1. Declaratory Judgment

The Rhode Island Uniform Declaratory Judgment Act provides, in pertinent part, that:

> [a]ny person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

*See R.I. Gen. Laws* § *9-30-2*.

It is well-established in Rhode Island that a necessary predicate to a court's exercise of jurisdiction under a claim for declaratory judgment is an actual justiciable controversy. A declaratory judgment action may not be used "for the determination of abstract questions or the rendering of advisory opinions," *Lamb v. Perry*, 225 A.2d 521, 523 (R.I. 1967), nor does it "license litigants to fish in judicial ponds for legal advice." *Goodyear Loan Co. v. Little*, 269 A.2d 542, 543 (R.I. 1970). *See also, Sullivan v. Chaffee,* 703 A.2d 748, 751 (R.I. 1997).

In other words, the party seeking declaratory relief must present the court with an actual controversy. *See Providence Teachers Union v. Napolitano*, 690 A.2d 855, 856 (R.I. 1997).

By definition, a justiciable controversy must contain a plaintiff who has standing to pursue the action; that is to say, a plaintiff who has suffered "injury in fact". *Meyer v. City of Newport*, 844 A.2d 148, 151 (R.I. 2004), citing *Rhode Island Ophthalmoligical Society v. Cannon*, 317 A.2d 124, 131

(R.I. 1974). Injury in fact may be characterized as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural or hypothetical'". *Meyer,* at 151, citing *Pontbriand v. Sundlun*, 699 A.2d 856, 862 (R.I. 1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Even more, justiciability is not present unless the facts of the case yield some legal hypothesis which will entitle the plaintiff to real and articulable relief. *Meyer,* at 151. *See Goodyear Loan Co.,* at 543; *Lamb,* at 523.

2. Breach of Contract

In Rhode Island, in order to recover for breach of contract, a party is required to demonstrate: (1) that the parties reached a valid and binding agreement (2) that one party breached its agreement with the other; and (3) that the party was damaged or harmed as a result of the breach of the parties' agreement. *Coll v. PB Diagnostic Systems, Inc.*, 50 F. 3d 1115, 1122 (1st Cir. 1995); *Michelson v. Digital Financial Services, Inc.*, 167 F. 3d 715, 720 (1st Cir. 1999).

The elements of a contract are offer, acceptance, consideration, mutuality of agreement and mutuality of obligation. *See, generally, Smith v. Boyd*, 553 A. 2d 131 (R.I. 1989); *Lamoureux v. Burrillville Racing Assn.*, 161 A. 2d 213 (R.I. 1960). The court must make "the predicate findings of offer, acceptance, consideration and breach requisite to determining a breach of contract claim." *Gorman v. St. Raphael Academy*, 853 A. 2d 28, 33 (R.I. 2004).

Generally, the question of whether a party to a contract has substantially performed or materially breached its obligations is usually a question of fact for a jury to resolve after considering all of relevant evidence. *Verizon Connected Solutions, Inc. v. Starlight Communications Holding, Inc.*, 2004 U.S. Dist. LEXIS 15847 *11 (D. R.I. 2004). *See also*, *Women's Dev. Corp. v. City of Central Falls*, 764 A. 2d 151, 158 (R.I. 2001); *URI Congregation Partners, L.P. v. Bd. of Governors for Higher*

*Educ.*, 915 F. Supp. 1267, 1285 (D. R.I. 1996), citing *Nat'l Chain Co. v. Campbell*, 487 A. 2d 132, 135 (R.I. 1985).

3. Unjust enrichment

The equitable doctrine of unjust enrichment applies in order "to prevent a person from retaining a benefit received from another without appropriate payment for same." *Doe v. Burkland*, 808 A.2d 1090, 1095 (R.I. 2002). It should be applied when retention of the benefit by one party would "be unjust under some legal principle recognized in equity." *Rhode Island Hospital Trust Co. v. Rhode Island Covering Co.*, 190 A.2d 219, 221 (R.I. 1963). "To recover under a claim for unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 99 (R.I. 2006)(citing *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997)).

4. Quantum meruit

Under Rhode Island law, a plaintiff is entitled to recover under a quantum meruit theory if "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof." *Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87, 97 (R.I.1992); *Bailey v. West,* 249 A.2d 414, 417 (1969); *Allstate Drilling Co. v. Martinelli*, 2004 WL 253526, *3 (R.I.Super.2004) . The obligation to pay in these case arises not from the consent of the parties but "from the law of natural immutable justice and equity" *Fondedile, S.A.*, 610 A.2d at 97.

5. Waiver

In Rhode Island waiver "is the voluntary intentional relinquishment of a known right." *Fracassa v. Doris*, 876 A.2d 506, 510 (R.I. 2005); *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.*, 488 A.2d 723, 725 -726 (R.I. 1985) . Waiver can result from either "action or nonaction." *Haxton's*, 488 A.2d at 725–726. The "question of whether a party has voluntarily relinquished a known right is one of fact for a jury" *Id.*

6. Mitigation

In Rhode Island, under the doctrine of avoidable consequences a party has a duty to mitigate damages that result from a breach of contract. *Dovenmuehle Mortg., Inc. v. Antonelli*, 790 A. 2d 1113, 1115 (R.I. 2002); *Tomaino v. Concord Oil of Newport, Inc.*, 709 A. 2d 1016, 1026 (R.I. 1998); *Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury*, 603 A. 2d 726, 729 (R.I. 1992)). The party must make reasonable efforts and ordinary care in the attempting to mitigate damages. *Tomaino*, 709 A. 2d at 1026. The purpose of this rule is to prevent the injured party from sitting silent while the damages accumulate. *Id*. The burden is on the defendant to prove that the plaintiff failed to mitigate the damages. *Bibby's Refrigeration*, 603 A. 2d at 729.

**Pending Matters**

There are currently no pending outstanding matters with respect to the instant case at this time. Thus, this matter appears to be in order for trial.

**Estimated Time of Trial**

E.R. Smith estimates that the presentation of its case will take approximately two (2) to three (3) days. As such, E.R. Smith anticipates the total trial time, including Colonial Press' presentation and jury deliberation, to be approximately five (5) days.

Respectfully submitted,

E.R. Smith Associates, Inc.

By its Attorneys,

/s/ Christopher M. Mulhearn
Christopher M. Mulhearn (#5188)
**Ferrucci Russo, P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel.: (401) 455-1000
Fax.: (401) 455-7778

## Certification

I hereby certify that on this 22nd day of May, 2007, I served a true and accurate copy of the within upon **Barbara S. Cohen, Esq.**, bcohen@wszlaw.com at Winograd, Shine & Zacks, P.C.; and **George A. Comolli, Esq.**, george@comolli-lamountain.com at Comolli & LaMountain Ltd., via e-mail.

/s/ Christopher M. Mulhearn