UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

E.R. SMITH ASSOCIATES, INC.

Plaintiff/Counter Defendant

Civil Action No. 05-CV-45-T

v.

THE COLONIAL PRESS, INC.

Defendant/Counterclaimant

**PRETRIAL MEMORANDUM OF THE COLONIAL PRESS, INC.**

The defendant and counterclaimant, The Colonial Press, Inc. ("Colonial"), submits the following Pretrial Memorandum:

A. PARTIES

| | |
|---|---|
| Plaintiff/Counterclaim Defendant: | E.R. Smith Associates, Inc. |
| Trial Counsel: | Christopher M. Mulhearn, Esq. |
| Defendant/Counterclaimant: | The Colonial Press, Inc. |
| Trial Counsel: | Barbara S. Cohen, Esq. |

B. FACTS

Colonial is a commercial printer and lithographer located in La Vista, Nebraska. Colonial prints newspaper inserts, business brochures, and other multi-color, high volume items for businesses. In May 2004, Smith solicited Colonial with respect to a certain Harris M-110B Web Offset Press and associated equipment ("Press") available for purchase in Leeds, England. In June 2004, Smith sent Colonial proposals for the sale of the Press and for services to be performed by Smith for the removal, insurance, containerization, shipping, and installation of the Press in Colonial's plant. The purchase

price of the Press was $275,000 and the price for the installation services (namely, the removal, insurance, containerization, shipping, and installation of the Press, including a compatible sixth printing unit), was an additional $275,000. Smith estimated the installation time to be approximately five weeks from the date that the Press arrived at Colonial's plant.

Colonial was interested in acquiring a six unit press in order to continue providing services to one of its major customers. In order to meet this customer's requirements, Colonial had to have the Press fully operational in September 2004. Colonial communicated this information and its requirements to Smith. Smith assured Colonial that the Press was of high caliber and good quality, and would perform the services required by Colonial and its customer. Smith also assured Colonial that the Press would be installed and running so as to meet Colonial's deadline.

Based on Smith's assurances that the installation would be completed and the Press would be fully operational in September 2004, and that the same personnel who dismantled the Press in England would reassemble the press in Nebraska, Colonial agreed to purchase the Press and agreed to the quotation for installation services. Also based on Smith's assurances, Colonial withdrew a deposit it had placed on another press, which was located in Texas. Furthermore, based on the parties' prior dealing, their discussions regarding the purchase of the Press, and representations made by Smith, Colonial understood that Smith would perform an appropriate inspection of the Press. Colonial's reliance on the assurances and representations made by Smith was reasonable.

Notwithstanding Smith's representations, the substantial payments made by Colonial to Smith as requested by Smith, and Colonial's president's traveling to Leeds,

England for an inspection of the Press (as Smith requested), Smith did not fully inspect the Press.[1] However, Smith purchased the Press and promptly re-sold it to Colonial (for roughly $50,000 more than Smith paid for it), and Smith assured Colonial that Smith would fully support the installation of the Press.

Moreover, notwithstanding Smith's representations regarding the installation time and Smith's assurances that the Press would be fully operational in time for Colonial to meet its requirements, Smith failed to install the Press as promised. Among other deficiencies, the Press was not properly removed and containerized in England, resulting in the loss of components and damage to components of the Press. Inferior packing of the Press resulted in damage in transit. Smith also made numerous errors in the installation process, thereby significantly delaying the work and, ultimately, Smith walked off the job without completing the installation. Among other deficiencies, Smith's installation drawings were incorrect, Smith failed to provide Colonial with a compatible sixth printing unit, Smith failed to re-wire the entire press as required by the contract, Smith failed to install the register system, and Smith did not start up the Press systems or explain the fundamentals of the equipment operation, all as required by the installation contract.

