UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

E.R. SMITH ASSOCIATES, INC.

Civil Action No. 05-CV-45-T

Plaintiff/Counter Defendant

v.

THE COLONIAL PRESS, INC.

Defendant/Counterclaimant

# Addendum to Pretrial Memorandum of The Colonial Press, Inc.

# INDEX OF AUTHORITIES

CASES


1. Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury, 603 A.2d 726 (R.I. 1992)
2. Boucher v. Butera, 798 A.2d 340 (R.I. 2002)
3. Home Pride Foods, Inc. v. Johnson, 634 N.W.2d 774 (Neb. 2001)
4. Kottis v. Cerilli, 612 A.2d 661 (R.I. 1992)
5. Lawton v. Nyman, 327 F.3d 30 (1st Cir. 2003)
6. PSW, Inc. v. VISA U.S.A., Inc., No. 04-347T, 2006 U.S. Dist. LEXIS 11763 (D.R.I. Feb. 3, 2006)
7. Smith Dev. Corp. v. Bilow Enters., Inc., 112 R.I. 203, 308 A.2d 477 (1973)
8. Standard Mach. Co. v. Duncan Shaw Corp., 208 F.2d 61 (1st Cir. 1953)
9. Troutbrook Farm, Inc. v. DeWitt, 611 A.2d 820 (R.I. 1992)
10. Weaver v. American Power Conversion Corp., 863 A.2d 193 (R.I. 2004)


OTHER AUTHORITIES


11. Restatement (Second) of Contracts § 281(2) (1981)

**603 A.2d 726; Bibby's Inc. v. Salisbury;**

Page 726

**BIBBY'S** REFRIGERATION, HEATING & AIR CONDITIONING, INC. V. ROBERT G. SALISBURY, D/B/A ROUND HOUSE TAVERN.

No. 91-117-A.

Supreme Court of Rhode Island.

February 20, 1992.

Bailor of ice machine sued bailee to recover unpaid rent for period during which bailee retained possession after bailment agreement had expired. The Superior Court, Providence County, Hurst, J., entered judgment for bailor but awarded zero damages. Appeal was taken. The Supreme Court, Fay, C.J., held that bailor was entitled to recover rent, at the amount set forth in the bailment agreement, for the period during which bailee retained possession.

Affirmed in part and reversed and remanded in part.

Herbert Katz, Pawtucket, for plaintiff.

Gerard R. Laliberte, Lincoln, for defendant.

OPINION

FAY, Chief Justice.

This case comes before the Supreme Court on appeal by the plaintiff, **Bibby's** Refrigeration, Heating & Air Conditioning, Inc. (**Bibby's** Refrigeration). This action began in the District Court wherein the plaintiff sought recovery of unpaid rent for the period during which the defendant retained possession of an ice-making machine after expiration of the parties' rental agreement. The judge found for the plaintiff in the amount of $3,016.40. The defendant appealed this award. An arbitrator heard the matter and found for the plaintiff. Thereafter the case was heard before the Superior Court wherein the trial justice directed a verdict for the plaintiff but awarded zero damages. The plaintiff appeals from this decision. For the reasons set forth herein, we affirm the trial justice's decision in part and reverse in part.

Page 727

The facts pertinent to this appeal are as follows. On May 14, 1979, defendant, Robert G. Salisbury (Salisbury), d/b/a Round House Tavern, rented an ice-making machine from **Bibby's** Refrigeration. The terms of the rental agreement required Salisbury to pay **Bibby's** Refrigeration $63.60 per month for thirty-six months plus a $100 security deposit. The agreement also provided defendant an option to purchase the machine outright at the end of the first year of the rental agreement by making a lump-sum payment of the remaining two years' rent.

According to Peter Bibby (Bibby), at the end of the first year he telephoned defendant in order to determine if defendant was going to exercise the option to purchase the ice-making machine. The

plaintiff testified that Salisbury said he was not exercising the option because he did not have the money to do so at that time. In total Salisbury made thirty-four monthly payments of $63.60 to plaintiff. In April 1982 defendant sent plaintiff a check in the amount of $27.20 marked "Paid in Full." Presumably the sum of $27.20 represented the March 1982 and April 1982 rent payments totaling $127.20 less the $100 security deposit. The plaintiff did not cash the check.

The parties had a telephone conversation shortly after plaintiff received the check from defendant. In that telephone conversation and at trial, Salisbury asserted that he believed he owned the ice machine at the end of the rental period. The defendant testified at trial that he told plaintiff, "I thought the contract was up, I was paying the remainder of the price on it" by tendering the check for $27.20. However, Bibby testified at trial that in this telephone conversation he explained to defendant that defendant did not own the ice machine and that the ice machine was not paid in full since defendant had not exercised the option.

Bibby claims that he made numerous telephone calls to defendant and that he attempted to remove the ice machine from defendant's premises. The plaintiff stated that he was unable to remove the machine because defendant's employees prevented him from entering defendant's building. Salisbury denies plaintiff's assertions and claims that plaintiff never attempted to reclaim the ice machine.

**Bibby's** Refrigeration argues that the trial justice awarded an improper amount of damages. The plaintiff contends that upon expiration of the lease, it had the option to treat the rental agreement as continuing or renewed. The defendant asserts, however, that the trial justice properly applied a quantum meruit standard of damages and that as a result of *Morrissey v. Piette*, 103 R.I. 751, 241 A.2d 302 (1968), plaintiff was not entitled to a recovery in the absence of evidence of the reasonable rental charge of the ice machine.

The defendant in *Morrissey* lived in a mobile home at a trailer park when the plaintiff purchased the park. *Id.* at 752, 241 A.2d at 302. The defendant made regular weekly rental payments until she moved out, leaving the trailer behind. *Id.* The plaintiff brought suit on the theory that there was an express agreement between the parties and that the defendant was liable for the weekly rent payments while the trailer remained at the park. The trial justice found that the plaintiff "did not prove that there was or ever had been an express landlord-tenant relationship between" the plaintiff and the defendant. *Id.* at 753, 241 A.2d at 302. Therefore, on appeal the court concluded that an implied agreement was the only basis for liability. *Id.* at 753, 241 A.2d at 303. However, the court concluded that the plaintiff was not entitled to recover on an implied contract because he failed to prove "what would have been a fair and reasonable rental or storage charge." *Id.* at 754, 241 A.2d at 303.

Although the facts of the present case appear to be quite similar to those in *Morrissey*, we conclude that *Morrissey* is distinguishable and therefore not precedent to this case. The trial justice in *Morrissey* concluded that the parties had never entered into an express agreement. However, in the instant case Salisbury and **Bibby's** Refrigeration had entered into an ex-

**Page 728**

press agreement for the rental of the ice-making machine. Therefore, *Morrissey* is not determinative of the issues in the present case.

**[1, 2]** This court has addressed the status of a tenant who holds over after the expiration of a lease. *Rose v. Congdon*, 72 R.I. 21, 25--27, 47 A.2d 857, 859--60 (1946); *Rimnik Corp. v. Wallace*, 61 R.I. 282, 284--85, 200 A. 765, 766 (1938). It is a covenant either express or implied in all leases that the

leased premises be delivered to the landlord upon termination of the lease. Although holding over by the tenant is wrongful, the tenant is not immediately treated as a trespasser. The landlord has the power to determine the status of holdover tenants either by treating them as trespassers or by waiving the wrong of holding over and treating them as tenants. *Rose*, 72 R.I. at 25, 47 A.2d at 860; *Providence County Savings Bank v. Hall*, 16 R.I. 154, 156--57, 13 A. 122, 124 (1888). When the landlord elects to treat the tenancy as continuing, the tenant is a "tenant from year to year, in case the prior term was for a year or longer; and if the prior term was shorter than a year, then from term to term." *Providence County Savings Bank*, 16 R.I. at 158, 13 A. at 124.

[3] A number of courts have applied the same reasoning to cases involving bailees who retain possession of the bailed property after the expiration of the bailment. *See, e.g., Fast Bearing Co. v. Koppers Co.*, 181 Md. 203, 205, 29 A.2d 289, 290 (1942); *Shepherd v. Hub Lumber Co.*, 273 Or. 331, 338--39, 541 P.2d 439, 443 (1975); *Luling Oil & Gas Co. v. Edwards*, 32 S.W.2d 921, 926 (Tex.Ct.App.1930); *see generally* 8 Am.Jur.2d *Bailments* § 293 (1980). In general the law imposes an obligation on the bailee to return the bailed property at the expiration of the bailment. *Edgar v. Parsell*, 184 Mich. 522, 528, 151 N.W. 714, 715 (1915); *Alice Pipe & Supply Co. v. Harroun*, 195 S.W.2d 852, 853 (Tex. Ct.App.1946); 8 Am.Jur.2d *Bailments* § 293. If at the expiration of the bailment the bailee does not redeliver the property or excuse the failure to do so, the bailor may elect to treat the bailee's retention of the property as a continuation of the original agreement or to treat the contract as ended and pursue a remedy for breach of contract or in tort. *Fast Bearing Co.*, 181 Md. at 205, 29 A.2d at 290; *Edgar*, 184 Mich. at 528, 151 N.W. at 715--16; *Shepherd*, 273 Or. at 338--39, 541 P.2d at 443. If the bailor elects to treat the bailee's retention of the property as a continuation of the original agreement, the bailor may recover rent at the rate specified in the original agreement for the period during which the bailee retained possession of the bailed property. *Shepherd*, 273 Or. at 338--39, 541 P.2d at 443; *Louisville & N.R. Co. v. Conasauga River Lumber Co.*, 25 Tenn. App. 157, 162, 153 S.W.2d 143, 147 (1941); 8 Am.Jur.2d *Bailments* § 293.

Some courts appear unwilling to imply a renewal of the original bailment agreement from the mere fact that the bailee held over. *Edgar*, 184 Mich. at 528, 151 N.W. at 716 (holding over without more does not "work a change of ownership"). These courts seem to be concerned that binding a bailee to an implied renewal of the bailment agreement, solely as a result of the holding over, might result in hardship to the bailee. *Louisville & N.R. Co.*, 25 Tenn.App. at 162, 153 S.W.2d at 146. For example, the bailee may suffer hardship when the original bailment agreement is for many years and the bailed property would become less suited for its use by the end of the bailment period. *Id.* However, these courts have held that the bailee's continued possession without objection by the bailor, coupled with other circumstances, is sufficient to establish that the bailment was continued or renewed. *Fast Bearing Co.*, 181 Md. at 205, 29 A.2d at 290 (bailee refused to return boring machine); *Shepherd*, 273 Or. at 338--39, 541 P.2d at 443 (even after the defendant gave the plaintiff notice that it was terminating the lease, the defendant retained possession of the equipment).

After reviewing the analysis enunciated by the above-cited jurisdictions, we conclude that a bailee who retains the bailed property after expiration of the bailment agreement is in a position analogous to that of a holdover tenant. Therefore, we

**Page 729**

find that a bailor may elect to treat the bailee's failure to return the bailed property as a renewal or a continuation of the bailment agreement. The bailor is entitled to payment of rent at the agreed rental rate for the period during which the bailee retains possession of the property.

[4] Salisbury and **Bibby's** Refrigeration entered into a written agreement for the rental of an ice-making machine. Neither party has disputed that there was a bailment. *See Emond v. Fallon*, 56 R.I. 419, 425, 186 A. 15, 18 (1936) (defining "bailment" as a transfer of personalty for a particular purpose). We are unpersuaded by defendant's argument that he believed he had purchased the ice-making machine and conclude that as a bailee defendant was under an obligation to return the machine at the expiration of the original rental agreement. However, defendant failed to do so. Therefore, **Bibby's** Refrigeration had the option to treat, and did elect to treat, the bailment agreement as continuing or renewed on the same terms as the original rental agreement. This is not a case of "mere holding over"; defendant would not suffer hardship if bound by an implied renewal of the ice-machine rental agreement. The renewal was not for an extensive period, and the ice machine did not become unusable over the period of the implied renewal agreement. Despite the assertions of defendant's attorney that the ice machine was a "piece of junk," defendant continues to utilize it. Therefore, plaintiff is entitled to recover rent at the rate specified in the rental agreement for the entire time during which defendant retained possession of the ice-making machine.

[5] The defendant argues that plaintiff failed to mitigate its damages. **Bibby's** Refrigeration denies defendant's assertions and argues that defendant had the burden of proving that **Bibby's** Refrigeration could have mitigated its damages.

The doctrine of avoidable consequences states that a party may not recover damages "that the injured party could have avoided without undue risk, burden or humiliation." Restatement (Second) *Contracts* § 350(1) (1981). This rule prevents parties from sitting idly by and permitting their damages to accumulate. John D. Calamari & Joseph M. Perillo, *The Law of Contracts* §§ 14--15 (3d ed. 1987). Although the aggrieved party has the duty to mitigate, he or she does not incur liability for failing to do so. 22 Am.Jur.2d *Damages* § 501 (1988). The aggrieved party is simply prohibited from recovering damages that he or she could reasonably have avoided. However, the defendant has the burden of proving that the plaintiff failed to adequately mitigate his or her damages. *Norm Co. v. Cumberland Coal Co.*, 53 R.I. 228, 229, 165 A. 592, 593 (1933); *see also, e.g., Federal Insurance Co. v. Sabine Towing & Transportation Co.*, 783 F.2d 347, 350 (2d Cir.1986); *Preston v. Keith*, 217 Conn. 12, 20--21, 584 A.2d 439, 444 (1991); *American Mechanical Corp. v. Union Machine Co. of Lynn, Inc.*, 21 Mass.App. 97, 103, 485 N.E.2d 680, 684 (1985).