Although the installation was supposed to take approximately five weeks, Smith's installation sub-contractor was at Colonial's plant for more than four months and, when the sub-contractor left in December 2004, the installation was not completed. The Press

[1] In its answers to interrogatories, Smith states, "In or about the second week of June, 2004, at the direction of Colonial Press, and per the terms of E.R. Smith's engagement, E.R. Smith, by and through its then representative, Robert Tucker, traveled to England with Colonial Press' President, Thomas A. Visty ("Visty") to "view" the Press. E.R. Smith was paid by Colonial Press for its services in accompanying Visty, as well as reimbursed the travel expenses associated with Mr. Tucker's travel to England." By the date of that trip, Colonial already had paid Smith $27,500. The following week, Smith's representative wrote in an email, "I believe that we should plan on next week regarding the E.R. Smith Technical representative to be on site in Leeds for the sort of inspection and the supervision of the dismantling etc."

was not partially operable until late January/early February 2005, and is still not operating as contemplated by the parties. Accordingly, Smith failed to install all equipment in an acceptable manner, as required by the contract.

As a result of Smith's untimely and deficient services, and at the request of Smith's president, Colonial issued Smith an Invoice detailing the expenses, as of December 1, 2004, that Colonial had incurred or would incur because of Smith's failure to provide services as agreed. At that time, the expenses exceeded $200,000.

After several discussions in Nebraska, Smith and Colonial reached an agreement resolving Smith's claim for monies owed on the installation services contract ($82,500) and Colonial's claim for reimbursement of expenses due to Smith's failure to provide those services as agreed ($214, 819.95). Among other things, under the December 2004 agreement, Smith agreed to assume the cost of repairing certain equipment, to share the cost of reconfiguring and purchasing other equipment, and to forego the payment of $82,500 that would have been due had Smith installed the Press as promised. The president of Smith and the president of Colonial noted these items on the Invoice issued by Colonial to Smith, and each officer signed the Invoice evidencing their agreement. However, Smith failed to perform the obligations which it undertook to perform in December 2004.

Colonial paid Smith a total of $467,500 ($275,000 for the Press and $192,500 for the installation services). To date, however, Smith has not completed the installation services and the Press is not fully operational. Smith has acknowledged that Colonial fully paid Smith the purchase price of the Press and that Smith's installation services were delayed and deficient. Although Smith also has acknowledged that the damage in

transit was its responsibility and that it would reimburse Colonial for related expenses and/or the equivalent value, it has not done so. Nor has Smith performed under the December 2004 agreement.

As a result of Smith's failure to perform installation services as promised and as a result of Smith's failure to perform its obligations under the December 2004 agreement, Colonial has suffered, and continues to suffer, substantial damages, including damages due to production delays, the spoilage of raw materials, lost business opportunities and profits, the cost of correcting and completing Smith's deficient work, and the cost of repairing and replacing equipment damaged by Smith or which Smith failed to provide.

C. <u>CLAIMS AND DEFENSES OF COLONIAL</u>

Colonial asserts two claims:

Count I – Breach of Contract – Installation Services; and

Count II – Breach of Contract – December 2004 Contract.

Colonial asserts the following defenses to Smith's breach of contract claim:

1. This Court lacks personal jurisdiction over Colonial.

2. The plaintiff's claim is barred by the contract of settlement and/or substituted contract entered into by the parties on or about December 2, 2004.

3. The plaintiff's claim is barred by the doctrine of accord and satisfaction.

4. The plaintiff's claim fails for lack of consideration.

5. Venue of the plaintiff's claim is not properly placed in this judicial district.

6. The plaintiff has waived the claim set forth in the Complaint.

7. The plaintiff is estopped by its own conduct from asserting the claim set forth in the Complaint.

8. Colonial is entitled to setoff, against any damages which the plaintiff may be awarded, the damages suffered by Colonial as a result of the plaintiff's breaches of contract, together with any resulting interest, costs, attorneys' fees, and other expenses.

9. The plaintiff's claim is barred by reason of the plaintiff's substantial and material breach of contract.

10. The plaintiff's claim is barred by reason of the plaintiff's misrepresentations to Colonial and Colonial's justifiable reliance on those misrepresentations.