[6] Although **Bibby's** Refrigeration is denied from recovering damages that it could have avoided through reasonable efforts. Salisbury had a duty to produce evidence proving that plaintiff could have avoided its damages through reasonable efforts. The defendant did not introduce sufficient evidence to meet this burden. For example, no evidence was introduced showing that plaintiff made attempts to purchase, or could have purchased, a similar ice-making machine. The defendant did not show that plaintiff had the opportunity to enter into another rental agreement at a similar rental rate with a third party. The defendant did not introduce evidence showing that plaintiff unreasonably allowed its damages to accumulate. Since insufficient evidence was introduced to meet defendant's burden, we conclude that plaintiff's recovery is not limited by this doctrine.

Relying on the above, we are of the opinion that the trial justice was correct in directing a verdict in favor of the plaintiff. However, the trial justice erred by failing to award damages to the plaintiff. Consequently the plaintiff is entitled to damages

**Page 730**

in accordance with the rental rate specified in the parties' rental agreement multiplied by the number of months from the expiration of the lease to date with interest and costs.

The plaintiffs appeal is sustained. The judgment of the Superior Court is affirmed in part and reversed in part, and the papers of this case are remanded to the Superior Court for further proceedings consistent with this opinion.

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**798 A.2d 340; Boucher v. Butera;**



Richard N. **Boucher** et al. v. David **Butera**, d/b/a/ **Butera** Building and Design

[Cite as **Boucher** v. **Butera**, 798 A.2d 340]

Supreme Court

No. 99-409 Appeal.
(PC 93-5869)

Richard N. **Boucher** et al.
v.
David **Butera**, d/b/a/ **Butera** Building and Design

Present: Williams, C.J., Lederberg, Bourcier, Flanders, and Goldberg, JJ.

OPINION

Flanders, Justice.The American dream of building a home of one's own can sometimes turn into a nightmare. This case deals with some of the problems that arise when that dream bumps up against the reality of all that can go awry in the construction process. After a jury verdict, two disappointed homeowners and a frustrated builder appeal from a Superior Court judgment that awarded lost profits to the builder and damages for breach of contract to the homeowners. For the reasons crafted below, we affirm the Superior Court's judgment in all respects.

Facts and Travel

In April 1993, a builder, David **Butera** (plaintiff or builder) contracted to build an energy-efficient single-family residence for Richard N. **Boucher** (**Boucher**) and his wife, Janice E. **Boucher** (defendants or homeowners), for approximately $175,000. Two days before the date specified in the contract for completing construction, the homeowners terminated the builder's contract, alleging lack of job oversight and failure to accomplish substantial construction of the house by August 15, 1993, the completion date specified in the contract. In response, the builder filed a lawsuit in Superior Court, alleging wrongful termination of the contract, slander, malicious prosecution, and abuse of process. The homeowners answered the complaint, raised affirmative defenses, and filed a counterclaim for breach of contract. They also sought damages for the cost of remedial work, asserting that the builder had constructed the home in an unworkmanlike manner.

After a trial, a Superior Court jury returned a verdict in favor of the builder in the amount of $15,500 for his unrealized profits on this project, finding that the homeowners had terminated the contract without justification. But it also returned a verdict in favor of the homeowners on the builder's slander claim and awarded them $1,200 on their counterclaim against the builder for breach of contract. After the verdict, both parties moved for a new trial, but the trial justice denied their motions. Thereafter, the homeowners appealed and the builder cross-appealed. The builder argues that the trial justice erred in denying his motion for a new trial on the counts of slander, malicious prosecution, and abuse of process. See note 2, infra. In support of that assertion, he contends that on or about August 9, 1993, the supplier notified **Boucher** that a custom-ordered door had been returned for credit. **Boucher** disputed this fact, asserting that he was not aware that the door had been returned until September 8 or 9. In any event, on

September 4, 1993, the homeowners filed a complaint against the builder with the Lincoln Police Department, accusing him of stealing the door. Later that month, **Boucher** returned to the police to file another complaint, accusing the builder of "fraud and deception." The homeowners also filed a complaint against the builder with the Rhode Island Contractors' Registration Board (board). The builder alleged that the homeowners subjected him to embarrassment and to public humiliation because of these and other accusations and that he had been forced to expend great sums of money financing his defense of these false charges.

The homeowners' appeal argues that both the jury verdict and the trial justice's denial of their motion for a new trial were in error, against the weight of the evidence, and that other procedural errors during the trial deprived them of a fair trial. We address and resolve each of these issues below.

I

Quashing the Homeowners' Eve-of-Trial Subpoena For the Builder's Records Concerning Another Project

The homeowners asserted that the builder's chronic absence from the job site contributed to the construction delay, justifying their termination of the contract. Just two days before the trial began, the homeowners caused two extremely broad subpoenas duces tecum to be served on the builder, requiring him to produce a great number of documents, including, inter alia, his construction files and records for another house that he also was building while he was under contract to build the house for these homeowners. In response to the builder's motion to quash, the trial justice limited the scope of the records he had to produce by quashing the request for records pertaining to his other construction project. On appeal, the homeowners argue the court's granting of the motion to quash prejudiced them, and that their "defenses to [the builder's] petition for wrongful termination had essentially been emasculated * * *."

The trial justice concluded that the records in question were "not relevant to this case," and that, in any event, the contract did not prevent the builder from constructing more than one home at a time. Furthermore, he found that contractors do not keep attendance records of the days and hours they spend on various job sites, especially when they have agreed to a contract price. In sum, it was the trial justice's judgment that the subpoenaed documents had nothing to do with the gravamen of the claims at issue in this case because, regardless of the builder's other contractual commitments, contractors "have to comply with the terms of their contract." We agree.

Additionally, the homeowners' eve-of-trial issuance of a blunderbuss subpoena % requesting the builder to produce reams of documents % was both overbroad and untimely because they served the subpoena on him just before trial without giving him adequate time to gather, review, and produce the requested records. Compare Rule 34 of the Superior Court Rules of Civil Procedure (allowing parties forty days to respond to document requests) with Rule 45 of the Superior Court Rules of Civil Procedure (allowing parties to subpoena trial witnesses and to require them to bring specified documents with them). In any event, the subpoena was objectionable because of its gross overbreadth. In National Exchange Bank v. Lubrano, 29 R.I. 64, 68 A. 944 (1908), this Court held that a trial justice properly quashed a subpoena duces tecum when the defendant moved for a writ of subpoena duces tecum, during trial, after the plaintiff had closed its case. The Court in Lubrano held that the defendant could have called a witness available in the court to provide testimony concerning the matter, and that in any case, it did not appear that the information, if produced, would have been material to the controversy.

When an analogous federal rule and our own state rule of civil procedure are similar, this Court has

looked to the federal courts for interpretative guidance in applying the rules in question. Heal v. Heal, 762 A.2d 463, 466-67 (R.I. 2000). Several federal district courts have held that a Rule 45 subpoena duces tecum, when used as a means of belated discovery, should not be allowed to circumvent the discovery deadlines for parties established by the other rules of civil procedure or by court order. See Dreyer v. GACS, Inc., 204 F.R.D. 120 (N.D. Ind. 2001); Integra Lifesciences I, Ltd. v. Merck KGaA, 190 F.R.D. 556 (S.D.Cal. 1999); Rice v. United States, 164 F.R.D. 556 (N.D. Okla. 1995). For example, in Marvin Lumber and Cedar Co. v. PPG Industries, Inc., 177 F.R.D. 443 (D. Minn. 1997) the court recognized that, although subpoenas can be used as a means of discovery, they, too, are subject to Rule 26 of the Federal Rules of Civil Procedure, and to the same time constraints and other limitations that apply to other methods of discovery. The court also recognized that, when used improperly, a Rule 45 subpoena "unnecessarily lengthens [the] discovery process, and diverts the parties' attention, from the post-discovery aspects of preparing a case for Trial." Id. at 445. As a general proposition, we subscribe to the notion that "parties should not be allowed to employ a subpoena after a discovery deadline [on the eve of trial] to obtain materials from third parties [or parties] that could have been produced before discovery [closed]." Charles Alan Wright & Arthur. R. Miller, 9A Federal Practice & Procedure §2452 (Supp. 2002).

Here, the trial justice considered that the subpoenaed documents either were irrelevant or immaterial to the breach-of-contract claim in question. Moreover, the builder acknowledged that he was working on two construction projects, and this fact was not lost on the jury during the trial. Under these circumstances, we are of the opinion that the trial justice exercised appropriate discretion in granting the motion to quash this overbroad, eve-of-trial subpoena insofar as it sought to obtain documents pertaining to the builder's other continuing construction project. This information was not discovered in a timely fashion and, if introduced into evidence, it could have confused the jury, encouraged speculation on an immaterial point, and delayed the trial. Moreover, the homeowners suffered no prejudice from this ruling because the evidence was undisputed that the builder did not personally spend most of his working time at the site.

II

The Challenged Jury Instructions

A. Substantial Performance

The homeowners next argue that the trial justice erred in failing to instruct the jury on the issue of substantial performance of a contract. During the trial, the homeowners' attorney suggested the following jury charge:

> "With regard to the claim asserted by David **Butera**, d/b/a/ **Butera** Building and Design that he was discharged by the Defendants after having performed his obligations under the contract, you are instructed that in order for you to find in favor of Mr. **Butera**, you must first find that Mr. **Butera** had substantially performed his obligations under the contract. If you find that Mr. **Butera** did not substantially perform under the terms of the written contract, he is precluded from recovering from breach of contract."

The trial justice declined to give this instruction, stating that the doctrine of substantial performance was inapplicable in this case because the builder "was terminated before [the contract] was completed." The trial justice also observed that, even according to the contract, there still were two days left to complete the house when the homeowners terminated it and that the contract did not specify that time was of the essence. He reasoned that it would be inconsistent to give a substantial-performance charge

and then tell the jury that time was not of the essence under this contract.

In reviewing a trial justice's charge to a jury, we examine the charge "in its entirety, 'in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions].'" Patino v. Suchnik, 770 A.2d 861, 866 (R.I. 2001) (quoting Neri v. Nationwide Mutual Fire Insurance Co., 719 A.2d 1150, 1153 (R.I. 1998)). "An erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." Id. (quoting Brodeur v. Desrosiers, 505 A.2d 418, 422 (R.I. 1986)).

Substantial performance entitles a party to the contract to recover the contract price less the amount needed by the party benefiting from that performance to remedy any defects in the work. National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985); see also 13 Am. Jur. 2d Building and Construction Contracts §§ 46-48 (2000). This doctrine, however, is inappropriate in situations such as this one in which the owner has terminated the builder's contract before the builder has had an adequate opportunity to complete the performance required under the contract. In other words, the substantial-performance doctrine does not apply when, as here, the builder is still in the act of performing the contract when the owner has purported to terminate it. Thus, the substantial-performance doctrine ordinarily is applicable only when the time for completion has passed because, until that time, the contractor still may be able to remedy any alleged defects in the performance. See Wells Benz, Inc. v. United States, 333 F.2d 89, 95 n.5 (9th Cir. 1964). Thus, the homeowners' reliance on National Chain Co. as well as DiMario v. Heeks, 116 R.I. 44, 351 A.2d 837 (1976) is misplaced because, unlike the contract in this case, those cases involved completed contracts.

Furthermore, a builder who fails to substantially perform a construction contract still is entitled to recover the contract price minus the cost of completion and correction when the contract has been so far performed that the structure can be used by the owner for its intended purpose or the work is of some value to the owner. See Mahoney v. Galokee Corp., 522 P.2d 428 (Kan. 1974); Kulseth v. Rotenburger, 320 N.W.2d 920 (N.D. 1982); see also 13 Am. Jur. 2d Building and Construction Contracts § 84 (2000). "A party to a building and construction contract who has performed part of it according to its terms, but is prevented by the other party from completing the contract, may recover compensation for the work performed and the materials furnished." 13 Am. Jur. 2d Building and Construction Contracts § 50 (2000). See also Harris v. Holder, 230 S.W.2d 645 (Ark. 1950); Valente v. Weinberg, 67 A. 369 (Conn. 1907); Parish v. Tahtaras, 318 P.2d 642 (Utah 1957).

This is precisely what happened in this case, as the homeowners' attorney conceded in his argument for a new trial. Although the jury held that both parties were liable for breaching the contract, it awarded the builder $15,500 for lost profits after concluding that the homeowners prematurely terminated the contract. But it also awarded the homeowners $1,200 to remedy defects in the builder's performance; namely: "cracks in the garage." In short, a builder can recover for lost profits, even though he has not substantially performed the contract, if the owner has breached the contract by terminating it without justification before the completion date. For these reasons, we hold, the trial justice did not err in failing to instruct the jury in accordance with the homeowners' proffered jury instruction that tied the builder's recovery to whether he had substantially performed the contract.