D. DAMAGES

Colonial claims the following damages:

Costs incurred by Colonial

| | |
|---|---|
| Low pressure air pipes, etc. | $17,929 |
| Metro machine shift and two colors | 474 |
| Wires, wiring, wire drops and wire way material | 40,550 |
| Freight costs for bearings | 1,046 |
| Sheeter repair | 33,240 |
| Journal for 5th unit | 9,950 |
| Journal for 1st unit | 9,450 |
| Bevel set | 1,349 |
| 5th unit bearers | 12,000 |
| Cleaning of press | 13,478 |

| | |
|---|---|
| Registration (RGS) 5 to 6 unit conversion | 12, 645 |
| RGS keypad install | 3,280 |
| Freight | 829 |
| Print unit drive shaft | 633 |
| Personnel/labor | 75,000 |
| Raw material spoilage/wasted paper | 34,875 |
| Costs to complete work | |
| Remote inking system | $172,000 |
| Lost profits | |
| Lost net profits | $477,514 |

E. ISSUES

The factual and legal issues that must be resolved in this case are:

1. Whether Smith materially breached the installation services contract;

2. Whether Smith materially breached the December 2004 contract;

3. The damages, including lost profits, to which Colonial is entitled as a result of Smith's breaches of contract;

4. Whether evidence of oral or written communications outside of the contracts is admissible because neither agreement is an integrated agreement and/or because the installation services contract or the December 2004 contract is ambiguous;

5. Whether "As is Where is - UK" language in the purchase agreement bars Colonial's claim of breach of the installation services contract;

6. Whether Colonial's obligation to pay the balance of the installation services contract price is excused and/or discharged by reason of Smith's substantial and material breach of that contract;

7. Whether the Invoice signed and dated by the respective presidents of Colonial and Smith constitutes an enforceable agreement;

8. Whether Colonial has satisfied its duty to mitigate damages; and

9. Whether any of Smith's other affirmative defenses bar Colonial's claims.

F. ARGUMENT

Claims

1. Smith failed to perform the installation contract as agreed. As a result of Smith's breach of contract, Colonial incurred significant expenses and suffered substantial damages. The elements of a claim of breach of contract are the existence of a contract; performance by Colonial; Smith's failure to perform; and resulting damages to Colonial. See, e.g., PSW, Inc. v. VISA U.S.A., Inc., No. 04-347T, 2006 U.S. Dist. LEXIS 11763, * 39 (D.R.I. Feb. 3, 2006).[2] Among other deficiencies, the Press was not properly removed and containerized in England, resulting in the loss of or damage to components. Inferior packing of the Press caused in damage in transit. Smith's installation drawings were incorrect. Smith failed to provide Colonial with a compatible sixth printing unit. Smith failed to re-wire the entire press as required by the contract. Smith failed to install the register system. Smith did not start up the Press systems or explain the fundamentals of the equipment operation. Additionally, Smith has acknowledged that the contract required the conversion of the fountain control system to accept the additional printing unit, however, Smith never performed that work.

[2] Copies of the authorities cited in this memorandum are attached.

Any contention by Smith that it was more difficult or costly for Smith to perform the installation contract than Smith may have originally believed does not relieve Smith of its contractual obligations. Moreover, as Smith drafted that contract, any ambiguity it may claim should be construed against Smith. Smith's own records confirm the conclusion that Smith failed to perform its obligations under the installation contract. Smith cannot now disclaim those obligations by referring to the "As is Where is" language of the purchase agreement.

2. After Smith breached the installation contract, the parties agreed, in December 2004, to a resolution of their respective claims against one another and signed a document reflecting that resolution. "[A]n 'accord and satisfaction' [is] 'an agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance.'" Weaver v. American Power Conversion Corp., 863 A.2d 193, 197 (R.I. 2004) (quoting Black's Law Dictionary 17 (7th ed. 1999)); see also Kottis v. Cerilli, 612 A.2d 661, 664 (R.I. 1992) ("An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions.") (internal quotation marks and authorities omitted). "A novation is . . . a 'species' of accord and satisfaction" and has been characterized as a "substituted contract." Weaver, 863 A.2d at 197 (citations omitted).