B. Adequate-Staffing Instruction

The homeowners also argue that the trial justice erred in failing to instruct the jury on the builder's alleged failure to adequately staff this home-construction project. The contract stated, in pertinent part:

"In the prosecution of the work, the builder shall at all times keep a competent foreman and

a sufficient number of workers skilled in their trades to suitably perform their work. The foreman shall represent the builder and, in the absence of the builder, all instructions given by the owner to the foreman shall be binding upon the builder as though given to the builder. Upon request of the foreman, instructions shall be in writing and signed by the owner."

Because the homeowners attributed the builder's personal absence from the job site to the delay in the builder's completion of the house, they requested the following instruction to be given by the court to the jury:

"The Defendants have asserted that Mr. **Butera** breached the contract in a number of ways. First, they allege that Mr. **Butera** failed to provide adequate and consistent staffing at the project site in violation of the section of the contract entitled 'Labor and Supervisor' on page 2 of the contract. If you find that Mr. **Butera** failed to provide a 'competent foreman and a sufficient number of workers skilled in their trades to suitably perform the work,' then you must find for the defendants and against the plaintiff on the Plaintiff's breach of contract claim."

The trial justice correctly noted that during the trial the homeowners offered no evidence concerning the builder's alleged inadequate staffing of the job site. While he was away from the site, the builder had assigned site-foreman authority to a framer who was one of his subcontractors. The homeowners argue that the foreman-framer, Dean Racicot, "was simply a framer and not a site foreman," and that the builder "would stop by in the morning, at best." Significantly, the trial justice recognized that the homeowners had selected Racicot % the builder's framer % to be their new general contractor after they terminated the builder's contract. Furthermore, Racicot also served as an expert witness for the homeowners during the trial of this case. Under these circumstances, we conclude, the trial justice did not err in failing to give the requested instructions. The homeowners' proof at trial simply did not warrant such charges to the jury.

Additionally, the homeowners argue that the trial justice erred when he failed to instruct the jury, as they had requested, about the "change order procedures or adjustments in contract price and completion time." But as we stated in Patino, we will not consider on appeal a party's objection to jury instructions unless the objection was "'specific enough to alert the trial justice as to the nature of his alleged error.'" Patino, 770 A.2d at 866-67. Rule 51(b) of the Superior Court Rules of Civil Procedures states "[n]o party may assign as error the giving or the failure to give an instruction unless [they state] * * * distinctly the matter to which the party objects and the grounds of the party's objection." The record in this case shows that the homeowners failed to preserve their objection to the court's failing to give this proposed jury instruction concerning change-order procedures, price adjustments, and completion time, because they did not specifically advise the trial justice in what way the instructions the court proposed to give allegedly were defective. Merely calling the trial justice's attention to a proposed jury instruction that he or she has not given to the jury is inadequate to preserve any objection thereto for appeal. Here, all that was said on this issue is as follows:

"DEFENDANT: No. 6, Judge.

"THE COURT: I gave them a charge on that. If you find it's clear and unambiguous you must enforce the terms, but if there's any ambiguity, you must determine what the intention of the parties were * * *. What else?

"DEFENDANT: No. 7 Judge * * *."

As this excerpt reveals, the homeowners proceeded to the next requested jury charge without specifically advising the trial justice of the alleged error in the court's failure to instruct the jury in accord with their proposed instruction "No. 6." Hence, the homeowners failed to preserve this objection for appeal.

III

Denial of New-Trial Motion

The homeowners next argue that the jury verdict was against the weight of the evidence, and that, thereafter, the trial justice should have granted their motion for a new trial. In considering a motion for a new trial, if the trial justice "'reviews the evidence, comments on the weight of the evidence and the credibility of the witnesses, and exercises his [or her] independent judgment, his [or her] determination either granting or denying a motion for a new trial will not be disturbed unless he [or she] has overlooked or misconceived material and relevant evidence or was otherwise clearly wrong.'" English v. Green, 787 A.2d 1146, 1149 (R.I.2001) (quoting Kurczy v. St. Joseph Veterans Association, Inc., 713 A.2d 766, 770 (R.I. 1998)).

The homeowners contend that the builder failed to prove his damages with specificity, and that he speculated about the amount of damages. Furthermore, they maintain, the jury's finding, on the one hand, that the builder breached the contract, and, on the other hand, that he was entitled to damages for lost profits, was clearly wrong and not supported by competent evidence. The homeowners also argue that the trial justice did not exercise independent judgment when he ruled on the new-trial motion.

We are of the opinion that the trial justice reviewed the evidence in a methodical and thoughtful manner. He did not misconceive or overlook material evidence when he found that reasonable minds could conclude that the builder was at least partly deserving of compensatory damages for his lost profits because of the homeowners' wrongful termination of the contract. The trial justice found that title to the property still had not passed to the homeowners when the builder was supposed to begin constructing the house. In fact, the homeowners were unable to close on the property until three weeks later than the original closing date. And the building permits for the house did not issue until two weeks after the closing on May 28. Further, the homeowners failed to submit their first payment to the builder until May 29. The jury was entitled to conclude that these circumstances pushed back the builder's ability to complete the project by the August 15 date specified in the contract.(Fn1) Indeed, the contract's August 15 completion date was expressly "[d]ependent on complete transfer of clear title and financing to be completed by April 21," neither of which occurred by that date.

Furthermore, the trial justice found that the homeowners were personally involved in the work on this project; indeed, **Boucher** himself was usually on the site every morning by 7 a.m. **Boucher** also ordered the windows for the house, chose the subcontractor that would excavate the property, and bought materials from various suppliers for the construction of the home. His personal involvement in some instances caused additional delays in completing the project. Based on the evidence, the trial justice ruled that it was unreasonable for the homeowners to believe that the builder would finish the job by August 15, and that the terms of the contract itself did not state that time was of the essence. Both the trial justice and the jury found that, given the above-referenced delays that were beyond the builder's control and the absence of a time-is-of-the-essence clause, the homeowners had breached their contract with the builder when they prematurely terminated the contract on August 13. We lack any basis to conclude that they erred in doing so.

With respect to the $15,500 in damages that the jury awarded to the builder, the trial justice found

that the builder's mechanic's-lien exhibit showed that the homeowners owed him $12,066 for work he already had completed at the site when the homeowners wrongfully terminated the contract. There was also testimony that the builder expected to make a profit of $15, 961 on this project. As the trial justice concluded, "[the jury] accepted the testimony of Mr. **Butera** that he expected to make $15,961 profit on the contract. * * * I don't think the jury speculated in the case * * * so I think the award of $15,500 is appropriate in this case for the Plaintiff, and I will deny the Motion for New Trial on that basis."

Damages do not have to be calculated with mathematical exactitude; all that is required is that they are based on reasonable and probable estimates. See Rhode Island Turnpike Authority and Bridge Authority v. Bethlehem Steel Corp., 119 R.I. 141, 167-68, 379 A.2d 344, 358 (1977). "This court has held that 'a damage award may be disregarded by the trial justice and a new trial granted only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled.'" English, 787 A.2d at 1150 (quoting Dilone v. Anchor Glass Container Corp., 755 A.2d 818, 820-21 (R.I. 2000)). We are persuaded the trial justice did not err in ruling that the jury's award of damages to the builder was reasonable, not speculative, and that it responded to the evidence presented during the trial. Consequently, we decline to overturn his decision denying the homeowners' motion for a new trial.

IV

Denial of Judgment as a Matter of Law and

Denial of Motion for a New Trial on the Slander Count

The jury returned a verdict for the homeowners on the builder's claim for slander. In his cross-appeal, the builder alleges that **Boucher** went on a "prosecutorial rampage" after being served with a mechanic's lien for the builder's work. In particular, **Boucher** filed successive complaints with the Rhode Island Contractors' Registration Board (board) and with the Lincoln Police that the builder had stolen building materials, particularly a custom-ordered door, from the job site. After the jury found for the homeowners on this slander count, the builder moved for a judgment as a matter of law, as well as for a new trial on this count. The trial justice denied both motions.

It is well settled that this Court will not disturb the decision of a trial justice to grant or deny a motion for new trial if that justice reviewed the evidence, commented on the weight of the evidence, and evaluated the credibility of the witnesses, while applying his or her independent judgment. Anderson v. Botelho, 787 A.2d 468, 471 (R.I. 2001) (citing Kurczy, 713 A.2d at 770). On the other hand, "an improperly supported decision [on a motion for new trial] is deprived of the weight it is normally accorded." Id. (quoting Lariviere v. Dayton Safety Ladder Co., 525 A.2d 892, 900 (R.I. 1987)). If a trial justice has failed to perform his function in analyzing the evidence and passing upon the credibility of the witnesses, this Court will apply "the appellate rule," and "the jury's verdict will be sustained if as we examine the evidence in the light most favorable to the prevailing party, there is any competent evidence which supports the verdict." Id.

When the trial justice denied the builder's motion for a new trial on his slander claim, he remarked, "the jury obviously felt that **Boucher** filed his complaint in good faith. I disagree with this * * * I think he did it for spite and ill will * * * ." Despite this observation, however, the trial justice denied the builder's motion for a new trial without indicating whether he believed that the verdict was against the weight of the evidence. Therefore, because the trial justice failed to perform his function on this aspect of the builder's new-trial motion, we will proceed to examine the evidence under the "appellate rule"

doctrine.

In doing so, we conclude that the record contains evidence that supports the jury's verdict for the homeowners on the builder's slander claim. The parties' relationship had turned sour and contentious after the homeowners ended the contract in mid-August. Thereafter, the homeowners complained to the Lincoln police that the builder had stolen a door from the job site, together with other building supplies costing in excess of $500. If true, this would amount to accusing the builder of criminal misconduct. Although the evidence established that the supplier sold the door in question to **Boucher** himself, who later requested the builder to "[t]ake this door back," the homeowner testified that he was not aware that the builder had returned the door until September 8 or 9, several days after reporting the builder's alleged theft of the door to the Lincoln police. The supplier of the door, however, testified that he informed the homeowner no later than August 9, when he came into the supplier's store to order a new door, that the builder already had returned the old door. Given this disputed evidence, the jury was entitled to believe **Boucher** and to conclude that he possessed a good-faith basis to charge the builder with theft of the door before he became aware of its return to the supplier.

The court also instructed the jurors on the homeowners' qualified privilege to complain about the builder to the appropriate authorities, see Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 247 A.2d 303 (1968), advising them that the homeowners should prevail on the builder's slander claim if they possessed a good-faith basis to publish the statement about the builder's alleged theft of the door to the authorities. The trial justice told the jury that:

> "In order for the Plaintiff to prevail in this defamation action, he must prove that in addition to the false and defamatory statement that the Defendant, Richard **Boucher**, did not have what we call a qualified privilege to publish the statement. A qualified privilege exists when a party, in good faith and for the purposes of bringing a criminal to justice, communicates the alleged commission of a crime to a law enforcement officer. However, the qualified privilege is lost if the Plaintiff can show that the primary motivating force for the communication was ill will or spite towards the Plaintiff."

Given the conflicting evidence on this point, the jury could have concluded that the homeowners acted pursuant to their qualified privilege to communicate the alleged commission of a crime when they informed various law-enforcement authorities about the builder's alleged theft of the door and his other supposed misconduct. Although the evidence showed that the homeowners were angry and frustrated by the builder's failure to complete the construction of their house as per the August 15 contract date, the last time **Boucher** observed the patio door was when he saw the builder removing it from the building site. Furthermore, the builder later conceded that lumber missing from the site had been returned to the supplier and mistakenly credited to the builder's account instead of to the homeowners' account. After hearing this evidence, a reasonable jury could have concluded that the homeowners had leveled these charges against the builder in good faith. As a result, we hold, the trial justice did not err in denying the builder's motion for a new trial on the slander count.

V

Denial of Judgment as a Matter of Law

On the Malicious-Prosecution And Abuse-of-Process Counts

The trial justice granted the homeowners' motion for judgment as a matter of law on the builder's claim for malicious prosecution under Rule 50 of the Superior Court Rules of Civil Procedure.(Fn2) An

action for malicious prosecution, or "wrongful civil procedure," lies whenever a defendant (1) has instituted or continued to press a civil claim; (2) which terminated in favor of the plaintiff; (3) when the defendant had no probable cause to believe in the validity of the proceeding or pursued the claim with malice toward the plaintiff and, consequently; (4) injured the plaintiff. See W. Page Keeton, Prosser & Keeton on the Law of Torts § 120 at 892-93 (5th ed. 1984) (Prosser). See also Nagy v. McBurney, 120 R.I. 925, 392 A.2d 365 (1978); Powers v. Carvalho, 117 R.I. 519, 368 A.2d 1242 (1977).