The essential element of an accord and satisfaction or a novation/substituted contract "is a factual determination that the original contractual rights and obligations of both parties were extinguished and new contractual rights and liabilities created for each,

all by their mutual agreement." Weaver, 863 A.2d at 198 (quoting Salo Landscape & Constr. Co. v. Liberty Elec. Co., 119 R.I. 269, 273, 376 A.2d 1379, 1382 (1977)).

"Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord." Restatement (Second) of Contracts § 281(2) (1981).

Here, the parties agreed that Smith would assume the cost of repairing certain equipment, would share with Colonial the cost of reconfiguring and purchasing certain equipment, and would forego the payment of $82,500, the balance that would have been due had Smith performed the installation services as agreed. However, shortly after reaching this agreement, Smith reneged on these obligations.

3. Colonial is entitled to an award of the damages it has suffered as a result of Smith's breaches, including its lost profits. A party seeking damages may recover damages which were reasonably foreseeable at the time the contract was made. Here, Smith was well aware of the purposes for which Colonial was purchasing and installing the Press and the deadlines to which Colonial was subject. Smith is liable for the damages sustained by Colonial as a result of Smith's deficient and untimely installation services, including the costs incurred or to be incurred by Colonial to repair and replace equipment, the costs to complete the installation, and lost profits.

"[P]rospective profits, if proved, are an element of a [claimant's] damages for breach of contract." Standard Mach. Co. v. Duncan Shaw Corp., 208 F.2d 61, 64 (1st Cir. 1953). "The basic requirement for the recovery of loss of profit is that such loss must be

established with reasonable certainty." Smith Dev. Corp. v. Bilow Enters., Inc., 112 R.I. 203, 212, 308 A.2d 477 (1973) (citing McCormick, Damages @ 26 at 99-100 (1935)); see also Lawton v. Nyman, 327 F.3d 30, 43 (1st Cir. 2003) ("Although mathematical precision is not required, the [trier of fact] should be provided with some rational model of how the lost profits occurred and on what basis they have been computed"); Home Pride Foods, Inc. v. Johnson, 634 N.W.2d 774, 783 (Neb. 2001) ("a claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude"). A party must prove with reasonable certainty its lost revenue and the costs and expenses involved in producing that revenue. Troutbrook Farm, Inc. v. DeWitt, 611 A.2d 820, 824 (R.I. 1992); Home Pride Foods, Inc. v. Johnson, 634 N.W.2d 774, 783-84 (Neb. 2001).

4. The "As is Where is - UK" language in the purchase agreement does not bar Colonial's claim for breach of the installation contract or its claim for breach of the December 2004 agreement. Moreover, because the contacts are not integrated, and/or because they may be deemed to be ambiguous, evidence of oral and written communications is admissible and will demonstrate the full terms of the agreements and Smith's breach of those terms.

5. If Smith contends that Colonial did not mitigate its damages, then Smith must prove that Colonial could have avoided its damages through reasonable efforts. See Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury, 603 A.2d 726, 729 (R.I. 1992). Colonial devoted its own personnel and spent significant sums to repair, replace and complete work that Smith left unfinished when it walked off the job. The only work that remains unfinished, installing a remote inking system that will recognize

the six units of the Press, has not been accomplished because of the substantial expense which Colonial has not yet been in a position to finance because of the considerable funds it paid to Smith, the considerable funds it has paid to date to repair and replace Smith's deficient work, and its inability to perform work that it had anticipated performing when it undertook this project.

Defenses

1. This Court lacks personal jurisdiction over Colonial as Colonial does not have sufficient minimum contacts with Rhode Island to satisfy the requirements of the state's long-arm statute and the United States Constitution. In addition, the exercise of personal jurisdiction over Colonial offends traditional notions of fair play and substantial justice.