In this case, the trial justice correctly found that there was no favorable termination for the builder in connection with the malicious-prosecution count concerning the homeowners' claims, Numbers 869 and 870, filed with the board on September 23, 1993. Because the board had "discontinued processing" these claims, it never held a hearing on the merits of the homeowners' breach of contract and negligence charges.(Fn3) Although claims 869 and 870 alleged mostly charges of construction defects and discrepancies in costs, the homeowners still maintained at the time of this filing that the patio door was "taken off site by D. **Butera**, no credit given even though door was paid in full." Without a determination favorable to the builder, his malicious-prosecution claim could not survive a dismissal motion. In Nagy, this Court ruled that "a plaintiff, in order to maintain an action for malicious prosecution, must show that the original proceeding against him finally terminated in his favor." Nagy, 120 R.I. at 931, 392 A.2d at 368. (Emphasis added.) "[W]hen a proceeding is withdrawn merely in order to substitute immediately another one for the same offense, it is to be regarded as one continuous proceeding, which is not terminated." Prosser, § 119 at 875. Furthermore, any proceeding "which does not terminate [the action] but permits it to be renewed * * * cannot serve as a foundation for the action [of malicious prosecution]. * * * [I]t will be enough that the proceeding is terminated in such a manner that it cannot be revived * * *." Id. at 874.

Here, the board's executive director testified that he had sent a letter concerning claims 869 and 870 to the builder's attorney stating: "In reviewing the above claims and the fact that the contract is subject to litigation in Superior Court, * * * the Board will discontinue processing these claims." Based on above-stated authority and the fact that the board discontinued processing the claims because of the pendency of litigation between the parties in the Superior Court, the court properly granted judgment as a matter of law on the malicious-prosecution count because no final termination of the board's proceeding had occurred.

Later, the homeowners filed another claim (No. 1240) with the board against the builder after the board had discontinued claims 869 and 870. The board thereafter dismissed claim No. 1240 at a hearing held on September 20, 1994. This claim alleged that the builder was not registered with the board at the time the parties executed the contract, but that he had used his father's registration number on the contract. A witness testifying on behalf of the board at the trial said that the board's records on this claim had been destroyed three years after the hearing, and only the fact that it had been dismissed remained in the computer file, but the board's records did not disclose any reason for the dismissal. Although the trial justice failed to address this particular claim specifically, on this scant record we hold that the builder failed to meet his burden of proving that this dismissal showed the claim finally had terminated in his favor as required under Nagy for it to trigger a malicious-prosecution claim. Therefore, this claim also did not meet the required element of a "favorable termination" to satisfy a claim for malicious prosecution.

On the other hand, the trial justice erred when he did not address or recognize the builder's claim for abuse of process, which was embedded in the malicious-prosecution count of the complaint. See note 2, supra. "[V]agueness, lack of detail, conclusionary statements, or failure to state facts or ultimate facts, or facts sufficient to constitute a cause of action are no longer * * * fatal defects." Bragg v. Warwick Shoppers World, Inc., 102 R.I. 8, 12, 227 A.2d 582, 584 (1967). All that is required is that the complaint give the opposing party fair and adequate notice of the type of claim being asserted. See Haley v. Town

of Lincoln, 611 A.2d 845 (R.I. 1992). Although it is obvious that the count of abuse of process "could have been framed with more particularity, we believe that [the pleadings] provided the * * * defendants with more than sufficient notice of the type of claim that [the builder] was asserting against them in [his] complaint as well as the relief sought." Hendrick v. Hendrick, 755 A.2d 784, 791 (R.I. 2000).

"Abuse of process, as distinguished from malicious prosecution, 'arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed.'" Clyne v. Doyle, 740 A.2d 781, 783 (R.I. 1999) (quoting Hillside Associates v. Stravato, 642 A.2d 664, 667 (R.I. 1994)). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion * * * ." See Prosser, § 121 at 898.

In Nagy we stated that for a plaintiff to prove abuse of process, he or she must demonstrate that (1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish. Nagy, 120 R.I. at 934, 392 A.2d at 370. Furthermore "[a] judicial process must in some manner be involved." Prosser, § 121 at 898. In this case, the homeowners' reports of alleged theft to the police, which only resulted in an investigation and no arrest or "process," failed to satisfy this essential element. With respect to the homeowners' claims filed against the builder before the board, this Court ruled in Hillside that a hearing before an administrative body, such as the board, can constitute legal proceedings which "embody sufficient trappings of the judicial process to support claims for malicious prosecution and abuse of process." Hillside Associates, 642 A.2d at 669. The claims % 869 and 870 % filed against the builder essentially were comprised of detailed lists of specification deviations and cost discrepancies, as well as complaints about the builder's general lack of oversight and follow-through on the project, all of which supposedly delayed its completion. The third complaint filed by the homeowners % claim number 1240 % reported a discrepancy in the registration number that appeared on the contract from the number that appeared on the building permits. The testimony showed that the builder had used his father's registration number on the contract, but his own number on the building permits. The gist of an abuse-of-process claim is the misuse of legal process to obtain an advantage, "not properly involved in the proceeding itself * * *. [However], even a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created." Prosser, §121 at 897. (Emphasis added.)

Here, part of the board's raison d'être was to iron out disputes between contractors and homeowners, allowing homeowners to file claims, to utilize dispute resolution, and to seek fines against contractors for alleged violations of applicable laws and regulations, when appropriate. Given the jury's verdict in favor of the homeowners on the builder's slander claim and on the homeowners' breach-of-contract claim against the builder, the homeowners did not use the authority of the board only to obtain "a result for which [the process] was [not] created." Here, because the jury found that the builder was liable for certain defective work, the homeowners were privileged to file their complaints with the board to assure that their home would be built in the time frame and to the specifications they had agreed to in the contract. Furthermore, given the discrepancy in the builder's registration numbers, the homeowners were justified in complaining about whether the builder they had hired was registered with the board at the time they entered into their contract. General Laws 1956 § 5-65-3(a) prohibits contractors to "undertake, offer to undertake, or submit a bid to do work as a contractor" without a valid certificate of registration from the board. The statute prohibits a municipal entity from issuing a building permit to anyone who is required to be registered with the board, but who does not hold such certification. Given their deteriorating relationship with their builder and the defective work on their home, the homeowners were entitled to initiate proceedings before the board because they had adequate grounds to do so. Moreover, this Court has viewed abuse-of-process actions with disfavor because "they tend to deter the prosecution of crimes and/or to chill free access to the courts." Clyne, 740 A.2d at 782 (quoting Brough v. Foley,

572 A.2d 63, 66 (R.I. 1990)). Therefore, we hold, given the jury's verdict on the slander claim and its award of damages against the builder for certain defective work, the evidence showed that homeowners "'possessed a good faith belief'" that the builder had deviated from the terms of their agreement, and that he was operating under a certificate of registration that was not his own when they complained to the board. Id. at 783. Thus, the trial justice did not err in granting judgment as a matter of law on this count of the complaint.

Conclusion

We deny the homeowners' appeal in its entirety and uphold the trial justice's decision to quash the subpoena for the builder's records concerning another construction project. We also reject the homeowners' challenges to the trial justice's jury instructions concerning substantial performance, and to the court's "adequate-staffing" charge. And we affirm the court's denial of the homeowners' motion for a new trial. Finally, we deny the builder's appeal on the slander, abuse-of-process, and malicious-prosecution claims. Thus, we affirm the Superior Court judgment in all respects.

COVER SHEET

TITLE OF CASE: David **Butera,** d/b/a **Butera** Building and Design v. Richard N. **Boucher** et al

DOCKET NO: 1999-409-A.

COURT: Supreme

DATE OPINION FILED: May 21, 2002

Appeal from SOURCE OF APPEAL: Superior

County: Providence

JUDGE FROM OTHER COURT: Ragosta, J.

JUSTICES: Williams, C.J., Lederberg, Bourcier, Flanders, and Goldberg, JJ.

Not Participating .

Concurring

Dissenting

WRITTEN BY: Flanders, J.

ATTORNEYS: Gerard M. DeCelles

For Plaintiff

ATTORNEYS: David Edward Maglio, III/Richard E. Kirby Jonathan Oster

For Defendant

CORRECTION NOTICE

TITLE OF CASE: David **Butera**, d/b/a **Butera** Building and Design v. Richard N. **Boucher** et al

DOCKET NO: 1999-409-A.

COURT: Supreme

DATE OPINION FILED: May 21, 2002

Two corrections have been made in this opinion.

On page 7, 10th line, the word "past" has been changed to "passed".

On page 11, 5th line from the bottom, the (') after homeowners has been removed.

---

Footnotes:

1 Although the contract specified that work on the house would be completed by August 15, the contract itself conditioned that date upon the timely completion of certain other antecedent events:

> "various portions of the work shall be completed on or before the following days: Dependent on complete transfer of clear title and financing to be completed by April 21, completion of all required engineering and scheduling for the excavation, work to begin one week after the transfer of title, on April 28, 1993 and the entire work shall be completed on or before the 15 [sic] day of August, 1993. This day will be revised, if necessary, after the shell is weather tight and the first disbursement is made by FIRSTFED." (Emphases added.)

2 The trial justice decided not to address the abuse of process claim because the builder did not plead it as a separate count. In paragraph 21 of the complaint, the builder alleged: "[the homeowners'] actions were wanton, reckless, willful, malicious prosecutions and abuses of process." The trial justice considered this language and determined, "[t]hat's not a count for abuse of process."

3 After oral argument, the homeowners' attorney moved for leave to correct certain misstatements he had uttered during oral argument. We grant the motion. One of them concerned the board's discontinuance of certain claims because of the pendency of the Superior Court action between the parties. Although the homeowners' attorney had denied this fact during oral argument, his motion admitted that the board dismissed these claims because of the pendency of the Superior Court action relating to these claims.

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

Home Pride Foods, Inc. v. Johnson
Neb.,2001.

Supreme Court of Nebraska.
HOME PRIDE FOODS, INC., a Nebraska corporation, Appellee,
v.
Christopher S. JOHNSON et al., Appellants.
**No. S-00-514.**

Oct. 19, 2001.

Home food service company brought action against competitor that acquired company's customer list and against competitor's officers for a permanent injunction and damages under Trade Secrets Act. Following a bench trial, the District Court, Douglas County, John D. Hartigan, Jr., J., entered judgment in favor of plaintiff, and defendants appealed. The Supreme Court, Connolly, J., held that: (1) as a matter of first impression, while the definition of a trade secret is a question of law, whether information sought to be protected rises to the level of a trade secret under the Act is a question of fact; (2) as a further matter of first impression, a customer list could be included in the definition of a "trade secret" under the Act; (3) company's customer list was a "trade secret;" (4) evidence supported finding that competitor used company's customer list; (5) court erred in awarding damages for lost profits absent evidence of company's **net profits**, but evidence of **net profit** earned by competitor warranted remand for a recalculation of damages; (6) company was not entitled to damages award for future use of customer list when a permanent injunction had also been issued.

Affirmed in part, and in part reversed and remanded for further proceedings.
West Headnotes
**[1] Antitrust and Trade Regulation 29T 433**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(B) Actions
29Tk433 k. Questions of Law or Fact. Most Cited Cases
(Formerly 382k1003 Trade Regulation, 379k28)
The definition of a "trade secret" is a question of law. Neb.Rev.St. § 87-502(4).

**[2] Appeal and Error 30 842(1)**

30 Appeal and Error
30XVI Review
30XVI(A) Scope, Standards, and Extent, in General
30k838 Questions Considered
30k842 Review Dependent on Whether Questions Are of Law or of Fact
30k842(1) k. In General. Most Cited Cases
When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court.

**[3] Antitrust and Trade Regulation 29T 433**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(B) Actions
29Tk433 k. Questions of Law or Fact. Most Cited Cases
(Formerly 382k1003 Trade Regulation, 379k28)
In an action for damages, whether information sought to be protected rises to the level of a "trade secret" under the Trade Secrets Act is a question of fact. Neb.Rev.St. § 87-502(4).

**[4] Appeal and Error 30 1008.1(2)**

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)3 Findings of Court
30k1008 Conclusiveness in General
30k1008.1 In General
30k1008.1(2) k. Same Effect as Verdict. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Appeal and Error 30 ⚷1008.1(5)**

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)3 Findings of Court
30k1008 Conclusiveness in General
30k1008.1 In General
30k1008.1(5) k. Clearly Erroneous Findings. Most Cited Cases

In a bench trial of a law action, a trial court's findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous.

**[5] Trial 388 ⚷165**

388 Trial
388VI Taking Case or Question from Jury
388VI(C) Dismissal or Nonsuit
388k165 k. Hearing and Determination of Motion. Most Cited Cases

A defendant who, after the overruling of a motion for dismissal made at the close of the plaintiff's evidence, adduces evidence on its own behalf waives any error on the motion for dismissal.

**[6] Appeal and Error 30 ⚷882(14)**

30 Appeal and Error
30XVI Review
30XVI(C) Parties Entitled to Allege Error
30k881 Estoppel to Allege Error
30k882 Error Committed or Invited by Party Complaining
30k882(14) k. Submitting Issues or Questions to Jury in General. Most Cited Cases

Competitor and its officers who, after the overruling of a motion for dismissal made at the close of evidence presented by home food services company in action under the Trade Secrets Act, adduced evidence on their own behalf waived appellate review of any error on the motion for dismissal. Neb.Rev.St. § 87-501 et seq.