2. Smith's claim, which is based on the installation contract, is barred by the provisions of the December 2004 contract. See Section F (Claims) 2, above.

3. Smith's claim is barred by the doctrine of accord and satisfaction. See Section F (Claims) 2, above.

4. Smith's claim fails for lack of consideration as Smith failed to perform the services for which Colonial contracted. Therefore, Smith is not entitled to the balance of the contract price that it seeks.

5. Venue of Smith's claim is not properly placed in this judicial district pursuant to the provisions of 28 U.S.C. §1391(a).

6. Smith waived its claim for breach of contract by knowingly and voluntarily entering into the December 2004 agreement.

7. Smith is estopped from asserting its claim for breach of contract because it voluntarily entered into the December 2004 agreement.

8. In the event that Smith proves its claim of breach of contract and resulting damages, Colonial is entitled to setoff against those damages the damages suffered by Colonial as a result of Smith's breaches of contract. See Boucher v. Butera, 798 A.2d 340 (R.I. 2002) (substantial performance entitled party to recover contract price less amount required to remedy defects in work).

9. Smith's claim is barred by reason of its own substantial and material breach of the installation contract. Among other deficiencies, the Press was not properly removed and containerized in England, resulting in the loss of components and damage to components. The inferior packing of the Press resulted in damage in transit. Smith made numerous errors in the installation process, thereby significantly delaying the work and, ultimately, Smith walked off the job without completing the installation. Smith's installation drawings were incorrect. Smith failed to provide Colonial with a compatible sixth printing unit. Smith failed to re-wire the Press. Smith failed to install the register system. Smith did not start up the press systems or explain the fundamentals of equipment operation. Although the installation was supposed to take approximately five weeks, Smith's installation sub-contractor was at Colonial's plant for more than four months and, when the sub-contractor left, the installation was not completed. The Press was not partially operable until late January/early February 2005, and is still not operating as contemplated by the parties.

10. Smith made numerous misrepresentations to Colonial regarding the quality and caliber of the Press and Smith's ability and willingness to perform this

project. Smith led Colonial to believe that the Press would be inspected. Smith misrepresented Smith's ability to install the Press and have it operational in a timely fashion, and Smith's ability to support and complete the project. Colonial reasonably relied on Smith's these representations in purchasing the Press, entering into the installation contract, and withdrawing its deposit on another press which Colonial was considering at the time that Smith solicited Colonial regarding the Press.

G. PENDING MATTERS

Due to certain family obligations, Thomas A. Visty, the president of Colonial, is not available to be present in Rhode Island during the period June 18, 2007 through June 26, 2007.[3]

In addition, in order to make travel arrangements for its witnesses, who are located in Nebraska and in North Carolina, Colonial requests that a date certain be scheduled for the commencement of trial. Colonial also requests that the parties be given sufficient advance notice of the date certain so that the cost of airline travel to Rhode Island is not prohibitive.

[3] By letter date April 26, 2007, counsel for Colonial brought this matter to the attention of the Clerk and opposing counsel.

H. ESTIMATED TIME OF TRIAL

Colonial estimates that five days will be required to present its case and that eleven days will be required to litigate the entire case.

THE COLONIAL PRESS, INC.
By its attorney,

/s/Barbara S. Cohen
Barbara S. Cohen (2848)
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903-3980
Tel: (401) 273-8300
Fax: (401)-272-5728
Email: bcohen@wszlaw.com

**CERTIFICATEOF SERVICE**

I hereby certify that on the 22nd day of May, 2007, a copy of the within document was electronically filed and is available for viewing and downloading from the Court's Electronic Case Filing system and that a copy of the within document was served on each of the following attorneys of record as stated below:

George A. Comolli, Esq.
Comolli & LaMountain, Ltd.
15 Franklin Street
Westerly, RI 02891
george@comolli-lamountain.com
(Email)

Christopher M. Mulhearn, Esq.
Ferrucci Russo, P.C.
55 Pine Street
Providence, RI 02903
cmulhearn@frlawri.com
(Email)

/s/ Barbara S. Cohen