**[7] Antitrust and Trade Regulation 29T ⚷421**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk421 k. Customer Lists and Information. Most Cited Cases

(Formerly 382k991 Trade Regulation, 379k10(5))

A customer list can be included in the definition of a "trade secret" under the Trade Secrets Act. Neb.Rev.St. § 87-502(4).

**[8] Antitrust and Trade Regulation 29T ⚷412**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk412 k. Purpose and Scope of Trade Secret Protection, in General. Most Cited Cases

(Formerly 382k983 Trade Regulation, 379k10(5))

Where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market.

**[9] Antitrust and Trade Regulation 29T ⚷421**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk421 k. Customer Lists and Information. Most Cited Cases

(Formerly 382k991 Trade Regulation, 379k10(5))

Home food service company's customer list, which contained information on customers who had previously placed orders with company and the amounts of those orders, was a "trade secret" under the Trade Secrets Act; customer list had independent economic value, was kept secret, and competitor paid $800 for a stolen copy. Neb.Rev.St. § 87-502(4).

**[10] Antitrust and Trade Regulation 29T ⚷432**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(B) Actions
29Tk429 Evidence
29Tk432 k. Weight and Sufficiency of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Evidence. Most Cited Cases

(Formerly 382k1002 Trade Regulation, 379k10(5))

Evidence that competitor contacted previous customers of home food service company and business from which company had purchased its customer list, that some of these customers received discounts on their orders, that some of these customers did not initiate the contact with competitor and that customers' names were not obtained from day-care providers as competitor claimed supported finding that competitor used company's customer list in violation of the Trade Secrets Act. Neb.Rev.St. § 87-501 et seq.

**[11] Damages 115 ⚷15**

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)1 In General

115k15 k. Nature and Theory of Compensation. Most Cited Cases

Award of $10,000, which represented the value of leads for future sales opportunities gained by competitor due to misappropriation of home food service company's customer list, did not represent competitor's unjust enrichment, but rather was a reasonable royalty, and, thus, company did not obtain a double recovery for both its lost profits and the gain in competitor's profits. Neb.Rev.St. § 87-504.

**[12] Damages 115 ⚷190**

115 Damages

115IX Evidence

115k183 Weight and Sufficiency

115k190 k. Loss of Profits. Most Cited Cases

Absent evidence of its **net profits**, home food service company failed to present evidence required to support damages award for lost profits in action under Trade Secrets Act; company presented evidence of only lost gross profits or losses based on its gross profit margin and presented no evidence of its expenses or overhead costs, and there was no evidence supporting 25% **net profit** amount used by trial court. Neb.Rev.St. § 87-504.

**[13] Damages 115 ⚷184**

115 Damages

115IX Evidence

115k183 Weight and Sufficiency

115k184 k. In General. Most Cited Cases

While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.

**[14] Damages 115 ⚷190**

115 Damages

115IX Evidence

115k183 Weight and Sufficiency

115k190 k. Loss of Profits. Most Cited Cases

A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness.

**[15] Damages 115 ⚷190**

115 Damages

115IX Evidence

115k183 Weight and Sufficiency

115k190 k. Loss of Profits. Most Cited Cases

Where a plaintiff presents evidence of only gross profits and fails to provide evidence of expenses and overhead costs from which **net profits** can be calculated, the plaintiff has failed to present sufficient evidence of lost profits.

**[16] Appeal and Error 30 ⚷1013**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)3 Findings of Court

30k1013 k. Amount of Recovery. Most Cited Cases

**Damages 115 ⚷208(1)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury
115k208(1) k. In General. Most Cited Cases
The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.

**[17] Implied and Constructive Contracts 205H ⚷3**

205H Implied and Constructive Contracts
205HI Nature and Grounds of Obligation
205HI(A) In General
205Hk2 Constructive or Quasi Contracts
205Hk3 k. Unjust Enrichment. Most Cited Cases
**Net profit** earned by competitor was recoverable as unjust enrichment as a result of competitor's misappropriation of home food service company's customer list.

**[18] Injunction 212 ⚷197**

212 Injunction
212V Permanent Injunction and Other Relief
212k197 k. Recovery of Damages in Addition to Injunction. Most Cited Cases
Home food service company was not entitled to damages award for future use of its customer list by competitor when a permanent injunction had also been issued to prevent competitor's future use of list.

**[19] Injunction 212 ⚷197**

212 Injunction
212V Permanent Injunction and Other Relief
212k197 k. Recovery of Damages in Addition to Injunction. Most Cited Cases
It is impermissible double recovery for a court to award damages for future use and, at the same time, issue a permanent injunction barring such use.
*Syllabus by the Court*

*701 1. **Trade Secrets: Words and Phrases.** The definition of a trade secret is a question of law.

2. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court.

3. **Trade Secrets: Actions: Damages.** In an action for damages, whether information sought to be protected rises to the level of a trade secret under the Trade Secrets Act is a question of fact.

4. **Judgments: Appeal and Error.** In a bench trial of a law action, a trial court's findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous.

5. **Motions to Dismiss: Waiver: Appeal and Error.** A defendant who, after the overruling of a motion for dismissal made at the close of the plaintiff's evidence, adduces evidence on its own behalf waives any error on the motion for dismissal.

6. **Trade Secrets: Words and Phrases.** A customer list can be included in the definition of a trade secret under Neb.Rev.Stat. § 87-502 (Reissue 1999).

7. **Trade Secrets: Restrictive Covenants.** Where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market.

8. **Damages: Proof.** While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.

**777 9. **Damages: Proof.** A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness.

10. **Damages: Evidence.** Where a plaintiff presents evidence of only gross profits and fails to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence of expenses and overhead costs from which **net profits** can be calculated, the plaintiff has failed to present sufficient evidence of lost profits.

11. **Damages: Appeal and Error.** The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.

12. **Damages: Injunction.** It is impermissible double recovery for a court to award damages for future use and, at the same time, issue a permanent injunction barring such use.

*702 Michael J. Lehan, of Kelley & Lehan, P.C., Omaha, for appellants.
Clay M. Rogers and Patrick E. Griffin, of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, Omaha, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, Justice.
The appellee, Home Pride Foods, Inc. (Home Pride), sued the appellants, Christopher S. Johnson, Jason J. Johnson, and Consumer's Choice Foods, Inc. (Consumer's Choice), for a permanent injunction and damages under Nebraska's Trade Secrets Act, Neb.Rev.Stat. § 87-501 et seq. (Reissue 1999). After a bench trial, the district court determined that the appellants had used a customer list misappropriated from Home Pride. The court determined the list was a trade secret, issued a permanent injunction, and awarded damages.

This appeal presents the questions, Is a customer list a trade secret, and if so, was the list used by the appellants? Because we decide these issues in Home Pride's favor, we inquire whether Home Pride proved damages. We determine that the district court erred in calculating damages by awarding an amount based on a 25-percent **net profit** when there is no evidence in the record to support that finding. We also conclude that the court erred in awarding damages for future use of the list when a permanent injunction was also entered. We reverse the district court's award of damages and remand the cause for further proceedings.

BACKGROUND

Facts

Home Pride and Consumer's Choice are competing home food service companies. The companies sell and deliver food products and appliances to their customers.

The parties stipulated that the appellants inappropriately came into possession of the customer list owned by Home Pride. *703 The appellants stipulated that they paid $800 for the list and knew the list was stolen when they purchased it. The parties further stipulated that under a search warrant for the Consumer's Choice premises related to the purchase of stolen goods, police found copies of the list at the Consumer's Choice premises. The list contains information about the customers such as their names, addresses, telephone numbers, amount of food ordered, and number of reorders of food.

**778 Bryce Johnson, no relation to Christopher Johnson and Jason Johnson, is the president of Home Pride. Before starting Home Pride, he and Christopher Johnson and Jason Johnson were employed by Nebraska Prime Meats (Nebraska Prime). In 1996, Bryce Johnson purchased the customer database of Nebraska Prime and its service contracts.

After the list was purchased, an employee of Nebraska Prime loaded the list into Home Pride's computers. Bryce Johnson testified that there were three different passwords on each computer and that the paper files were also protected. Bryce Johnson, his secretary, and his sales manager were the only people who had access to the customer list. In addition, Home Pride's sales representatives were subject to covenants not to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compete and not to divulge trade secrets, including customer lists.

The customer list is a valuable asset of a food service company. Bryce Johnson described the list as "priceless" and testified that if a customer list got into the hands of a competitor, the results could result in significant losses.

Testifying about damages, Bryce Johnson stated the average customer at Home Pride reorders food 4 1/2 times and that the national average is four to eight reorders. According to Bryce Johnson, Home Pride's gross margin of profit was 60 percent and between 30 and 50 percent on reorders. He stated the average value of reorders is between $1,200 and $1,500. After discovery proceedings, he compared customer files at Consumer's Choice against Home Pride's customer list and found that many of the names matched up. By cross-referencing the list, he determined the receipts from Consumer's Choice of the names that matched was $33,605. He assumed the average number of reorders from these customers would be four reorders each. *704 Using a gross profit margin of 60 percent, he calculated that Home Pride had lost approximately $80,000 in profits because of the theft of the customer list.

Kenneth E. McLaughlin, the previous owner of Nebraska Prime, corroborated Bryce Johnson's testimony. He testified that the customer list contained names of both active and inactive customers. McLaughlin explained that a food service business could be harmed if others knew the customers and the prices, because the company could then be undercut. According to McLaughlin, without the customer list, no business can exist.

McLaughlin testified that when he owned Nebraska Prime, it made every attempt to keep its customer list secret. Nebraska Prime kept the list password protected, and the list was never sold to anyone other than Home Pride. He testified that employees were given lists of people to call but that these employees did not have the master list. He also stated that the Nebraska Prime employee who loaded the list did not have the authority to have the list other than to install it in Home Pride's computers.

McLaughlin testified that between 50 percent and 60 percent of customers would reorder food. According to McLaughlin, most customers would stay with the service for 3 years because they had a service agreement or had bought a freezer through Nebraska Prime which entitled them to a discount on food. He stated that this would lead to between five and six reorders because a customer would have to place that many reorders in order to benefit from the discounts during the period that the appliance was financed.

Home Pride also called two expert witnesses whose testimony generally agreed with Bryce Johnson's testimony about Home Pride's gross profits and the value **779 of the list. Both testified that Home Pride lost $80,000 in gross profits.

Shannon Tews, an acquaintance of Christopher Johnson, corroborated that the appellants misappropriated the use of the list. Tews testified that Christopher Johnson told her he had bought disks copied from Nebraska Prime. She also stated that Christopher Johnson told her that he and his fiance, Kimberly Stigge, the sales manager of Consumer's Choice, were going to contact people within 1 to 2 months so as not to raise eyebrows.

*705 The appellants called Michael Schmidt, an employee of Consumer's Choice. Schmidt was previously employed by Nebraska Prime, where he was in charge of operations. He testified that Nebraska Prime had between 300 and 400 active customers and that there were between 2,000 and 3,000 names on the list. He stated that the list at Nebraska Prime was printed and not password protected. According to him, 40 to 50 percent of Nebraska Prime's business was derived from day-care providers, contrary to Bryce Johnson's claim that Home Pride did not solicit day-care centers. He stated that the average reorder rate is one or two and that the **net profit** on reorders at Consumer's Choice is 10-percent.

On cross-examination, Schmidt admitted that in April

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999, Consumer's Choice had purchased a home food service business owned by him and had retained him as a consultant. As part of that transaction, he receives between 10 and 20 percent of the sales price from people that he hires and trains for Consumer's Choice. He also conceded that the customer list is an asset of the business.

Stigge testified that the customer list had not been installed on the Consumer's Choice computers and was not used by the appellants. According to Stigge, Christopher Johnson and Jason Johnson did not make sales calls for Consumer's Choice.

Stigge testified there were 40 matches, but 15 of those were acquired by Consumer's Choice before the list was stolen in September 1996. She could not find a file for 1 of the remaining 25 matches. She stated that the rest of the matches were acquired through normal marketing, including day-care provider lists.

Stigge, who had previously been employed by Nebraska Prime as a telemarketer, stated that day-care lists were used at Nebraska Prime, along with other marketing lists. According to her, day-care lists generated the most appointments.

Trial Court's Findings

After the conclusion of Home Pride's case, the appellants moved for a directed verdict, which was overruled. The court entered a detailed order finding in favor of Home Pride. The court did not specifically state that it found the customer list to be a trade secret. The court did, however, note McLaughlin's ***706** testimony about the value of the customer list. The court also noted the conflicting testimony about whether the list was used and the value placed on the list.

The court then found that Home Pride had established the presence of 40 names from the stolen list on the Consumer's Choice customer database. The court stated that "[a]t this point, it would seem that the business from those 40 names should, in the absence of other evidence, be attributed to the stolen list." The court then found that Home Pride suffered no damage from those customers of Consumer's Choice acquired before the list was stolen. The court separately addressed the remaining names on the list and found that each customer had been acquired through the use of the stolen list with the exception of three names.

****780** Concerning damages, the court noted that the renewal rate from Nebraska Prime's list was "quite low." The court also noted that most of the customers who were acquired by Consumer's Choice had already purchased a freezer. The court found that this limited the loss to Home Pride since most of the profit lost from those customers would be through reorders or purchases of items other than freezers. The court determined that lost revenues were not the proper measure of damages and that gross profit margins were not reflective of actual damages. The court then determined that there were customers who demonstrated that they were active customers and found those customers represented lost profits, valued at the time of theft at $13,000, or $1,000 per contract. The court calculated the $13,000 based on "25% **net profit**."

In addition, the court found that the customer list had value because it represented future sales opportunities and provided "real leads in this area." The court found the value of those leads to be $10,000 and stated that "[t]o the extent that this value may represent neither an enrichment to Defendants' or a dollar loss to Plaintiff, it shall be considered a royalty under § 87-504." The court awarded Home Pride $23,000 and entered a permanent injunction prohibiting the appellants from continuing to misappropriate the customer list.

ASSIGNMENTS OF ERROR

The appellants assign, rephrased, that the district court erred in (1) finding that the customer list was a trade secret, (2) finding ***707** that the customer list was used by the appellants, (3) allowing Home Pride a double recovery by entering an order that included damages for both actual damages and unjust enrichment, (4)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entering an order for damages without competent evidence to support the award, (5) awarding $10,000 as a reasonable royalty, (6) failing to sustain their motion for a directed verdict, (7) failing to issue specific findings of fact and conclusions of law, and (8) failing to grant their motion for a new trial.

STANDARD OF REVIEW

We first address the appropriate standard of review. Before the enactment of the Uniform Trade Secrets Act in 1988, this court indicated that an action for damages because of the unlawful use of a trade secret was an action at law, subject to a clearly erroneous standard of review. *Henkle & Joyce Hardware Co. v. Maco, Inc.*, 195 Neb. 565, 239 N.W.2d 772 (1976). In a later case, we held that an action for both an injunction and damages for misappropriation of a trade secret was in equity and subject to a de novo standard of review. *Garner Tool & Die v. Laux*, 204 Neb. 717, 285 N.W.2d 219 (1979). See, also, *Selection Research, Inc. v. Murman*, 230 Neb. 786, 433 N.W.2d 526 (1989) (stating that trade secret action seeking injunction and filed before Trade Secrets Act went into effect was action in equity).

We have not addressed what the appropriate standard of review is in an action brought under Nebraska's Trade Secrets Act for money damages. Courts in other jurisdictions that have adopted the Uniform Trade Secrets Act have treated an action for damages under the act as an action at law. See, e.g., *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 752 A.2d 1037 (1999) (citing cases applying clearly erroneous standard of review); *Basic American, Inc. v. Shatila*, 133 Idaho 726, 992 P.2d 175 (1999); *Weins v. Sporleder*, 569 N.W.2d 16 (S.D.1997). Thus, courts have held that the definition of a trade secret is a matter of law under the act. But, the question of whether information ****781** sought to be protected by the act rises to the level of a trade secret is one of fact for the trial court that is subject to a clearly erroneous standard of review. *Id.; Bernier v. Merrill Air Engineers*, 770 A.2d 97 (Me.2001).

***708** [1][2][3][4] We hold that the definition of a trade secret is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *In re Guardianship & Conservatorship of Donley, ante* p. 282, 631 N.W.2d 839 (2001). Whether information sought to be protected rises to the level of a trade secret under the act is a question of fact. In a bench trial of a law action, a trial court's findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *O'Connor v. Kaufman*, 260 Neb. 219, 616 N.W.2d 301 (2000); *Blue Creek Farm v. Aurora Co-op. Elev. Co.*, 259 Neb. 1032, 614 N.W.2d 310 (2000).

ANALYSIS

Motion to Dismiss

[5][6] The appellants contend that the district court erred in failing to grant their motion for a directed verdict. The appellants made a motion for a directed verdict at the end of Home Pride's case, which was overruled. We interpret this motion to be the same as a motion to dismiss. After the motion was overruled, the appellants presented evidence and did not renew their motion at the end of their case. A defendant who, after the overruling of a motion for dismissal made at the close of the plaintiff's evidence, adduces evidence on its own behalf waives any error on the motion for dismissal. *Synacek v. Omaha Cold Storage*, 247 Neb. 244, 526 N.W.2d 91 (1995), *overruled in part on other grounds, Billingsley v. BFM Liquor Mgmt.*, 259 Neb. 992, 613 N.W.2d 478 (2000). We determine that the appellants' argument on this issue has been waived.

Determination That Customer List Was Trade Secret

The appellants argue that the court erred in determining that the customer list was a trade secret. Section 87-502(4), of the Trade Secrets Act, defines a trade secret as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:
(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable *709 by proper means by, other persons who can obtain economic value from its disclosure or use; and
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

[7] This court has never addressed the question whether a customer list can be included in the definition of a trade secret. Other jurisdictions hold that a customer list can constitute protected information under the Uniform Trade Secrets Act. See, e.g, *Brown v. Ruallam Enterprises, Inc.*, 73 Ark.App. 296, 44 S.W.3d 740 (2001); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 971 P.2d 936 (en banc 1999); *Fred's Stores of Miss. v. M & H Drugs*, 725 So.2d 902 (Miss.1998); *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731 (1997). We agree and hold that a customer list can be included in the definition of a trade secret under & § 87-502. The question is whether the customer list rises to the level of a trade secret in this case.

[8] The appellants argue that the customer list could be ascertained by proper means through the use of day-care lists **782 and other marketing lists and that therefore, the customer list was not a trade secret. Courts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources. *Morlife, Inc. v. Perry, supra.* But where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market. See *id.* Such lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers. *Id.*

[9] The record contains evidence that the customer list contained information not available from publicly available lists. For example, Bryce Johnson testified that the list provided information on customers who had previously placed orders with Home Pride or Nebraska Prime, and the amounts of those orders. With such information, a competitor could undercut Home Pride's pricing. Moreover, if the information was readily available, why did the appellants pay $800 for a stolen list? We determine that the court was not clearly wrong in finding that the list could not be ascertained through proper means.

*710 The appellants also argue that the list was not password protected or kept secret. The record, however, contains evidence that the customer list had independent economic value and was kept secret. Finally, the appellants do not deny that the list was misappropriated. There was evidence in the record to support the court's finding of fact that the customer list was a trade secret. Thus, the finding of the court was not clearly erroneous.

Determination That Customer List Was Used by Appellants

[10] The appellants next argue that the court erred in finding that the customer list was used by them. The appellants argue that Home Pride failed to present any evidence that the list was actually used.

The record contains evidence that previous customers of Home Pride or Nebraska Prime were contacted by Consumer's Choice and that some of these people received discounts on their orders. The record also contains evidence that some of these previous customers did not initiate the contact with Consumer's Choice. Finally, Home Pride's evidence refuted the contention by Consumer's Choice that many of the customers' names were obtained from day-care providers. Thus, there was circumstantial evidence that Consumer's Choice used the customer list, and it was reasonable for the court to infer from this evidence that the list had been used. See, generally, *Morlife, Inc. v. Perry, supra.* We determine that the court was not clearly wrong in finding that the customer list was used by Consumer's Choice.

Damages for Lost Profits and Unjust Enrichment

[11] The appellants first argue that the court awarded damages for both lost profits and unjust enrichment. The appellants argue that such an award allows a double recovery for the same damages.

Section 87-504 provides:
[A] complainant shall be entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation **783 *711 may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Courts are divided on whether a plaintiff may recover damages for both his or her lost profits and damages for unjust enrichment based on the defendant's gain. See Annot., 11 A.L.R.4th 12 (1982 & Supp.2001). A majority of courts hold that damages are to be calculated by either the plaintiff's lost profits or the defendant's gain, whichever is greater, but not a combination of the two. See, *id.*; *Saforo & Associates, Inc. v. Porocel*, 337 Ark. 553, 991 S.W.2d 117 (1999). Other courts allow for a combination of lost profits and unjust enrichment damages under certain circumstances that are not present in this case. See Annot., 11 A.L.R. 4th, *supra*.

We do not decide whether a plaintiff may recover both his or her lost profits and the defendant's gained profits because the court awarded damages based only on lost profits. The court did not base an award on the profit gained by the appellants. The court awarded $10,000 representing the value of leads for future sales opportunities gained by Consumer's Choice because of their misappropriation of the list. This figure did not represent the appellants' unjust enrichment and was characterized by the court as a reasonable royalty. Thus, the court did not award a double recovery for both the lost profits of Home Pride and the gain in profits of Consumer's Choice.

Evidence of Lost Profits

[12] The appellants next argue that Home Pride failed to provide sufficient proof of lost profits. In particular, the appellants argue that Home Pride failed to present evidence to support its claim for lost profits and that the evidence of lost profits was based only on gross profit without taking expenses into consideration.

[13][14] While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Sack Bros. v. Tri-Valley Co-op.*, 260 Neb. 312, 616 N.W.2d 786 (2000). We have held that a claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *712 *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996). In *World Radio Labs.*, a witness provided an opinion regarding lost profits, but no reliable financial data was provided to support the claim. We held under those circumstances that it was error for the district court to submit the claim for lost profits to the jury.

[15] Further, courts in other jurisdictions hold that the proper method of calculating damages for lost profits is on the basis of lost **net profits** and not gross profits. See, *Brown v. Ruallam Enterprises, Inc.*, 73 Ark.App. 296, 44 S.W.3d 740 (2001); *Fred's Stores of Miss. v. M & H Drugs*, 725 So.2d 902 (Miss.1998). Thus, where a plaintiff presents evidence of only gross profits and fails to provide evidence of expenses and overhead costs from which **net profits** can be calculated, the plaintiff has failed to present sufficient evidence of lost profits. See *Fred's Stores of Miss. v. M & H Drugs*, *supra* (reversing damage award based on gross profits).

[16] The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationship to the elements of the damages proved. **784*Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001); *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

Home Pride presented evidence of only lost gross profits or losses based on Home Pride's gross profit margin. No evidence was provided regarding Home Pride's expenses or overhead costs. There is no evidence in the record to support a damage award for lost profits. The court, however, based its award on an assumption of a 25-percent **net profit**. Because no evidence was provided that would allow a calculation of **net profit** to be made, we determine that the court's award of lost profits was clearly erroneous and must be reversed.

[17] Although we determine that there was insufficient evidence for the court's award of damages for Home Pride's lost profits, we note that evidence was presented regarding the **net profit** of Consumer's Choice. The **net profit** realized by Consumer's Choice is recoverable as unjust enrichment as a result of the misappropriation. The record contains testimony from Schmidt *713 that Consumer's Choice earned a 10-percent **net profit** on reorders of food. Accordingly, we remand for a determination of damages based on the unjust enrichment to Consumer's Choice.

Award of Royalty

[18] The appellants argue that the court's award of $10,000 as a reasonable royalty is not allowed under the Trade Secrets Act. The court awarded an additional $10,000 for the value of future sales generated by the misappropriation of the list. The court also permanently enjoined the appellants from further use of the list.

[19] Courts in other jurisdictions have held that it is impermissible double recovery for a court to award damages for future use and, at the same time, issue a permanent injunction barring such use. See, *Sonoco Products Co. v. Johnson*, 23 P.3d 1287 (Colo.App.2001) (citing cases); *Robert L. Cloud & Associates v. Mikesell*, 69 Cal.App.4th 1141, 82 Cal.Rptr.2d 143 (1999).

The court's award for the value of future sales is inconsistent with the issuance of a permanent injunction. Home Pride requested, and was given, a permanent injunction. The court's award of $10,000 for future sales was an impermissible double recovery and is reversed.

Remaining Assignments of Error

The appellants also assign that the court erred in failing to issue specific findings of fact and conclusions of law and in failing to sustain a motion for a new trial. We have reviewed these assignments of error and determine they are without merit.

CONCLUSION

We determine that a customer list can be a trade secret under the Trade Secrets Act. We further determine that the court was not clearly wrong in determining that the customer list was a trade secret under the facts of the case and that it was used by the appellants. We determine, however, that the court erred in awarding damages for lost profits when no evidence of Home Pride's **net profits** was provided. We further determine that the court erred in awarding $10,000 in damages for future use of the customer list when a permanent injunction had also been issued. *714 We reverse the award of damages. Because there is evidence of the **net profit** earned by Consumer's Choice, we remand for a recalculation of damages.

Affirmed in part, and in part reversed and remanded for further proceedings.

Neb.,2001.
Home Pride Foods, Inc. v. Johnson
262 Neb. 701, 634 N.W.2d 774

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

John G. Kottis et al. v. Benedetto A. Cerilli, Jr., et al.

No. 90-502-Appeal.

SUPREME COURT OF RHODE ISLAND

612 A.2d 661; 1992 R.I. LEXIS 172; 18 U.C.C. Rep. Serv. 2d (Callaghan) 701

July 7, 1992, Decided
July 7, 1992, Filed

PRIOR HISTORY: [**1] Appeal from Superior Court. Newport County. Gibney, J.

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant buyer sought review of the judgment from the Superior Court in Newport County ( Rhode Island) that awarded damages to plaintiff sellers for breach of contract of a purchase-and-sale agreement.

OVERVIEW: On appeal, the court affirmed the judgment of the trial court. The court determined that the sellers of the stock were ready to close on the date of closing and that the buyer's argument asserting their actual inability to close was unavailing. The court found that the parties continued to negotiate after the closing failed to take place but there was no accord and satisfaction and the sellers did not abandon the contract. The court held that since the closing never took place, the buyer never signed a pledge agreement and a security interest was never created. The court ruled that since the buyer signed the written agreement and the law regarded a signature on such a document as manifesting the signer's intent, the trial court's finding that price and payment terms were included in the agreement was not erroneous. The court held that the trial court did not err in its calculations of damages awarded to the sellers and that it properly awarded attorney's fees. The court rejected the buyer's contention that the trial court award of costs included expert witness fees.

OUTCOME: The court affirmed the judgment of the trial court that awarded damages to the sellers.

CORE TERMS: stock, abandonment, shareholder, deposit, accord and satisfaction, purchase-and-sale, buyer, notice, breach of contract, seller, material evidence, contract price, properly awarded, chose in action, trial record, pledge, misconceived, overlooked, bargain, medium, entitled to notice, conclusions of law, ready and willing, written agreement, intent to abandon, directed verdict, right of action, witness fees, new trial, expert-witness

LexisNexis(R) Headnotes

Contracts Law: Breach: Causes of Action
Contracts Law: Breach: Nonperformance
[HN1] When concurrent acts are to be performed by the parties to a contract, the party bringing suit for breach need only aver that he or she was ready and willing to perform and that the alleged breacher was requested to perform but refused. When the party alleging the breach demands the other's performance of the concurrent act, an offer to perform on the part of the alleging party is implied and understood. Actual performance by the party alleging the breach is not necessary; rather, notice of his or her readiness to perform constitutes and implies tender.

Contracts Law: Breach: Causes of Action
Contracts Law: Breach: Nonperformance
[HN2] Parties alleging breach are not required to perform their part of the bargain before suing other parties for breach. The party alleging breach is only required to tender performance. Tender of performance occurs by providing notice to the other party that one is ready to perform. What is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing that the plaintiff is to give is said to be unnecessary.

Contracts Law: Performance: Accord & Satisfaction
[HN3] An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions. Thus, in order for the doctrine of accord and satisfaction to operate as a defense, the party asserting the defense must show that an agreement exists and that the agreement was accepted in exchange for refusal to press a right of action.

Contracts Law: Breach: Nonperformance
[HN4] Generally abandonment is the voluntary relinquishment of a known right. Abandonment of an executory contract for the sale of land requires an intent to abandon and some act or failure to act that shows that vendee no longer claims or retains any interest in the subject matter. Moreover, abandonment is unilateral, requiring action only by the possessor of the right that is to be abandoned.

Civil Procedure: Trials: Bench Trials
[HN5] R.I. Super. Ct. R. Civ. P. 52(a) does not require the trial justice to set forth all facts presented at trial. The rule also does not require the trial justice to explain why each legal result asserted by a party was not accepted by the court.

Commercial Law (UCC): Secured Transactions (Article 9): Classification of Goods
Commercial Law (UCC): Secured Transactions (Article 9): Chattel Paper & Instruments
[HN6] The U.C.C. "applies to transactions in goods." U.C.C. @ 6A-2-102. Goods are defined as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the

money in which the price is to be paid, investment securities and things in action. U.C.C. @ 6A-2-105(1). This appellate court is of the opinion that stock of a closely held corporation does not meet any of these definitions of goods.

Commercial Law (UCC): Investment Securities (Article 8): Security Interests
[HN7] A "security" is an instrument which (i) is issued in bearer or registered form; and (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and (iii) is either one of a class or series or by its terms divisible into a class or series of instruments; and iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer. U.C.C. @ 6A-8-102(1)(a).

Civil Procedure: Appeals: Standards of Review: Standards Generally
[HN8] Findings of a trial justice sitting without a jury will not be disturbed unless it is demonstrated that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong.

Contracts Law: Formation: Formation Generally
[HN9] A party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents.

Contracts Law: Formation: Ambiguity & Mistake
Contracts Law: Contract Interpretation: Interpretation Generally
Contracts Law: Contract Interpretation: Ambiguities & Contra Proferentem
[HN10] When the terms of a contract are construed unless a plain and unambiguous intent to the contrary is manifested, the words used in the contract are assigned their ordinary meaning. Stated another way, clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions.

Civil Procedure: Costs & Attorney Fees: Litigation Costs
[HN11] R.I. Gen. Laws @ 9-22-5 (1969 reenactment) provides that in civil actions at law, the party prevailing shall recover costs, except where otherwise specially provided, or as justice may require, in the discretion of the court.

COUNSEL: Robert Fine (Licht & Semonoff) Providence, for plaintiff

Milton Stanzler, Providence, Lauren E. Jones, Providence, for defendant.

JUDGES: Fay, C.J., Kelleher, Weisberger, Murray, Shea, JJ., Concurring.

OPINIONBY: SHEA

OPINION: [*663] OPINION

SHEA, J. This case comes before the Supreme Court on the defendant's appeal from a judgment in Superior Court awarding the plaintiffs $ 1,872,999.42 plus additional interest, costs, and attorney fees for a claim of breach of contract. We affirm.

The plaintiffs are John G. Kottis (Kottis), William J. McManus (McManus), Harry B. Casey (Casey), and Paul E. Burke (Burke). These four individuals own

half the shares of Camelot Gardens, Inc. (Camelot). Camelot was formed to own real estate known as the Hammersmith Farm in Newport, Rhode Island. n1 Camelot operated a museum on this property. Benedetto A. Cerilli, Jr. (Cerilli), represented the interest of Thomas DeFelice (DeFelice), the defendant and prospective purchaser of the property. DeFelice negotiated with plaintiffs and eventually signed a purchase-and-sale agreement on December 11, 1979, to buy their stock in Camelot for the total sum of $ 1,360,000 or $ 340,000 per [**2] shareholder. The defendant paid plaintiffs a $ 12,000 deposit upon the signing of the purchase-and-sale agreement. A closing was scheduled for December 28, 1979. On that date the closing did not occur.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Hammersmith Farm, a large tract of land with a water view, is a well-known Newport property because it was used as the Summer White House during the Kennedy administration.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

The plaintiffs eventually filed suit, alleging that defendant breached the December 11, 1979 purchase-and-sale agreement. At trial the trial justice granted defendant's motion for a directed verdict. That judgment was appealed to this court, and in Kottis v. Cerilli, 526 A.2d 506 (R.I. 1987), we determined that the motion for directed verdict was improperly granted on one of the counts alleged and we therefore granted a new trial. The present case comes before us on an appeal from the judgment rendered in that new trial.

The defendant raises seven issues on appeal. Pertinent facts will be added as is necessary for a[**3] discussion of these issues.

I

The first issue that defendant raises is whether plaintiffs' tender of performance at the December 28, 1979 closing was sufficient to support an award for breach of contract against defendant. Specifically defendant asserts that plaintiffs did not have the actual ability to perform their end of the bargain because plaintiffs could not transfer all the shares of stock they had agreed to deliver, the Camelot corporate records were incomplete, and Camelot's financial statements were improperly prepared. Moreover, defendant argues, plaintiffs actually could not perform their part of the bargain because Camelot did not have marketable title to Hammersmith Farm because of a lis pendens that was recorded against the real estate, Camelot could not establish that they had met the requirements of the corporation's preemptive right to purchase the stock, and plaintiffs did not produce copies of schedules that they were required to deliver at the closing.

It has long been established that [HN1] when concurrent acts are to be performed by the parties to a contract, the party bringing suit for breach need only aver that he or she was ready and willing to perform and[**4] that the alleged breacher was requested to [*664] perform but refused. Kottis, 526 A.2d at 509; Nowell v. Waterman, 53 R.I. 16, 19, 163 A. 402, 404 (1932); Guilford v Mason, 22 R.I. 422, 430, 48 A. 386, 389 (1901). When the party alleging the breach demands the other's performance of the concurrent act, an offer to perform on the part of the alleging party is implied and understood. Kottis, 526 A.2d at 509; Guilford, 22 R.I. at 430, 48 A. at 389. Actual performance by the party alleging the breach is not necessary; rather, notice of his or her readiness to perform constitutes and implies tender. Kottis, 526 A.2d at 509; Guilford, 22 R.I. at 428, 48 A. at 388; see Safeway System, Inc. v. Manuel Bros., Inc. 102 R.I. 136, 143, 228 A.2d 851, 855 (1967); Fournier v. Cass, 49 R.I. 35, 39, 139 A. 655, 656 (1927).

These rules clearly delineate that [HN2] parties alleging breach are not required to perform their part of the bargain before suing other[**5] parties for breach. The party alleging breach is only required to tender performance. Tender of performance occurs by providing notice to the other party that one is ready to perform. Williston succinctly summarized the preceding rules by stating that:

"what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary." 6 S. Williston, Contracts @ 833 at 104 (3d ed. Jaegar 1962).

In the present case, plaintiffs properly pleaded in their complaint that they were ready and willing to perform and that defendant refused to perform. Moreover, a review of the trial record indicates that plaintiffs attended the closing, intending to sell their stock. McManus testified that he and Kottis arrived promptly for the closing and brought a briefcase containing documents they were required to[**6] supply for the closing. Thus plaintiffs represented to defendant that they were ready to close and, most importantly, that they had the ability to close. Indeed, the trial justice found that "plaintiffs met their obligations for tender, they were ready to perform." We agree with the trial justice, and moreover, we find that plaintiffs' act constitutes a sufficient tender of performance and therefore can support plaintiffs' claim for contract damages.

Since we have determined that plaintiffs were ready to close on the date of the closing, defendant's fact-specific arguments asserting actual inability to close are unavailing and therefore do not merit further discussion.

II

The second issue that defendant argues is whether the trial justice erroneously failed to consider DeFelice's claim that the December 11, 1979

contract was unenforceable. The defendant asserts that plaintiffs had reached an accord and satisfaction with DeFelice or that plaintiffs had abandoned the contract. Moreover, defendant contends that the trial justice's failure to comment on these issues when issuing her decision violated Rule 52(a) of the Superior Court Rules of Civil Procedure.

After the closing [**7] did not occur on December 28, 1979, the parties continued to negotiate, hoping that the deal could be restructured. A meeting on February 27, 1980, produced another agreement. One issue the parties haggled over at that time was whether the $ 12,000 deposit should be returned. The defendant contends that he permitted plaintiffs to keep the deposit in exchange for plaintiffs' agreement that the December 11, 1979 agreement was no longer effective.

[HN3] An accord and satisfaction is "an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions." Cavanagh v. Bostitch, Inc., 92 R.I. 12, 14, 165 A.2d 728, 729 (1960) (quoting Bouvier's Law Dictionary 103 (1914)). [*665] Thus, in order for the doctrine of accord and satisfaction to operate as a defense, the party asserting the defense must show that an agreement exists and that the agreement was accepted in exchange for refusal to press a right of action.

In the present case, the parties did agree that plaintiffs could keep the $ 12,000 deposit defendant gave them as a deposit for the December 11, 1979 [**8] agreement. Nevertheless, the record does not reveal any evidence that would support the contention that defendant allowed plaintiffs to keep the deposit in exchange for plaintiffs' relinquishment of their right to enforce the December 11, 1979 agreement. Rather the testimony presented at trial indicates that defendant permitted plaintiffs to keep the money because he did not want this dispute to impair the possibility of reaching a new agreement. The plaintiffs did not keep the money in exchange for refusing to sue defendant on the December 11, 1979 agreement. Thus, the requirements for an accord and satisfaction are not met.

The rules for the doctrine of abandonment are well established. [HN4] Generally abandonment is the voluntary relinquishment of a known right. Jakober v. E. M. Loew's Capitol Theatre, Inc., 107 R.I. 104, 110, 265 A.2d 429, 433 (1970). Abandonment of an executory contract for the sale of land requires an intent to abandon and some act or failure to act that shows that vendee no longer claims or retains any interest in the subject matter. Id. Moreover, abandonment is unilateral, requiring action only by the possessor of the [**9] right that is to be abandoned. Id. at 110-11, 265 A.2d at 433.

We are of the opinion that plaintiffs did not abandon the contract in the present case. The defendant relinquished his right to the return of the $ 12,000 because he feared that if he pressed his claim for the money, a new deal would not be consummated. Thus, he did not have an intent to abandon the December 11, 1979 contract but rather merely intended to do everything in his power to keep the negotiations going. Moreover, defendant's continued negotiation with plaintiffs supports the contention that defendant retained an interest in Hammersmith Farm pursuant to the December 11, 1979 contract. Therefore, the requirements for an abandonment are not met.

Finally defendant's contention that the trial justice violated Rule 52(a) by not specifically addressing defendant's assertions about accord and satisfaction and abandonment in her decision is without merit. Rule 52(a) provides, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *. If an opinion or memorandum[**10] of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." We have stated that in order to comply with the rule, "the trial justice * * * need only make specific findings on factual issues relevant to the controlling legal questions which are endemic to the contested issues." Shoor-Elias Glass Co. v. Raymond Construction Co., 114 R.I. 714, 716, 339 A.2d 250, 252 (1975). Furthermore, we have also stated that "we will not in every instance insist upon strict compliance with the fact-finding requirements of Rule 52(a)." Rowell v. Kaplan, 103 R.I. 60, 70, 235 A.2d 91, 97 (1967).

In the present case a review of the trial justice's decision reveals that the trial justice adequately set out the facts necessary to reveal how she reached her legal conclusions. [HN5] Rule 52(a) does not require the trial justice to set forth all facts presented at trial. The rule also does not require the trial justice to explain why each legal result asserted by a party was not accepted by the court. Here, the court determined that a breach of the December 11, 1979 agreement occurred. By implication[**11] this determination results in rejection of defendant's contention that an accord and satisfaction or an abandonment had occurred. The trial justice did not violate Rule 52(a) by not discussing these issues.

III

Next defendant argues that the trial justice erroneously held that plaintiffs properly [*666] mitigated their damages. The defendant argues that the stock of Camelot that was to be purchased pursuant to the December 11, 1979 agreement is a good within the meaning of the Uniform Commercial Code. Therefore, defendant claims that he was entitled to notice of plaintiffs' intention to sell the stock as required by G.L. 1956 (1969 Reenactment) @ 6A-2-706(3). The defendant asserts that plaintiffs failure to give notice of their intention to sell as required by @ 6A-2-706(3) deprived plaintiffs of their claim for the difference between the contract price and the price for which they sold the stock. The defendant also argues that the December 11, 1979 agreement was intended to be a secured transaction and that thus he was entitled to notice of the sale of the stock pursuant to G.L. 1956 (1969 Reenactment) @ 6A-9-504(3), as amended by P.L. 1979, ch. 172, @ 4.

In March of 1980 it became[**12] apparent that the transaction between plaintiffs and defendant was not going to go forward. Five of the shareholders requested a special meeting of the board of directors of Camelot at this time. Three plaintiffs in this case -- Casey, Kottis, and Burke -- though this notice was a precursor to an attempt to oust them as directors. They then brought a civil action against the other shareholders, claiming that their attempted ouster was a violation of the corporate bylaws. At a hearing for a temporary restraining order on this lawsuit, the parties decided that the disagreement among the shareholders could best be resolved by having the corporation redeem the shares of stock owned by Casey, Kottis, and Burke for $ 162,500 each. Casey, Kottis, and Burke then agreed to drop their lawsuit. McManus, also agreeing to sell his Camelot stock, sold it to two remaining shareholders for

$ 140,000. Naturally, in their suit plaintiffs claim their damages are the difference between the contract price of $ 340,000 per shareholder and the amount for which they sold their shares back to the corporation. The essence of defendant's argument is that because he did not have notice of this sale, [**13]he could not offer to purchase the stock or find buyers that could pay more than the amount for which plaintiffs sold the stock back to the corporation.

Paragraph 10 of the December 11, 1979 purchase-and-sale agreement states:

"The Buyer agrees to sign a Pledge Agreement of the Stock in Camelot Gardens, Inc. transferred herein to him pledging the Stock to the Sellers who will maintain possession of said Stock. This Pledge of Stock shall be held by the Seller from the date of sale to the date of final installment, if paid."

The defendant relies on this clause to show that a chapter 9 of title 6A security interest was created in the purchase and sale agreement.

It is undisputed that Camelot is a closely held corporation. Thus the issue before us is whether the stock of a closely held corporation is a "good" within the Uniform Commercial Code (UCC). [HN6] The U.C.C. "applies to transactions in goods." Section 6A-2-102. Goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities * * * and things in action." Section[**14] 6A-2-105(1). We are of the opinion that stock of a closely held corporation does not meet any of these definitions of goods.

First the stock of a closely held corporation is not a "thing" that is movable at the time of identification to the contract. "Thing" in this context should be interpreted to apply to tangible goods that are exchanged in the flow of commerce. A determination that stock of a closely held corporation was a thing according to @ 6A-2-105 would pervert the intent of this section, which is to ensure the uniform exchange of goods. The exchange of stocks, even stock in a closely held corporation, is governed by other rules.

Second, the stock of Camelot does not meet the U.C.C. definition for securities. The code, at the time the purchase and sale agreement was signed, stated that a

[HN7] "(a) A 'security' is an instrument which

[*667] (i) is issued in bearer or registered form; and

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms divisible into a class or series of instruments; and[**15]

(iv) evidences a share, participation or other interest in property or in an

enterprise or evidences an obligation of the issuer." Section 6A-8-102(1)(a), as amended by P.L. 1973, ch. 270 @ 1.

The stock of Camelot does not meet all the requirements of @ 6A-8-102(1)(a). The stock of Camelot is represented by an instrument issued in registered form, namely, the stock certificates, and is one of a class that is divisible into shares. Furthermore, the stock of Camelot does comprise a share of an enterprise, specifically Camelot Gardens, Inc.

The second part, however, requiring the stock to be traded on a securities exchange or recognized as a medium for investment, is not fulfilled by the Camelot stock. Clearly the stock of this closely held corporation is not traded on a securities exchange or market. Moreover, the Camelot shares are not a medium for investment because there is no ready market for the shares or a means for determining their value. Thus, the Camelot stock shares are not "securities" for purposes of @ 6A-8-102(1)(a).

Moreover, we are not persuaded that the Camelot stock can be classified as a thing in action, also commonly known as a chose in action. A[**16] chose in action can be defined as "a right of bringing an action or right to recover a debt or money." Black's Law Dictionary 241 (West 6th ed. 1990). We are of the opinion that the Camelot stock does not meet this definition. Holding stock in a closely held corporation does not empower the holder with a right to bring an action. A right to sue may be incident to possession of the stock, but mere possession does not create that right. Moreover, ownership of stock does not create a debtor-creditor relationship between the stockholder and the corporation. The stockholder does not have a right to be repaid his or her investment by the corporation. Thus the Camelot stock is not a chose in action, and therefore, it is not a good for purposes of @ 6A-2-102.

Section 6A-9-102(2), as amended by P.L. 1979, ch. 172, @ 4, provides that "this chapter applies to security interests created by contract including pledge * * *." Paragraph 10 of the December 11, 1979 purchase-and-sale agreement requires the buyer to pledge the stock of Camelot to the sellers as security for the buyer's obligation to pay. Since the closing never occurred, the buyer did not sign the pledge agreement, and thus [**17] the pledge never was executed. Therefore, the requirements of @ 6A-9-102(2) are not met, and a chapter 9 of title 6A security interest was never created.

IV

The next issue that defendant asserts is that the trial justice overlooked or misconceived the evidence when making factual findings. Specifically, defendant argues that the evidence does not demonstrate that the parties reached an agreement on the price and payment terms of the December 11, 1979 agreement. Moreover, defendant contends that the trial justice improperly determined that the reason for the failure to close on December 28, 1979, was DeFelice's lack of funds.

It is well established that [HN8] findings of a trial justice sitting without a jury will not be disturbed unless it is demonstrated that the trial justice overlooked or misconceived material evidence or was otherwise clearly

wrong. Smith v. Boyd, 553 A.2d 131, 134 (R.I. 1989); Miller v. Dixon Industries Corp., 513 A.2d 597, 601 (R.I. 1986); Dickinson v. Killheffer, 497 A.2d 307, 312 (R.I. 1985). Thus our task is to determine if the trial justice overlooked or misconceived material evidence regarding[**18] whether the parties reached an agreement on price and payment terms and whether the failure to [*668] close on December 28, 1979 was due to DeFelice's lack of funds.

In regard to the agreement on price and payment terms, a review of the trial record indicates that the trial justice did not overlook or misconceive any material evidence. The record clearly reflects that the written agreement signed by both parties contained a sales price of $ 340,000 per shareholder. The well-accepted applicable rule is "that [HN9] a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." F.D. McKendall Lumber Co. v. Kalian, 425 A.2d 515, 518 (R.I. 1981). Since defendant signed the written agreement and the law regards a signature on such a document as manifesting the signer's intent, the trial justice's determination that price and payment terms were included in the agreement is not erroneous.

Furthermore, defendant's contention that the trial justice improperly determined that DeFelice's lack of funds caused the failure to close on December 28, 1979, is without merit. As previously[**19] discussed in the first section of this opinion, plaintiffs fulfilled their obligation at the closing by arriving and tendering the documents that were necessary for the closing. DeFelice then failed to tender payment. The trial justice properly evaluated the evidence, and her decision was correct.

V

Next, defendant argues that the trial justice erroneously calculated damages. First, defendant asserts that the trial justice failed to reduce plaintiffs' damages by a total of $ 12,000, the amount that DeFelice had paid as a deposit on the contract. Second, defendant contends that the trial justice failed to consider an option in the purchase-and-sale agreement that would have allowed DeFelice to purchase all the stock owned by the four plaintiffs for $ 640,000. At trial the trial justice determined that the total purchase price was $ 1,360,000 and awarded each plaintiff damages of $ 177,500, which is the difference between $ 340,000, the contract price per share, and $ 162,500, the amount per share for which plaintiffs redeemed their stock to the corporation.

A review of the trial record indicates that the trial justice considered all the evidence presented when determining the[**20] amount of contract damages to award to plaintiffs. Our deferential review of the findings of the trial justice sitting without a jury, combined with our determination that the trial justice considered all the evidence presented concerning damages, leads us to conclude that the trial justice did not err in calculating damages.

VI

The sixth issue that defendant raises is whether the trial justice erroneously interpreted the December 11 agreement by holding that plaintiffs could recover interest on the damages at 20 percent for the period after February 20, 1982, and could recover attorney's fees. Paragraph 12 of the agreement states:

"If upon February 20, 1982, the balance due and payable is not then paid, the Sellers may at their option proceed to enforce their obligations against the buyers and said outstanding balance shall be computed at the rate of twenty (20%) percent per annum, plus necessary attorneys fees for collection."

The defendant contends that this paragraph only applies to payment of the balance due on the promissory note and not to any damages caused by a breach of contract.

[HN10] When the terms of a contract are construed "unless a plain and unambiguous intent[**21] to the contrary is manifested, the words used in the contract are assigned their ordinary meaning." Westinghouse Broadcasting Co., v Dial Media, Inc., 122 R.I. 571, 581, 410 A.2d 986, 991 (1980). Stated another way, "clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions." Elias v. Youngken, 493 A.2d 158, 163 (R.I. 1985) (quoting Chapman v. Vendresca, 426 A.2d 262, 264 (R.I. 1981)).

[*669] In the present case, paragraph 12 of the contract does not define any of its terms or refer to any other parts in the contract. The contract law of Rhode Island therefore requires that we ascertain the ordinary meaning of the words in paragraph 12. It is clear to us that the ordinary meaning of paragraph 12 requires the defendant-buyer to pay 20 percent interest starting on February 20, 1982, if he or she has not paid the balance due on the contract. Of course, when defendant breached his contract with plaintiffs he did not pay the balance due. The ordinary meaning of paragraph 12 leads to the conclusion that[**22] its terms cover a breach of contract since paragraph 12 covers instances when the defendant does not pay. Similarly the ordinary meaning of the words in paragraph 12 provides for an award of attorney's fees. Thus, attorney's fees were properly awarded. Therefore, the trial court properly awarded 20 percent interest to plaintiffs for the period after February 20, 1982, and properly awarded attorney's fees necessary to collect this interest.

VII

The defendant's final contention is that the trial justice improperly included expert-witness fees in the amount of costs awarded to plaintiffs. After the written decision of the trial justice was issued plaintiffs filed a motion for award of costs and requested payment of $ 5,400 for the witness fees of two experts who evaluated the property. The trial court never directly ruled on the motion. Later, the trial court did, however, issue a judgment that awarded plaintiffs "costs." This judgment did not explicitly include witness fees within the award of costs.

[HN11] General Laws 1956 (1969 Reenactment) @ 9-22-5 provides: "In civil actions at law, the party prevailing shall recover costs, except where otherwise specially provided, or as justice[**23] may require, in the discretion of the court." Thus the issue before us becomes the question of whether expert-witness fees are costs for purposes of @ 9-22-5.

Costs are normally considered the expenses of suing another party,

including filing fees and fees to serve process. Fees to pay expert witnesses would not be included in this definition of costs. Moreover, since the trial justice never directly ruled on the plaintiffs' motion for award of costs, we can infer that the trial justice did not intend to exercise the discretion granted to her by @ 9-22-5 and have her award of costs include the fees for expert witnesses. Thus, we reject the defendant's contention that the trial justice's judgment awarding costs included expert witness fees. Finally, we note that if such fees had been included as costs, this award would be improper.

For these reasons the defendant's appeal is denied, the judgment of the trial justice is affirmed, and the papers of the case are remanded to the Superior Court.