**327 F.3d 30 (1st Cir. 2003); 02-1371, Lawton v. Nyman;**

327 F.3d 30
Lawton v. Nyman

02-1371
April 29, 2003

Page 30

327 F.3d 30 (1st Cir. 2003)

JUDITH A. LAWTON; THOMAS LAWTON; MARSHA E. DARAS; STEPHEN H. LAWTON; NANCY LAWTON CRONIN; DAVID T. LAWTON; T. MICHAEL LAWTON; JOANNA J. LAWTON; SUZANNE M. LAWTON, Plaintiffs, Appellees/Cross-Appellants,

v.

ROBERT NYMAN; KEITH JOHNSON; KENNETH NYMAN, Defendants, Appellants/Cross-Appellees,

NYMAN MANUFACTURING CO., Defendant, Cross-Appellee.

Nos. 02-1371, 02-1407

United States Court of Appeals, First Circuit

April 29, 2003

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND,
Hon. Ernest C. Torres, U.S. District Judge.

Page 31

[Copyrighted Material Omitted]

Page 32

COUNSEL

Robert Corrente with whom Brian C. Newberry and Hinckley, Allen & Snyder LLP were on brief for appellants.

Karen Pelczarski with whom Staci L. Kolb and Blish & Cavanagh, LLP were on brief for appellees.

Before SELYA, Circuit Judge, STAHL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Following trial, the district court found officers and directors with voting control of a closely held family corporation, Nyman Manufacturing Co., to be in breach of their state law fiduciary duties to minority shareholders whose shares the three had caused the corporation to redeem without making adequate disclosures. Robert Nyman, Kenneth Nyman, and Keith Johnson were held jointly and severally liable to nine Nyman family members for the total sum of $2,096,798.50, which was, roughly, the value of those shares at the time of the sale of the Nyman corporation to a strategic buyer some sixteen months later, following the redemption of their shares. The court also awarded prejudgment interest under state law at the rate of 12 percent from May 30, 1996, the date the plaintiffs sold their shares.

The three defendants appeal, on the basis that the liability finding of breach of fiduciary duty was error in that the non-disclosed information was not material. They also argue the court erred in its award of damages and as to the date on which prejudgment interest started to run. The plaintiffs cross-appeal, find fault with the damages, and argue they were entitled to more.

We affirm the liability finding and remand for further proceedings on the appropriate measure of damages.

Page 33

I.

Nyman Manufacturing Company was a closely held, fourth-generation family-owned company in Rhode Island that manufactured paper and plastic dinnerware. Robert Nyman, the President and CEO of the company, and his brother Kenneth, the Vice-President of Manufacturing, had worked in the business their entire adult lives.

There were two classes of company stock: Class A shares, which were non-voting, and Class B shares, which were voting stock. The company's articles of incorporation authorized 13,500 shares of Class A stock and 1,500 shares of Class B stock. Traditionally, one or two family members owned all of the Class B stock, while the Class A shares were dispersed throughout the family. No dividends were ever paid on either class of stock. Robert and Kenneth Nyman had each inherited 375 shares of the Class B voting stock from their uncle; this was the entirety of the issued Class B stock. Because they were the controlling shareholders, we refer to them as the majority shareholders of the company. In the beginning of 1995, there were 8,385 shares of Class A stock outstanding. Judith Lawton, the sister of Robert and Kenneth, owned Class A stock, as did her husband and eight children. The Lawtons together owned 952 Class A shares. The children of Robert and Kenneth together owned another 140 Class A shares. Beverly Kiepler, another Nyman sibling, and her daughter together owned 700 Class A shares. The Magda Burt Estate controlled 2,256 Class A shares, and the Walfred Nyman Trust controlled 1,677 Class A shares.

The company teetered on the verge of bankruptcy in the late 1980s. In 1991, the company's performance again began to suffer. In 1994, after three consecutive years of losses, the company hired Keith Johnson, a specialist in turning around and then selling companies, as a consultant. Johnson was made the Chief Financial Officer and Treasurer in August 1994, and his liability stems from his position as an officer.[1] He was promised an equity share of the company if he could revive the company's flagging profits.

By the spring of 1995, it appeared that the fortunes of the ailing company were being reversed.

Earlier, in the fiscal year ending March 25, 1995, the company reported a profit of nearly $1.6 million, in vivid contrast with its past losses. On April 3, 1995, the company granted Johnson 1,000 options to buy Class A stock at $145.36 a share. This price was equal to eighty percent of book value; no effort was made to ascertain the actual market value of the stock, as required by the bylaws.[2] In the words of the district court, at this time "the prospect of a future sale of the company to a strategic buyer was, at most, nothing more than a remote possibility."

In July 1995, after a series of discussions, the company offered to redeem 2,256 shares from the Magda Burt Estate. On November 6, 1995 the Burt shares were redeemed for $145.36 per share. That price represented eighty percent of the $180 book value of the stock in April 1995. The price was not pegged to the higher November 1995 book value of $312.02 a
Page 34

share.[3] After probate court approval, the estate accepted and the deal closed on November 6, 1995. That same day, the Board, which now consisted of Johnson, Robert and Kenneth, issued options to these three to buy the same number of shares as those redeemed, at the same price, $145.36 a share. Robert received 1,128 options, while Kenneth and Johnson received 564 options each.

In January 1996, the company also offered to redeem the shares held by the Walfred Nyman Trust. The offer was again for $145.36 a share. By that time, the book value had risen to $318.59 a share. One of the beneficiaries of the trust, Beverly Kiepler, withheld agreement, and the offer was abandoned.

The company's fiscal year ended on March 29, 1996. The unaudited financials showed a profit of $3.5 million and a quadrupling of shareholder equity. Although it is true that much of the profit came from non-recurring items, it is also true that the three defendants, sitting as the Board, adopted deferred compensation plans for themselves which had a total value of $2 million.

They also decided to hire a consultant and, at the March 20, 1996 annual meeting, authorized Johnson to begin to interview candidates. Although the defendants dispute that their intent was for the consultant to help them sell the company, the district court permissibly inferred, from the evidence at trial, that such was their purpose. This inference was based, inter alia, on the contents of the retention letter with the consultant eventually hired, Shields & Co., dated in August 1996, which was, in turn, based on an earlier meeting. That letter made clear that Shields would offer services including:

1. strategic issues as they relate to the long-term value of Nyman;
2. operational issues to maximize Nyman's position in the future in the eyes of a potential acquirer;
3. the specific dynamics of the merger and acquisition market;
4. assist you in responding to the numerous aquisition inquiries when approriate. . . .

None of this information was disclosed to the minority shareholders. There is evidence, not specifically referred to by the district court, that by May 1996 the three defendants were also engaged in discussions, also undisclosed, to acquire other companies. Those discussions did not lead to a merger or acquisition.

In April 1996, Johnson, on behalf of the company, offered to purchase 700 shares of Class A stock directly from Kiepler and her daughter for $145.36 a share. By that point, shareholder equity had risen to $576.40 per share. Johnson put Kiepler under a false deadline, saying that the bank waivers which would permit the purchase would expire on May 1, 1996. This was untrue: no waivers had yet been secured. Kiepler declined the offer, based on the low price.

On May 8, 1996, the company, over Johnson's signature, sent letters to all Class A shareholders except Robert and Kenneth, their spouses, and the Walfred Nyman Trust, offering to redeem their shares for $200 per share. The letter said the following:

I would like to report to you some information about Nyman Mfg. and a limited term opportunity that you now

Page 35

have as a Nyman shareholder with [] shares of Class A Non-Voting Stock.

As you know, the Company has had major "ups and downs" over the past 10 years including 5 years in which significant losses were experienced. In the two most recent years, the Company's financial condition has improved and its lending banks have agreed that limited amounts of its common stock may be re-purchased. This is an opportunity for shareholders who are interested in achieving liquidity now.

Last November, the Company was able to re-purchase certain shares of stock held by Rhode Island Hospital Trust Bank as co-executor of Marge Burt's estate at a price of $145.36 per share. Since that time, the Company has received several inquiries from other minority shareholders concerning their desire to sell their shares of Nyman Mfg. Co. stock. In response to these inquiries, the Company has negotiated with its lending banks to allow it to offer to purchase additional shares of Nyman stock at this time.

Given favorable economic factors and current estimates of operating results, the Company is offering to purchase all of your shares at a price of $200 per share.

Since the Company cannot provide you with any advice as to whether the sale of the stock by you is in your best financial interest, we suggest that you discuss this matter with your financial advisor. You should know that these receipts will be subject to the appropriate federal and state taxes and that you should consult with a tax advisor, particularly with regard to your share of any tax-loss carry-over from the Magda Burt estate which may help to reduce any tax liability you may have.

Please indicate on the enclosed form your interest in selling your [] shares back to the Company at the offer price of $200.00 per share for a total value of []. This offer will expire on May 22, 1996. The Company is planning to complete this transaction with you within two weeks after the receipt of your written acceptance of this offer along with the receipt of your stock certificates.

Several statements in the letter were not accurate. The record shows that the impetus to redeem the shares came from the company, not that the company made the offer in response to several inquiries from other minority shareholders concerning their desire to sell their stock. The record also shows that there was no bank-imposed deadline of May 22, as the letter implied. One lender had imposed no deadlines and the other had imposed a deadline of July 29. This phoney deadline of May 22 meant that the minority shareholders had to decide whether to sell before the company made its next audited financial statements available.

The next day, on May 9, 1996, Johnson reported to Heller Financial, Inc. that Nyman's fiscal year-end profit was estimated to be $3.533 million, and he included a copy of Nyman's unaudited FY 1996 financial statement. The unaudited financials were not disclosed to plaintiffs, nor was the decision to retain a consultant, nor was the fact that the defendants were in May engaged in discussions to acquire other companies. The letter also implied that the $200 a share price was based on "favorable economic factors and current estimates of operating results," but did not disclose what was meant by this. The

stock price of $200 a share was based on neither current market value nor book value. Defendants did not seek to have an appraisal done.

Page 36

On May 10, Robert called Judith Lawton to ensure that she had received the letter. He described the offer as a "once in a lifetime" opportunity. He gave no further financial information about the company's recent upturn or its plans.

Most of the Lawtons met on the evening of May 10 and, after ruminating over the weekend, all of the Lawtons who held stock in Nyman Manufacturing Co. agreed to sell their shares. Judith, her husband Thomas, and seven of their children sold all of their combined 952 shares back to the company on May 30, 1996 for $200 a share; the children of Robert and Kenneth Nyman also sold their 140 shares back to the company at $200 a share. Because this stock was redeemed by the company, the redemption increased defendants' share of the Class A stock.

On June 25, 1996, the company awarded Robert, Kenneth, and Johnson options to purchase a total of 1,092 Class A shares. This is the same as the number of shares redeemed by the company on May 30. Robert received the right to purchase 432 shares, and Kenneth received the right to purchase 330 shares, for $220 a share.[4] Johnson received the right to purchase 330 shares for $200 a share.

The officers also purchased all Class A and B shares in the company treasury on June 25. For these they signed promissory notes totaling $973,000 that called for interest payments to be made commencing on June 30, 1997. Robert purchased 1,675 Class A and 375 Class B shares; Kenneth purchased 1,250 Class A and 375 Class B shares; and Johnson purchased 1,190 Class A shares. Again, there was no appraisal of shares.

By June 1996, the book value of the shares was $527.50. The district court accepted the valuation of defendants' expert, William Piccerelli, that in May and June 1996, the fair market value of the company's stock was approximately $303 a share.

Johnson at some point discovered that the Van Leer Corporation, a Dutch company whose subsidiary, Chinet, was a competitor of Nyman Manufacturing, had funds available to acquire other companies. In October 1996, Johnson discussed with Thomas Shields, a principal of Shields & Co., the possibility of a strategic acquisition by Van Leer. These discussions between Johnson and Shields & Co. continued in January 1997. In March 1997, Johnson met with representatives of Van Leer to discuss a sale. Van Leer offered to purchase the company, and it signed a letter of intent on June 25, 1997. The sale closed on September 29, 1997.

Van Leer purchased all of Nyman Manufacturing's stock for $28,164,735.00. After deducting closing costs of $980.383.00, and an escrow amount of $1,423,331.00, set aside to satisfy a potential liability of the company, the net amount paid to shareholders was $25,761,021.00. Some $1,667.38 was paid for each of the 13,500 Class A shares and options, and $2,167.59 was paid for each of the 1,500 Class B shares, 1.3 times the price of the Class A shares. Van Leer asked that the stockholders' options not be exercised, and in return, the options were bought as if they had been exercised.

A chronology is set forth at the end of the opinion.

Page 37

II.

Judith and Thomas Lawton and seven of their eight children filed suit against Robert and Kenneth Nyman, Keith Johnson, and Nyman Manufacturing in the United States District Court for the District of Rhode Island on May 22, 1998. They alleged that the defendants were in breach of their fiduciary duties and had committed securities and common-law fraud. The plaintiffs asserted that the redemption price they were paid for their stock was less than the true value, that the defendants knew that the company might be sold, and that they misrepresented and failed to disclose material facts regarding, inter alia, the sale of the company and the value of the stock.

A parallel suit was filed by Beverly Kiepler, the beneficiary to the Walfred Nyman Trust who originally rejected the sale of the trust's Class A shares, and her daughter, against Robert, Kenneth and Johnson. She alleged that the defendants' award of options to themselves, and their purchase of treasury stock, diluted the stockholders' ownership interests.

After separate bench trials, the district court issued two opinions on the same day. In the Kiepler case, the court found that the purchase of treasury shares had constituted a breach of fiduciary duty, but that the granting of options to purchase shares was not in violation of that duty. Kiepler v. Nyman, No. 98-272-T, 2002 U.S. Dist. LEXIS 19630 (D.R.I. Jan. 17, 2002).[5]

In the Lawton case, the court found that the company's purchase of the Lawtons' shares was a breach of common-law fiduciary duty. However, the court dismissed the federal securities law claims, finding that disclosure was not required under the applicable statutes. It also found that the claim against the granting of the options failed because it should have been brought as a derivative shareholder action on behalf of the corporation, and that the April 1995 grant to Johnson was, in any event, not in breach of any duty. Lawton v. Nyman, No. 98-288-T, 2002 U.S. Dist. LEXIS 17398 (D.R.I. Jan. 17, 2002). The court held that it was a breach of fiduciary duty for the defendants to have purchased the treasury shares in June 1996, and accordingly subtracted those shares in determining the value per share in September 1997, but did not deduct the price defendants paid for those shares from the valuation of the company. The Lawton plaintiffs appealed the damages calculation and the dismissal of their federal securities claim and their claim regarding the grant of options; the defendants appealed the breach of fiduciary duty finding and the damages award.

III.

We review the district court's legal conclusions de novo, and its factual conclusions after a bench trial for clear error. Walsh v. Walsh, 221 F.3d 204, 214 (1st Cir. 2000). We review damages awards for abuse of discretion. Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 9 (1st Cir. 2002). An error of law is an abuse of discretion. Seavey v. Barnhart, 276 F.3d 1, 9 n.8 (1st Cir. 2001).

A. Breach of Fiduciary Duty Under Rhode Island Law

The defendants frame their challenge to the breach of fiduciary duty finding by arguing that the district court failed to use the correct standard of materiality. They argue the district court was required to use the same standard of materiality for both the federal securities law claim, under
Page 38

Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and the state common-

law fiduciary duty claim; the fact that the court found on materiality grounds that there was no federal securities law violation means, they argue, that it was error for the district court to have found that there was a violation of state law fiduciary duties.

Whatever doubts we have about the district court's federal securities law analysis need not be resolved. There is no need to explore whether there are significant differences between the disclosure standards under Section 10b and the Rhode Island law on fiduciary obligations owed among shareholders in closely held family corporations. The parties agreed at oral argument that the federal securities law claims have essentially dropped out of the action. We do refer to federal securities law cases by analogy and because Rhode Island law may look to them for guidance.

Defendants here stand in three intertwined capacities: as directors, as officers, and, for Robert and Kenneth Nyman, as majority shareholders of a closely held corporation. We consider these capacities as a group for purposes of the analysis. For more than a century, Rhode Island law has viewed directors of companies as owing a fiduciary duty to the shareholders of the company. Olney v. Conanicut Land Co., 18 A. 181, 182 (R.I. 1889). It has analogized the duties corporate officers owe to stockholders to those of trustees. Point Trap Co. v. Manchester, 199 A.2d 592, 595-96 (R.I. 1964); Hodges v. Screw Co., 1 R.I. 312, 340-41 (1850). Such a relationship is one of trust and confidence and imposes the duty on the fiduciary to act with the utmost good faith. That good faith requirement forbids action on the part of a fiduciary without the knowledge and consent of his cestui que trust when he has an individual interest in the subject matter or when his interest is in conflict with that of the person for whom he acts.
Point Trap, 199 A.2d at 596. Rhode Island law also provides that directors of an insolvent corporation owe this fiduciary duty to creditors. Olney, 18 A. at 182; see Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F. Supp. 2d 81, 99 (D.R.I. 1999).

In A. Teixeira & Co. v. Teixeira, 699 A.2d 1383 (R.I. 1997), the court reiterated that corporate officers stand in a fiduciary capacity and are liable if they take corporate opportunities; if a small number of shareholders in a corporation act as though they were partners, then they have a fiduciary duty to each other as partners. [6] Id. at 1386-88. The claim at issue here involves, by contrast, breach of a duty to minority shareholders.

The Rhode Island Supreme Court has had no occasion to expressly define the obligations owed by shareholders to each other in a closely held family corporation. But in Teixeira the court reiterated that "shareholders in a close held family corporation may have a fiduciary duty toward one another." Id. at 1387 (citing Estate of Meller v. Adolph Meller Co., 554 A.2d 648, 651-52 (R.I. 1989), and Fournier v. Fournier, 479 A.2d 708, 712 (R.I. 1984)) (emphasis added). The court noted that "the existence of such a fiduciary duty is a fact-intensive inquiry" and that shareholders could show by evidence, such as a stockholder's
Page 39

agreement, that no such duty had been undertaken. Id.

The fiduciary duties of corporate directors, officers and majority owners encompass a variety of different situations. See generally P.M. Rosenblum, Corporate Fiduciary Duties in Massachusetts and Delaware, in How to Incorporate & Counsel a Business 293 (MCLE 2000); L.E. Mitchell, The Death of Fiduciary Duty in Close Corporations, 138 U. Pa. L.Rev. 1675 (1990). Still, defendants have essentially conceded that Rhode Island law would recognize a fiduciary duty among shareholders in a closely held family corporation and that it would be a heightened duty. We too think that the Rhode Island Supreme Court would recognize such a duty, at least in the absence of an express shareholder agreement to the contrary.

This case involves the narrow question of the duties owed by officers and directors, including those who are majority controlling shareholders in a closely held corporation, to minority shareholders when

the defendants offer to buy, or have the corporation redeem, the shares of minority shareholders. What precise duties are owed in this situation is also a question on which there is no direct precedent in Rhode Island law. Given Rhode Island's rule that officers have a fiduciary duty, we think Rhode Island is likely to adopt at least those duties required by the common law "special facts" rule, as described by our sister circuit:

Close corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts. . . . The "special facts" doctrine developed by several courts at the turn of the century is based on the principle that insiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock. See, e.g., Strong v. Repide, 213 U.S. 419, 29 S. Ct. 521, 53 L. Ed. 853 (1909), and the cases discussed in Comment, Insider Trading at Common Law, 51 U. Chi. L.Rev. 838 (1984); cf. Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965) . . . .

Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 435 (7th Cir. 1987).[7]The Colorado Supreme Court applied the "special facts" rule in a case factually similar to this: We hold, therefore, that it is a violation of a fiduciary duty for an officer or director of a closed corporation to purchase the stock of minority shareholders without disclosing material facts affecting the value of the stock, known to the purchasing officer or director by virtue of his position but not known to the selling shareholder.

Van Schaack Holdings, Ltd. v. Van Schaack, 867 P.2d 892, 899 (Colo.1994). Again, defendants agree that under Rhode Island law there is a duty to disclose material information to minority shareholders faced with an offer by the close corporation, controlled by majority shareholders, to purchase their shares.

The district court defined the standard for determining materiality as follows: "When directors of a closely held corporation are purchasing a minority stockholder's shares, fiduciary duty imposes an obligation of 'complete candor' to disclose 'all information in their possession 'germane' to the transaction.'" (quoting F.H. O'Neal'

Page 40

& R.B. Thompson, O'Neal's Close Corporations § 8.12, at 129 (3d ed. & Supp. 1995)). That is a generally accepted standard and its use was appropriate. The court found that under state law, negotiations for a sale need not be underway for there to be a duty to disclose; the duty "also encompasses transactions that the directors anticipate are reasonably likely to occur or that are something more than remote possibilities." The district court, in its finding that the defendants were in breach of their fiduciary duties, focused on the company's repurchase of the plaintiffs' stock for $200 a share in May 1996, when the defendants, as it found, had a realistic expectation that Nyman Manufacturing might be sold.

The defendants argue that when a company is considering the possibility of sale, the standard for materiality, even under state law, requires something much more definite. Defendants cite to Section 10b securities cases in support.[8] See, e.g., List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965); James Blackstone Mem'l Library Ass'n v. Gulf, Mobile & Ohio R.R., 264 F.2d 445 (7th Cir. 1959). The cases they cite, however, do not apply federal securities law to closely held corporations.

It seems to be commonly accepted that officers of close corporations have a greater duty of disclosure about the possible sale or merger of a company to minority shareholders than do officers of a publicly traded corporation.[9] See, e.g., Michaels v. Michaels, 767 F.2d 1185, 1196-97 (7th Cir. 1985). One reason given is that premature disclosure could itself do more harm than good in a publicly traded market, because it could lead to inflation of the stock price which might prevent the sale or merger. See Flamm v. Eberstadt, 814 F.2d 1169, 1176 (7th Cir. 1987). In public companies, there is also more of a need for a certain, clear rule as to when disclosure is required. Id. at 1178; Greenfield v. Heublein, Inc., 742 F.2d 751, 757 (3d Cir. 1984). As the Seventh Circuit has recognized, those reasons disappear when, as here, "there is no public market for a shareholder's stock." Michaels, 767 F.2d at 1196. In a close

corporation the company need disclose a decision to sell only to the person whose stock is to be acquired and the company may extract promises of confidentiality. See Jordan, 815 F.2d at 431.

Rhode Island law would, we think, similarly recognize a heightened duty of disclosure in a close corporation setting by officers who are majority shareholders with undisclosed information, who are purchasing minority shares or causing the corporation to do so. It would also, we think, impose an objective rather than a subjective standard of materiality. See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976); see also Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 415 (1st Cir. 1989).

Materiality depends on all the circumstances. The general rule under the securities laws is that when contingent or speculative events are at issue the materiality of the events "depends on the probability that the [event] will be consummated, and its significance to the issuer of the
Page 41

securities." Basic Inc. v. Levinson, 485 U.S. 224, 250 (1988) (emphasis added). No single factor is necessarily determinative of the materiality inquiry. See id. at 239. Here there were only two possible types of buyers for plaintiffs' shares - the defendants (either directly or by causing redemption of the shares) or an outside buyer looking to acquire the company. Here the defendants did not disclose their decision to work toward selling the company, their decision to hire a consultant, or their acquisition talks in May with other companies. Each is pertinent to the question of whether there was an outside buyer for the shares.

The mere causing of a closely held corporation to offer an inadequate price by majority shareholders to minority shareholders is not itself sufficient to establish a breach. It may be evidence, though, as to breach of other duties. And if a majority shareholder violates his duties of disclosure and the minority shareholder sells at an inadequate price, the minority shareholder can seek damages based on the difference between the offered price and the fair value of the stock. See Sugarman v. Sugarman, 797 F.2d 3, 8 (1st Cir. 1986) (applying Massachusetts law in freeze-out scenario).

If the finding of breach of fiduciary duty turned purely on the definiteness of the plan to sell, this would be a difficult liability issue. However, the case does not turn on that isolated proposition, but instead on an interrelated series of non-disclosures and misrepresentations. There is ample evidence to support the district court's finding of breach of fiduciary duty.

As the district court held, the redemption of the plaintiffs' stock represented a marked departure from the company's previous lack of interest in purchasing stock. As the district court also held, "Additional indications of the defendants' suddenly strong and, otherwise, inexplicable interest in acquiring more shares may be found in the urgency with which they sought to redeem the Lawton and Kiepler shares as shown by the artificial deadlines established for responses to the redemption offers."

The evidence supports the plaintiffs' theory that these defendants engaged in a concerted, accelerating effort to buy up the minority shareholders' stock, thus increasing the defendants' ownership of the company, in anticipation of a sale of the company. We understand the district court to have concluded that the non-disclosure of the possibility of a sale was material, even at this early stage, because it motivated the defendants' actions and was information which would aid and be important to the plaintiffs in evaluating the offer made.

There is more than adequate supporting evidence. There was evidence defendants were willing to violate the bylaws in the price set for options they acquired. Indeed, the district court found the corporation had from 1995 embarked on a program to "re-purchase shares of the Company in order to

eliminate any shareholders who are not active in day-to-day operations of the Company." (internal quotations omitted). The district court found that the defendants made the decision to redeem the minority shares even though the company had a pressing need for cash and was laying off workers to conserve funds. The district court reasonably concluded that the explanation was that "on May 8, 1996, when the defendants offered to buy back all of the plaintiffs' shares, they anticipated that the company soon could be sold for much more than the amounts that they paid for those shares."

Of course, with the May 1996 redemption offer the plaintiffs knew that defendants
Page 42

(and their families) were attempting to get sole ownership of the company. This might have led a reasonable investor to ask why and to seek further information. Still, this is not enough to render immaterial as a matter of law the undisclosed and misrepresented information. In all events, the district court's factfinding that there was a violation is supportable.

Thus, the evidence reasonably can be interpreted to show a scheme by defendants to obtain total ownership of the company for less than fair value through a variety of devices, anticipating a future sale. The devices fall into two general categories: first, the failure to disclose that management had decided to try to sell the company and, second, the withholding of other material information as to the redemption and misrepresentation of other information. For example, while defendants on May 9 thought it was material to Nyman's lenders that they have the company's unaudited financials, the defendants failed to disclose that information to the plaintiffs. To effectuate this scheme, defendants pressured plaintiffs to sell by imposing false deadlines, telling Judith Lawton this was a "once in a lifetime opportunity," failing to disclose financial information which would call into question the adequacy of the price offered, and timing the offer so that plaintiffs would not have the audited financial results while defendants simultaneously disclosed financial results to lenders. See Jordan, 815 F.2d at 434 (board's decision to seek a buyer coupled with fact that one putative buyer considered company to be worth $50 million sufficient to support a finding of materiality in close corporation).

We find no clear error in the conclusion that this totality of information would be germane and material to a selling minority shareholder and we uphold the liability finding.

B. Damages

1 Theory of Damages Calculation

The district court's method of calculating damages in this case is essentially a conclusion of law, to which we give full review. See Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 996 (2d Cir. 1988). In general, as the district court recognized, where immediate rescission of the purchase is unavailable, there are two different approaches to damages for non-disclosure by majority shareholders in a closely held corporation, with variations on both themes. The usual rule is to measure the plaintiffs' loss by the difference in price between what they received for their stock and its fair value at the time of sale. See, e.g., Sugarman, 797 F.2d at 8 (applying Mass. law); Holmes v. Bateson, 583 F.2d 542, 562 (1st Cir. 1978).

In appropriate cases, another approach, used in defrauded seller cases under federal securities laws, is to require defendants to pay over their wrongful profits in order to avoid unjust enrichment of a wrongdoer. Janigan v. Taylor, 344 F.2d 781 (1st Cir.). In a case involving a violation to a defrauded seller in a public company under § 28(a) of the Securities Act, the correct measure of damages . . . is the difference between the fair value of all the . . . seller received and the fair value of what he would have

received had there been no fraudulent conduct, except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972) (citing Janigan, 344 F.2d at 786); see Holmes, 583 F.2d at 562.
Page 43

Under Rhode Island damages law, "The basic precondition for the recovery of **lost profits** is that such a loss be established with reasonable certainty. Although mathematical precision is not required, the [trier of fact] should be provided with some rational model of how the **lost profits** occurred and on what basis they have been computed." Long v. Atl. PBS, Inc., 681 A.2d 249, 252 (R.I. 1996) (citations and internal quotation omitted). "We do not require mathematical certainty in this calculation. All that is required is that the court be guided by some rational standard." Abby Med./Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984) (citation omitted). At the same time, damages awards may not be based on speculation. MacGregor v. R.I. Co., 60 A. 761, 762 (R.I. 1905); see Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1166 (1st Cir. 1992). Finally, where breach of fiduciary duty is involved, the Rhode Island courts have looked to equity for appropriate remedial principles. See, e.g., Matarese v. Calise, 305 A.2d 112, 119 (R.I. 1973). We caution that we are not deciding federal securities law questions, but rather look to cases involving the securities laws for guidance on how the Rhode Island courts would address the question. The choice between these remedies is within the discretion of the district court, but must accord with proper legal principles. See Siebel v. Scott, 725 F.2d 995, 1002 (5th Cir. 1984).

a. Difference between price received and fair value absent the breach of fiduciary duty

The district court used September 1997, when the company was sold to Van Leer, as the relevant time to compute the difference between the price received and the fair value. The usual rule is that the fair value is to be determined as of the time of the plaintiffs' sale. The district court departed from the usual rule based on two rationales. First, the court thought "it is reasonable to conclude that, if the possibility of a sale had been disclosed, the plaintiffs would not have sold their shares for $200 each; but, rather, would have held on to [their shares] in the hope that the sale would take place." Second, it found that, "Since, in May of 1996, it was not certain that Nyman Manufacturing would be sold, it is impossible to calculate precisely the strategic value of the plaintiffs' stock at that time. The best indication of that value is [the sale price in September 1997]." Neither rationale can be sustained on this record.

There are a number of problems with the rationale that plaintiffs would have retained the stock over the next sixteen months if the requisite disclosures had been made. None of the plaintiffs testified to this effect, and there is no other evidence from which this conclusion can be drawn. Moreover, it is inconsistent with other findings the court made. The conclusion itself does not establish whether the plaintiffs would have sold had all the material information been provided. Further, it does not establish whether plaintiffs, in possession of all material information, would have sold if they had been offered $303 a share, a price the district court determined to be the fair market value in May 1996, or whether plaintiffs would have sought a premium, and if so, what premium. And it does not establish whether defendants would have proceeded with redemption at any of these higher prices. Key subsidiary factual findings are simply absent; largely, we suspect, because the parties neither produced the evidence nor requested the findings.

There is no evidence in the record to support the "conclusion" that "if the possibility
Page 44

of the sale had been disclosed" in May 1996, the plaintiffs would have held their stock until September 1997, some sixteen months later. The plaintiffs never testified to this at all, despite the ease with which this line of questioning could have been explored. Further, the factual findings made do not support this theory. The district court noted that plaintiffs had not bothered to seek additional financial information or outside advice before they sold their stock in May, that at least some of the plaintiffs had been exploring the possibility of redemption for some time, that plaintiffs accepted the offer two weeks before the deadline and within days after the offer was made, and that the decision was reached over a weekend after a family conference. These findings are more consistent with the conclusion that the family members would have leapt at the opportunity to sell in May 1996, especially at $303 a share, even if told that management was considering a sale of the company and in possession of the unaudited financials.

On appeal, the plaintiffs attempt to excuse their lack of proof by referring to our decision in Ansin v. River Oaks Furniture, Inc., 105 F.3d 745 (1st Cir. 1997), which upheld an inference that the plaintiffs would not have sold their stock when they did had they known about plans for an initial public offering (IPO). Id. at 758. Plaintiffs overread Ansin. In that case, the evidence showed at least one of the plaintiffs was initially planning to hold his stock until the IPO but was pressured into an early sale. Id. at 750-51. Further, there were actual sale negotiations which had not been disclosed, and the defendants knew, at the time they purchased the shares, that the preconditions for an IPO had been met. The court inferred that plaintiffs would not have deviated from their initial plan had they known about the impending IPO. By contrast, here there was no evidence of the plaintiffs' investment goals or how they would have responded to news of the potential sale of the business.

Plaintiffs' rejoinder in their briefs is that of course they would have held on to their stock in May 1996 had they known what their shares would have been worth when the company was sold to Van Leer. The argument very much misses the point. No one knew in May 1996 that the company would be sold in September 1997 for a per share value of about nine times what the plaintiffs were paid. The damages must be tied somehow to the information withheld or misrepresented. The information withheld was not that the company would in fact be sold to a strategic buyer some sixteen months later, much less at that price.

This theory that plaintiffs would have held on to their stock is also inconsistent with the district court's conclusion that, "Although it is fairly clear that by May 8, 1996, the defendants anticipated the possibility that Nyman Manufacturing would be sold, there is no indication that, at the time, a sale was anything more than a mere possibility."[10]
Nothing in the record establishes that a mere possibility of sale of the company would have led plaintiffs to retain their stock. That is particularly so if they had been offered $303 a share in May 1996, the fair market value the district court accepted as true through Piccerelli's expert testimony.

We also reject the district court's second rationale - that the sale price of the corporation some sixteen months later in 1997 represented a reasonable proxy for the market value of the shares in May 1996. No evidence supports this conclusion, and it is clearly erroneous. Indeed, several of

Page 45

the district court's other findings undercut its conclusion. The court found, as noted, that the fair market value of minority-held Class A stock in May 1996 was $303 a share. It found that while there could be a premium over market value for a strategic sale of the company,[11] there was, as of May 1996, no likelihood of a sale, only a "mere possibility." Finally, the district court rejected the testimony offered by the plaintiffs' expert, Steven Carlson, for a number of appropriate reasons, including his lack of training and education, the inconsistency of his methods with generally accepted methods of business valuation, and miscalculations.

Piccerelli, whose testimony the district court accepted, testified to a fair market value of $303 for a single share of non-voting company stock in May 1996. He defined fair market value as the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have knowledge of the relevant facts. He acknowledged that there were different methodologies available and was cross-examined on his choice. He was also cross-examined on his experience with valuing companies and on the total value he assigned the company for May 1996 of $6,800,000. Piccerelli was asked about whether the Van Leer sale undermined his confidence in the numbers, and he said it did not.

Using different figures, both sides' experts said two discounts had to be taken into account in valuing a single share of the company in May 1996: a marketability discount and a minority discount. By definition, a sale of an entire company will not involve any minority share or marketability discount, further undercutting the district court's assumption of equivalence between the May 1996 and September 1997 values.[12] There is a notable absence of expert or other evidence in support of any assumption that the "mere possibility" of sale would have increased the fair market value in May 1996 by adding a premium. We discuss the premium issue further below.

b. Avoidance of Windfall to Wrongdoer and Award of Defendants' Profits

There is another possible theory of recovery, first articulated in this court in Janigan: awarding plaintiffs whatever profits the fraudulent buyers made on resale of the stock in order to avoid unjust enrichment. 344 F.2d at 786-87; see 3 A.R. Bloomberg & L.D. Lowenfels, Securities Fraud & Commodities Fraud § 9.1 (2d ed.2002). The rule is based on equity and the principle that it is "more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." Janigan, 344 F.2d at 786. Under the Securities Act the Supreme Court has held, citing Janigan, that "where the defendant received more than the seller's actual loss . . . damages are the amount of the defendant's profit." Affiliated Ute, 406 U.S. at 155. "This alternative standard aims at preventing

Page 46

the unjust enrichment of a fraudulent buyer and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud." Randall v. Loftsgaarden, 478 U.S. 647, 663 (1986).

We believe that Rhode Island would adopt a similar equitable remedial rule of avoiding unjust enrichment for redemption of minority shareholders' stock involving a breach of fiduciary duty by corporate officers who are majority shareholders in close corporations. Indeed, equitable principles are routinely applied to remedies for breach of fiduciary duty.

Under Rhode Island law, a court's equitable power to award unjust enrichment damages is sometimes wielded under the rubric of the constructive trust. "A constructive trust will be imposed upon property that is obtained in violation of a fiduciary duty." Simpson v. Dailey, 496 A.2d 126, 128 (R.I. 1985). "The underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained . . . in violation of a fiduciary or confidential relationship . . . ." Id. While often used to grant the plaintiff legal title to real property, see, e.g., Matarese, 305 A.2d at 119, the constructive trust can also be used to convey proceeds or other liquid assets, see Simpson, 496 A.2d at 127.[13]

But there is need for a great deal of caution. The fiduciary label means different things in different contexts. Officers and directors of a close corporation are not wholly comparable to trustees entrusted with the assets of minor wards, and unjust enrichment may not be an appropriate remedy here. The law of remedies as to the latter situation may not be entirely appropriate for the former. And the answer to

the question of what are to be counted as "windfall profits" is far from clear from the record in this case. Rhode Island law discourages the award of speculative profits. See MacGregor, 60 A. at 762. Further, it is a general principle of equity "that the courts impose the least drastic remedy available to achieve the desired goals." See J.R. Farrand, Ancillary Remedies in SEC Civil Enforcement Suits, 89 Harv. L.Rev. 1779, 1813 (1976).

The district court did not independently analyze the Janigan avoidance of unjust enrichment theory of damages. Rather, based on its earlier error as to the value of plaintiffs' shares as of May 1996, it said, "That loss is identical to the profit realized by the defendants," and "the amount recoverable as damages is the same as the amount that the defendants would be required to disgorge."

There is little circuit law on the issue of how to approach a Janigan award based
Page 47

on the avoidance of unjust enrichment. Commentators have noted the confusion about damages in securities actions; a recent article by the authors of a leading treatise on securities law is entitled Compensatory Damages in Rule 10b-5 Actions: Pragmatic Justice or Chaos. L.D. Lowenfels & A.R. Bloomberg, 30 Seton Hall L.Rev. 1083 (2000).[14] This has been called a confused area of law where the courts, forced to rely on their wits, have crafted a myriad of approaches. See DCD Programs, Ltd. v. Leighton, 90 F.3d 1442, 1446 (9th Cir. 1996).

In equity, the correct legal standards interact with the underlying facts in determining an appropriate remedy. We think the wiser course is to remand the matter of this theory of damages for such further proceedings as are warranted. In doing so we set some general parameters, cautioning that this is not an area where hard and fast rules are either easy to articulate or warranted.

To be clear, Janigan does not embody a rule that plaintiffs are automatically entitled to all of defendants' profits from defendants' subsequent resale of stock regardless of circumstance. Janigan itself does not state a per se rule that all subsequent profits accrue to plaintiffs; it is subject to significant restrictions which were not considered here. Janigan built upon an earlier case which stressed that "the particular circumstances surrounding the case" must be taken into account. Myzel v. Fields, 386 F.2d 718, 749 (8th Cir. 1967).

Janigan itself recognized at least two limits. First, it referred only to the profit which was "the proximate consequence of the fraud," itself a limiting factor. This court, sitting en banc, limited the application of the Janigan rule in the context of publicly traded companies. SEC v. MacDonald, 699 F.2d 47 (1st Cir. 1983). MacDonald held that the SEC could not recover, on a disgorgement of profits theory, the defendants' profits from use of insider information for a period beyond a reasonable time after public dissemination of the information. This was so, we held, because "when a seller of publicly traded securities has learned of previously undisclosed material facts, and decides nevertheless not to replace the sold securities, he cannot later claim that his failure to obtain subsequent stock appreciation was a proximate consequence of his prior ignorance." Id. at 53 (emphasis added). Here, we have a close corporation; the plaintiffs lacked the opportunity, available to public shareholders, to reenter the market. Rather, MacDonald is significant, for our purposes, for its emphasis on the need for the wrongful profits to be "causally related" to the breach of duty. Id. at 54.[15] MacDonald also holds that the purpose of Janigan-type recovery is remedial, not punitive. Id. [16]

Second, Janigan said that extraordinary gains in a company's affairs attributable to extra efforts by defendants are not part of the windfall profits. See 344 F.2d at 787. "[A] subsequent increase in the value of

Page 48

the stock attributable to special or unique efforts of the fraudulent party other than those for which he is duly compensated" is not a windfall subject to disgorgement. Nelson v. Serwold, 576 F.2d 1332, 1338 n.3 (9th Cir. 1978); see Siebel, 725 F.2d at 1002.

As the Janigan doctrine has been refined, recovery of the defendants' later profits is usually applied when the subsequent resale follows fairly closely the original purchase from the plaintiffs. See, e.g., Pidcock v. Sunnyland Am., Inc., 854 F.2d 443 (11th Cir. 1988) (company put up for sale in the same month in which the agreement for a fraudulent purchase was signed); Siebel, 725 F.2d at 1001 ("[A] defendant's profits may be disgorged where he fraudulently induces the plaintiff to sell securities to him and resells them shortly thereafter at a higher price . . . .") (emphasis added).[17] "The mere passage of time, if long enough, may limit the amount of profits recoverable by a previously defrauded seller." Pidcock, 854 F.2d at 447; see also Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1306 (2d Cir. 1973) ("The passage of time introduces so many elements . . . that extreme prolongation of the period [9 years] for calculating damages may be grossly unfair."). In situations where the period of time was short and the defendants thus had more reason to be aware of a possible sale, the dangers of a speculative award are small. The length of time between the repurchase of stock and the eventual sale of the company here falls at neither extreme of this temporal continuum, and the district court is best positioned to make specific findings as to the effect, if any, of the passage of time.

Here there are a great many unanswered and perhaps unanswerable questions. For example, would defendants have tendered more than $200 a share upon disclosing the material information to plaintiffs? Would plaintiffs have accepted a higher tender, say, at $303 a share? Would defendants have offered that much? Would plaintiffs have held onto their shares in any of these scenarios? Is it fair to reward plaintiffs with the fruits of all profits given the risks defendants undertook in their subsequent management? Can any of these factors be quantified in some sense?[18]

The district court should also consider whether the case is appropriate for application of a Janigan approach which deems a defendant's later profits from sale of a company to be unjust enrichment. Other models of equitable relief may be better suited for the facts of this case, if equitable relief is warranted at all. If the evidence shows that the plaintiffs would have sold their shares even had they received the withheld information, then "any profit [defendants] earned above the premium [they] would have paid the [plaintiffs] absent the fraud is not unjust enrichment." Rowe v. Maremont Corp., 850 F.2d 1226, 1241 (7th Cir. 1988). Moreover, it may be that the stock's sale price in September 1997 is so untethered to the stock's fair

Page 49

value in May 1996 that equitable relief is inappropriate. See Holmes, 583 F.2d at 563-64.

Another approach may be to rely not on what the fair market price was at the time of sale, but on the premium plaintiffs would have exacted from defendants were the relevant information disclosed. See Rowe, 850 F.2d at 1243. This solution would award plaintiffs more than their loss, strictly speaking, while not requiring the disgorgement of all of defendants' eventual profit, some of which may have been justly earned. (We recognize that this solution may be more akin to the first damages rationale discussed above.) In the effort to avoid giving wrongdoers a windfall, there must be attention to what the windfall really is. Because of the ambiguity about the meaning of the finding of the district court that the fair market value of the shares was $303, and whether that figure included a premium for a possible sale, this approach may or may not be an appropriate model.

Part of what complicates this case is that there was a series of material omissions or misstatements, and the different categories of breach may produce different remedial results. See Sharp v. Coopers &

Lybrand, 649 F.2d 175, 191 (3d Cir. 1981). The district court should make such findings as are necessary and fashion a remedy accordingly which does not give windfalls to defendants and which remedies the real harm to plaintiffs.

In any event, the floor of the damages plaintiffs will receive is the difference between the $200 and $303 a share on their percentage of ownership of the company in May 1996. We take no view as to which of the damages options are best suited to this case.

2 Application of Damages Theory

If the district court does choose to apply a damages award grounded in unjust enrichment theory, some close questions arise concerning how to calculate the defendants' profit, and the plaintiffs' share of that profit. First, the district court made a series of calculations concerning the percentage of ownership by both sides at various times, most of which either defendants or plaintiffs contest.[19]

Second, defendants rightly complain that the district court's calculation of the sale price of the company was incorrect. The price paid by Van Leer was $25,761,021, but defendants were required to pay $1,042,400 for the promissory notes they signed when they purchased the treasury shares on June 25, 1996. When calculating the September 1997 purchase price of the company, the total purchase price of the stock should be reduced by that sum to reflect the fact that Van Leer, in effect, received an immediate refund of over a million dollars upon purchase of the company.

Third, defendants argue that the district court abused its discretion in awarding prejudgment interest calculated from May 30, 1996, the date the plaintiffs agreed to sell their stock, and not from the purchase of the company sixteen months later. Prejudgment interest is meant to compensate plaintiffs for their "inability to utilize funds rightly due" them. R.I.
Tpk. & Bridge Auth. v. Bethlehem Steel Corp., 446 A.2d 752, 757 (R.I. 1982). It must be calculated on the date the damages begin to accrue, even if a cause of action accrues earlier for other purposes. Blue Ribbon Beef Co. v.
Napolitano, 696 A.2d 1225,
Page 50

1230-31 (R.I. 1997). Otherwise, the plaintiffs would be compensated for more than "waiting for recompense to which they were legally entitled." Martin v. Lumbermen's Mut. Cas. Co., 559 A.2d 1028, 1031 (R.I. 1989).

We need not address whether the district court abused its discretion in awarding interest from May 1996 when its damages award was predicated, at least in part, on the theory that plaintiffs would not have sold their stock until September 1997. We caution only that the date prejudgment interest is awarded must comport with the theory of damages.

C. Options

The plaintiffs also appeal the district court's denial of their challenge to the individual defendants' granting of options to themselves. This was a separate claim from that involving the repurchase of plaintiffs' shares by the company.

The district court held that any claim as to options was a derivative claim not available to plaintiffs to assert in a direct action. We find no error. The usual rule is that an action grounded in an injury to a

corporation must be brought as a derivative suit. Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2d Cir. 1975); Halliwell Assocs. v. C.E. Maguire Servs., Inc., 586 A.2d 530, 533 (R.I. 1991). If, however, the injury is the result of a violation of a duty owed directly to shareholders, they may sue on their own behalf. "Where the act complained of creates not only a cause of action in favor of the corporation but also creates a cause of action in favor of the stockholder, as an individual, for violation of a duty owing directly to him, the stockholder may bring suit as an individual." Empire Life Ins. Co. v. Valdak Corp., 468 F.2d 330, 335 (5th Cir. 1972) (emphasis in original). In order to pursue a derivative suit, plaintiffs must allege that all other avenues of redress are foreclosed, including redress by the board of directors. See R.I. Super. Ct. R. Civ. P. 23.1 (defining the requirements for shareholder derivative suits); Hendrick v. Hendrick, 755 A.2d 784, 794 (R.I. 2000) (closely held corporation).

A challenge to the granting of options to executives usually requires a derivative suit. See In re Triarc Cos., 791 A.2d 872, 878 (Del. Ch. 2001) (rejecting a direct claim of fiduciary breach based on the granting of options to corporate executives in a public corporation). This is because if the option price is too low, the corporation as a whole suffers, because it will not receive a fair price when the options are exercised. The fact that the option price was too low because the defendants may have known something improperly withheld from the plaintiffs does not transform this suit into one which may be brought directly. The context of a closely held corporation does not change this analysis. See Hendrick, 755 A.2d at 793-94 (requiring a derivative action to challenge executive compensation in a closely held corporation); accord Symmons v. O'Keeffe, 644 N.E.2d 631, 638 (Mass. 1995) (same); Bessette v. Bessette, 434 N.E.2d 206, 208 (Mass. 1982).

Plaintiffs argue that a direct cause of action should be available because the individual defendants are also stockholders, so that they would benefit from a derivative action on behalf of all stockholders. This argument proves too much. Many, if not most, corporate executives are stockholders in the companies they represent. To establish an exception that would allow direct suits any time they named executives who were also stockholders would eviscerate the derivative suit requirement.

We affirm the district court's dismissal of the plaintiffs' claim against the granting of options.

Page 51

D. Conclusion

Disputes among next generations in family-owned small companies are not infrequent. Sometimes, as here, the disputes lead to litigation. The parties now have what may be their last opportunity to reach an agreement. We hope they will seize it.

We affirm the holding that defendants were in breach of their duties under Rhode Island law to the plaintiff minority shareholders in their redemption of plaintiffs' shares in May 1996. We also hold that the measure of the fair market value as of May 1996 is determined: the plaintiffs would be entitled to the difference per share between $303 and $200 (subject to the proviso stated before). The measure of the damages tied to preventing unjust enrichment to defendants is not determined, nor is the issue of whether that measure is the appropriate yardstick under equitable principles to use given the facts of this case. The case is remanded for further proceedings. The district court, in its discretion, may take such additional evidence as it deems necessary to enable it to make the necessary findings. Each side shall bear its own costs.

Lawton v. Nyman

Chronology

1936 Nyman Manufacturing founded by John Nyman.

late 1980s Robert and Kenneth Nyman inherited all Class B voting shares and became president and vice-president and members of the board of directors.

early 1990s Nyman Manufacturing lost money.

by 1994 Nyman Manufacturing on verge of bankruptcy. Robert and Kenneth personally guaranteed $1 million loan and reduced their salaries and benefits.

August 1994 Nyman Manufacturing hired Keith Johnson as CFO and Treasurer.

early 1995 Nyman Manufacturing doing better; Board adopted stock option and buy-back plans.

April 3, 1995 Board granted Johnson option to buy 1,000 Class A shares at 80 percent of book value, $145.36/share.

late 1995 Fleet Bank terminated relationship with Nyman Manufacturing; Johnson obtained new financing from other institutions.

November 6, 1995 Board redeemed the 2,256 Class A shares owned by the estate of Magda Burt for $145.36/share. Robert, Kenneth and Johnson ("the Defendants") received options to buy 2,256 shares.

January 1996 Board offered to redeem 1,677 Class A shares owned by the Walfred Nyman Trust for $145.36. Offer rejected because of Beverly Kiepler's resistance.

March 29, 1996 1996 fiscal year ended; Nyman Manufacturing earned a $3.5 million profit but largely on non-recurring items.

April 1996 Board voted the Defendants deferred compensation plans worth $2 million and decided to hire a consultant.

April-May 1996 Johnson talks to Kiepler about possible redemption of her shares and tells her the bank waiver permitting possible redemption of her shares expires on May 1. This is untrue.

May 8, 1996 Johnson mailed letter to stockholders offering $200/share buy-back. Letter doesn't mention possibility that company could be sold.

May 10, 1996 Robert called Judith Lawton; described opportunity to sell as "once in a lifetime"; did not mention possibility company might be sold.

Page 52

May 30, 1996 The Lawtons sold their 952 Class A shares for $200/share. The children of Robert and Kenneth also sold 140 Class A shares.

June 25, 1996 The Defendants voted themselves options to buy 1,092 shares at $200/share to

$220/share. The Defendants also bought all available treasury shares (4,115 Class A shares and 750 Class B shares) for $200/share. The book value of the company's shares is $527.50/share.

August 1996 The Defendants met with Shields & Co. to discuss the possible sale of the company and other issues.

October 1996 Johnson identified the Van Leer Corp. to Thomas Shields as a possible acquirer.

November 1996 Shields sent Johnson a letter identifying the "universe of potential buyers in the next three years."

March 1997 Johnson met with Van Leer executives in the Netherlands to discuss sale of Nyman Manufacturing or joint venture.

June 25, 1997 Letter of intent signed providing that Van Leer will buy all outstanding Nyman Manufacturing stock.

September 29, 1997 Closing for Van Leer purchase of Nyman Manufacturing. Van Leer paid $1,667.38 per Class A share and $2,167.59 per Class B share.

May 22, 1998 Complaint filed in Lawton v. Nyman.

January 17, 2002 District court decided Lawton v. Nyman and Kiepler v. Nyman.

July 2, 2002 Kiepler appeal dismissed at parties' behest.

---------------

Notes:

[1] For convenience sake, we refer to the three defendants using the term majority shareholders although Johnson did not hold Class B voting shares and purchased Class A shares later.

[2] The district court found that the award of options to Johnson, who had accepted a lesser salary in exchange for an equity share, was not improper.

[3] Under Rhode Island law, book value is not necessarily the fair value of a share. Egan v. Wirth, 58 A. 987, 992 (R.I. 1904). Since defendants pegged the option price to book value, we continue to use it to keep comparisons in like format.

[4] The stock option plan required majority shareholders to pay 110 percent of "fair market" value.

[5] The Kiepler case ultimately settled.

[6] In Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016 (R.I. 1998), the court applied similar Massachusetts law as developed under the Donahue doctrine. Id. at 1021 (citing Donahue v. Rodd Electrotype Co. of New Eng., Inc., 238 N.E.2d 505, 515 (Mass. 1975)).

[7] Jordan draws a strong dissent from Judge Posner on the liability finding based on the facts of the

case. See 815 F.2d at 444 (Posner, J., dissenting). For a more general critique, see D.A. DeMott, Beyond Metaphor: An Analysis of Fiduciary Obligation, 1988 Duke L.J. 879.

[8] The question of when directors and officers, under a fiduciary duty, must disclose possible actions is one not restricted to closely held corporation or even to the securities laws. It also comes up under ERISA. See Vartanian v. Monsanto Co., 131 F.3d 264, 272 (1st Cir. 1995) (finding a fiduciary duty of disclosure when an employer fails to disclose its "serious consideration" of whether to adopt a change in employee plan benefits that would affect the plaintiff). Of course, there may be different thresholds depending on context.

[9] In its ruling on the federal securities law claim the district court referred to a case involving public companies. See Jackvony v. RIHT Fin. Corp., 873 F.2d 411 (1st Cir. 1989).

[10] The district court also later used the phrase "distinct possibility."

[11] It is not clear whether the fair market value of the stock in May 1996, $303 a share, assumed disclosure of the possibility of a sale. The district court at times seems to refer to an additional strategic sale bonus to the value of the stock if the "mere possibility" of a sale had been disclosed, on the assumption that any sale would be a strategic sale. This topic was not directly addressed by the evidence and there is no finding on the point.

[12] Further undercutting the equivalence theory is the district court's finding in the companion Kiepler case that the company's "long-term success was far from assured because it faced increased competition from much larger companies."

[13] Rhode Island law elevates the standard of proof of liability to clear and convincing evidence before a constructive trust may be imposed. Under Rhode Island law, "parties requesting the imposition of a constructive trust must establish by clear and convincing evidence the existence of fraud or breach of a fiduciary duty; absent such proof there can be no constructive trust." Curato v. Brain, 715 A.2d 631, 634 (R.I. 1998); see Clark v. Bowler, 623 A.2d 27, 29 (R.I. 1993); Desnoyers v. Met. Life Ins. Co., 272 A.2d 683, 690 (R.I. 1971).

In our view, a damages theory based on avoidance of unjust enrichment is not identical to the law on creation of a constructive trust. Nevertheless, a constructive trust damages theory is an option the district court may consider. If damages under Rhode Island law are to be based on a constructive trust theory, then evidence of the nature of the fiduciary duty and the fact of the breach of that duty must be clear and convincing.

[14] Another, by Michael Kaufman, is entitled No Foul, No Harm: The Real Measure of Damages Under Rule 10b-5, 39 Cath. U. L.Rev. 29 (1989)(arguing that damages should measure the relative materiality of the non-disclosed information).

[15] As one treatise has noted, the Janigan rule has particular strength when it is used for a close corporation: "[U]nlike the publicly traded situation, the plaintiff does not have the alternative of covering by going into the market and purchasing the security after becoming aware of the fraud." 3C H.S. Bloomenthal & S. Wolff, Securities and Federal Corporate Law § 13:44 (2d ed. 1999).

[16] We have no reason to think Rhode Island would permit the measure of damages to be punitive rather than remedial.

[17] It is true that Janigan awarded profits from a sale two years later. But there are differences between Janigan and the present case. For example, in Janigan, the difference between the true market value of the stock at the time of the sale and its sale price was negligible; here it was not, and plaintiffs will receive real damages in any event.

[18] The Seventh Circuit has used the model of assessing the probabilities of a series of events (e.g., of a possible sale, of a possible strategic sale, of plaintiffs holding on to their stock until time of sale) and discounting the sale price for these and other variables. See Jordan, 815 F.2d at 442. Even there, the court required a showing that the plaintiff would have retained stock ownership if full disclosure had been made. Id.

[19] Perhaps these controversies could effectively be bypassed if the district court were to simply use the various ownership percentages as of the time just before redemption of the plaintiffs' stock in May 1996.

---------------

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

PSW, INC., d/b/a PSW, BILLING v. VISA U.S.A., INC., et al.

C.A. No. 04-347T

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

2006 U.S. Dist. LEXIS 11763

February 3, 2006, Decided
February 3, 2006, Filed

SUBSEQUENT HISTORY: Accepted by, Count dismissed at PSW, Inc. v. Visa U.S.A., Inc., 2006 U.S. Dist. LEXIS 12157 (D.R.I., Feb. 28, 2006)

CORE TERMS: chargeback, card, reserve account, breach of contract, antitrust, recommend, acquiring, website, Sherman Act, monopoly, aggregator, merchant, processing, covenant, general purpose, fair dealing, rule of reason, monopoly power, competitors, tortious interference, antitrust claim, embezzlement, monopolize, relevant market, consumer, issuing, conversion, entity, implied covenant, anticompetitive

COUNSEL: [*1] For PSW, Inc., doing business as, PSW Billing, Plaintiff: David Paul Steiner, David Steiner & Associates, PLC, Los Angeles, CA; Edward V. Formisano, Sinapi Formisano & Coleman Ltd., Cranston, RI; Richard A. Sinapi, Sinapi Formisano & Coleman Ltd., Cranston, RI

For VISA, USA, Inc., Defendant: Daniel H. Bookin, O'Melveny & Myers LLP, San Francisco, CA; Jonathan D. Hacker, O'Melveny & Myers LLP, San Francisco, CA; Patricia A. Sullivan, Edwards Angell Palmer & Dodge LLP, Providence, RI

For Mastercard International Incorporated, Defendant: Bruce A. Colbath, Weil, Gotshal & Manages, New York, NY; Jay N. Fastow, Weil, Gotshal & Manages, New York, NY; Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI; Staci L. Kolb, Blish & Cavanagh, Providence, RI

For First Financial Bank, Defendant: Brian Wallach, Howrey Simon Arnold & White LLP, Washington, DC; John A. Tarantino, Adler Pollock & Sheehan P.C., Providence, RI; Patricia K. Rocha, Adler Pollock & Sheehan P.C., Providence, RI; Peter E. Moll, Howrey Simon Arnold & White LLP, Washington, DC; Victoria Almeida, Adler Pollock & Sheehan P.C., Providence, RI

For First Data Merchant Services Corporation, Defendant: Brian Wallach, [*2] Howrey Simon Arnold & White LLP, Washington, DC; John A. Tarantino, Adler Pollock & Sheehan P.C., Providence, RI; Patricia K. Rocha, Adler Pollock & Sheehan P.C., Providence, RI; Peter E. Moll, Howrey Simon Arnold & White LLP,

Washington, DC; Victoria Almeida, Adler Pollock & Sheehan P.C., Providence, RI

JUDGES: LINCOLN D. ALMOND, United States Magistrate Judge

OPINION BY: LINCOLN D. ALMOND

OPINION: REPORT AND RECOMMENDATION

This is an antitrust action initiated on August 16, 2004 under both federal and state law by Plaintiff, PSW, Inc. d/b/a PSW Billing ("PSW" or "Plaintiff"). Plaintiff amended its Complaint on April 6, 2005. (Document No. 53). Defendants VISA, U.S.A., Inc. ("Visa"), MasterCard International, Inc. ("MasterCard"), First Financial Bank ("FFB") and First Data Merchant Services Corp. ("FDMS") have filed Motions to Dismiss all claims under Fed. R. Civ. P. 12(b)(6). (Document Nos. 59 (MasterCard), 61 (Visa) and 62 (FFB/FDMS)). The Motions have been referred to me for findings and recommendation. 28 U.S.C. @ 636(b)(1)(B); DRI LR Cv 72(a). A hearing was held on November 2, 2005. After listening to the arguments of counsel, [*3] reviewing the memoranda submitted by the parties and performing independent research, I recommend that the Motions to Dismiss be GRANTED in part, and DENIED in part, as set forth below.

Background

I. The Parties

PSW is an Internet business that processes MasterCard and Visa credit card sales on behalf of its clients, which are primarily adult entertainment websites. PSW's clients are either not qualified or otherwise not authorized to accept MasterCard or Visa payment cards directly. First Amended Complaint ("FAC") PP 17-20, 91.

Defendants MasterCard and Visa are national bank card associations. Both MasterCard and Visa are organized as open joint ventures, and are owned by their member banks. Id. PP 10-11. A member bank of either MasterCard or Visa is classified as an issuing bank, which issues MasterCard or Visa payment cards to consumers; an acquiring bank, which contracts with merchants to acquire and process credit card sales; or both an issuing and acquiring bank. Id. PP 13, 17-20, 91. FFB is PSW's acquiring bank, and FDMS assists FFB with processing its transactions. Id. PP 23, 25.

II. Credit Card Transactions

A basic MasterCard or Visa transaction[*4] involves several steps. The transaction commences when a cardholder presents a payment card to a merchant in exchange for products or services. The merchant accepts the card and then transmits the transaction information to its acquiring bank. Id. PP 14, 38. The acquiring bank processes the transaction information, and sends the information to the cardholder's issuing bank, which reviews and approves the transaction. Id. Finally, the issuing bank posts the charge to the cardholder's account. Both the acquiring and issuing banks charge fees in connection with processing the transactions. Id. The acquiring bank withholds its fee from the amount it reimburses the merchant, and the issuing bank withholds its fee from the acquiring bank. Id. P 38.

For PSW and its clients, a Visa or MasterCard charge transaction involves

an additional party, PSW, and therefore, an additional level of processing. When a merchant such as PSW's website clients are not authorized to accept Visa and MasterCard charge cards, they must obtain services from a third party like PSW to accept and process credit card sales on their behalf. Businesses such as PSW are classified as "aggregators" because[*5] they collect (or aggregate) the credit card transactions for numerous merchants and present those transactions to an acquiring bank. Id. PP 18-19. PSW essentially acts as a "gateway," which makes the sale to the consumer, while its website clients deliver the product to the consumer. Id. PP 20, 21.

III. The Merchant Agreement

On January 17, 2002, PSW entered into a Merchant Services Bankcard Agreement with FFB and FDMS (the "Merchant Agreement"). Id. P 104. In the Merchant Agreement, FFB/FDMS agreed to provide authorization, processing and credit card settlement services for PSW. Id. P 25. Essentially, as described above, PSW and FFB agreed that FFB would serve as PSW's acquiring bank and would process all the credit card transactions of PSW. The Merchant Agreement expressly incorporated the association rules adopted by Visa and MasterCard. Id. P 28.

The Merchant Agreement also sets forth how chargebacks would be handled by PSW and FFB/FDMS. A chargeback occurs when a consumer disputes a charge on his charge account, and the merchant is unable to provide proof (such as a signed receipt) that the consumer authorized the transaction. n1 If there is no proof [*6]of authorization, the disputed transaction is credited (or "charged back") to the consumer's payment card account. Id. PP 51-52. Under the Merchant Agreement, PSW agrees to reimburse FFB for "any fees, charges or expenses required or imposed by MasterCard or Visa" in connection with a chargeback. Id. P 108.

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Internet businesses typically experience a higher volume of disputed transactions than regular merchants, due in part to "friendly fraud," i.e., consumers that dispute valid charges on their account, in order to avoid paying for purchases of products or services. Since Internet transactions occur without any signed receipt, there is no mechanism to verify a consumer's charge. Id. P 59. Online purveyors of adult entertainment experience even higher rates of chargebacks than do other Internet merchants. Id. P 67. PSW concedes there are "unavoidable incidents of friendly and other fraud" concerning Internet payment card transactions, and that PSW is "powerless to prevent" such chargebacks and fraud. Id. PP 59, 113. PSW concedes that MasterCard has deemed the chargebacks and Internet fraud a "serious dilemma." Id. P 60.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*7]

In addition to requiring PSW to pay any chargeback fees, the Merchant Agreement also provided two other mechanisms to guard against FFB/FDMS'

potential loss in the event of a chargeback -- it required PSW to maintain a bank account or "reserve account" with FFB to cover potentially excessive chargeback expenses, Id. P 107, and it provided for an "Excessive Chargeback handling fee" in the event that the number of chargebacks exceeded a certain threshold. Id. P 106.

IV. Termination of the Merchant Agreement

PSW alleges that its business difficulties began in late 2002 when Visa started to enforce its so-called "cross-border acquiring rule," which prohibits a domestic bank from processing any foreign transactions and prohibits foreign banks from processing any domestic transactions. FAC P 113. PSW asserts that 60% of its Visa transactions were lost as a result of the enforcement of this rule. Id. At the same time, PSW "was required" to stop processing sales for "certain high chargeback sponsored clients." Id. Apparently, after ceasing business with international banks and after cutting ties with high-chargeback client, PSW's rates of chargebacks began to significantly[*8] rise. Id.

It is alleged that the enforcement of these two rules caused PSW to enter into a downward spiral. PSW states that as a result of the decline in business and the increased ratios of chargebacks, FFB/FDMS exercised its right in February 2003 under the Merchant Agreement to require PSW to increase the balance in its reserve account. At that point in time, PSW was required to increase the reserve account to $ 750,000.00, which FFB collected by withholding settlement of 33% of PSW's deposits until the reserve account was funded. Id. P 116.

Around the same time, PSW secured a website client that did not sell adult entertainment. Ultimately, however, FFB determined that this non-adult oriented client was "high risk" and FFB ceased processing for that client. Id. PP 117-128. Subsequently, FFB required another increase in the reserve account balance, this time withholding 50% of PSW's daily deposits until the reserve account reached $ 1.2 million. Id. P 129. Following that, and over a relatively short period of time, FFB apparently determined that PSW's potential liabilities were rapidly increasing, and it therefore required PSW to increase the reserve account to[*9] $ 2 million. FFB withheld a percentage of PSW's daily deposits in an attempt to increase the reserve account. Id. P 139.

In September 2003, Visa imposed an $ 81,000.00 penalty on PSW for exceeding its chargeback threshold. Id. P 146. Following that penalty, PSW apparently sent MasterCard and Visa a letter outlining its intent to file suit. Id. P 147. Subsequently, FDMS sent PSW a letter notifying it that FDMS was terminating the relationship due to "very significant financial exposure." Id. P 148. Shortly thereafter, FDMS sought to increase the reserve account balance to $ 3 million, rather than the $ 1.6 million being held at that time. Id. P 149. Following termination of the Merchant Agreement and the breakdown of the parties' relationship, FFB has retained the holdings in the reserve account. PSW has been unable to retain another acquiring bank. Id. P 154.

V. Case Posture

Plaintiff initiated this action by filing its Complaint against Defendants on August 16, 2004. Defendants responded to the Complaint by filing Motions to Dismiss. On April 6, 2005, PSW exercised its right to amend its Complaint as a matter of course under Fed. R. Civ. P. 15(a)[*10] . It appears from the

docket that this amendment may have been prompted, at least in part, by comments made by Chief Judge Torres at a status conference held on February 14, 2005 regarding the confusing structure of PSW's lengthy Complaint.

There was little, if any, change in the structure of PSW's allegations from the Complaint to the FAC and only minor substantive changes. The FAC is 40 pages long and consists of 180 substantive paragraphs and 11 counts. Each count is brought against all four Defendants, and PSW incorporated all 150 "factual" allegations into each and every substantive count. The FAC does not identify which particular factual allegations show that PSW is entitled to relief on each particular count. Further, even though they are separate legal entities, the FAC does not distinguish between the Defendants in any meaningful way and alleges in a conclusory fashion that each individual Defendant is liable for the acts and/or omissions of the others. See, e.g., FAC P 32. Further adding to the confusing nature of the FAC, the Introduction to both Complaints contains reference to an alleged violation of the Clayton Act, 15 U.S.C. @ 14, but no substantive[*11] count regarding such claim. The Clayton Act generally prohibits selling a commodity on the condition that the purchaser refrain from dealing with the seller's competitors and, on its face, such Act does not appear reasonably related to PSW's allegations.

Turning to substantive changes, the original Complaint included a count against all Defendants under the Robinson-Patman Act, 15 U.S.C. @ 13, claiming that the Defendants' "Excessive Chargeback Programs" gave larger aggregators a discriminatory preference over smaller aggregators such as PSW. See Compl. P 154 (Count 3). The Robinson-Patman Act by its clear terms is limited generally to claims that a seller of "commodities" discriminated in price as between "different purchasers." 15 U.S.C. @ 13(a). See Volvo Trucks N.A., Inc. v. Reeder-Simco GMC, Inc., 126 S. Ct. 860, 163 L. Ed. 2d 663 (2006). PSW dropped its Robinson-Patman Act claim from the FAC presumably because this case does not involve commodity purchasers and also presumably because the allegation of discrimination between competitors (large aggregators versus small aggregators) could be construed as inconsistent with its claims[*12] alleging harm to competition under the Sherman Act. PSW did not, however, remove the factual allegation of cost discrimination in favor of large aggregators as compared to smaller ones from its FAC. Compare Compl. P 81 with FAC P 90.

In replace of its Robinson-Patman Act claim, PSW added a First Amendment Bivens count against all Defendants. FAC P 184. PSW alleges that Defendants' corporate actions, including that they purportedly reviewed and screened the content of pornographic websites operated by PSW's clients, was "on information and belief," the result of coercion and/or encouragement by "unknown" federal officials and unlawfully impaired PSW's "right to freedom of speech." Id. PP 168, 184. No other "new" claims were added by PSW to its FAC. Therefore, in addition to its Bivens claim, the FAC includes all the other counts alleged in PSW's original Complaint -- Violation of Section 1 and Section 2 of the Sherman Act, Violation of the Rhode Island Antitrust Act, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Tortious Interference with Contractual Relations, Tortious Interference with Prospective Economic Advantage, Conversion and[*13] Embezzlement.

Standard of Review

In ruling on a motion to dismiss pursuant to Rule 12(b), the Court construes the complaint in the light most favorable to the plaintiff, see Greater

Providence MRI Ltd. P'ship v. Med. Imaging Network of S, New England, Inc., 32 F. Supp. 2d 491, 493 (D.R.I. 1998); Paradis v. Aetna Cas. & Sur. Co., 796 F. Supp. 59, 61 (D.R.I. 1992), taking all well-pleaded allegations as true and giving the plaintiff the benefit of all reasonable inferences, see Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002); Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 (1st Cir. 1995); Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994). If under any theory the allegations are sufficient to state a cause of action in accordance with the law, the motion to dismiss must be denied. See Hart v. Mazur, 903 F. Supp. 277, 279 (D.R.I. 1995). The Court "should not grant the motion unless it appears to a certainty that the plaintiff would be unable to recover under any set of facts." Roma Constr. Co. v. A Russo, 96 F.3d 566, 569 (1st Cir. 1996);[*14] accord Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) ; see also Arruda, 310 F.3d at 18 ("We will affirm a Rule 12(b)(6) dismissal only if 'the factual averments do not justify recovery on some theory adumbrated in the complaint.'").

Discussion

I. Count 1 -- Sherman Act, 15 U.S.C. @ 1

In Count 1 of the FAC, PSW alleges Defendants violated Section One of the Sherman Antitrust Act, 15 U.S.C. @ 1, through their programs and concerted conduct, and that their actions restrained "competition and/or trade in interstate commerce." Defendants argue that Plaintiff does not have antitrust standing nor has it sufficiently alleged an antitrust injury, and move that the Section One claim be dismissed.

Section One of the Sherman Act states, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal." 15 U.S.C. @ 1. Although the statute is broadly worded, the Supreme Court has "long recognized that the Act prohibits only unreasonable restraints of trade." [*15]See Lee v. Life Ins. Co. of N. Am., 829 F. Supp. 529, 534 (D.R.I. 1993) (citation omitted). The next question, therefore, is what constitutes an unreasonable restraint of trade. Courts determine whether an alleged restraint is unreasonable by applying either the per se rule or the "rule of reason." The per se rule applies to "certain agreements . . . [which] are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused . . . ." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)(citation omitted). In defining what conduct is subject to per se classification, courts have been "very careful" to limit per se treatment only to "conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (e.g., reduced costs, increased competition) worthy of being weighed against the negative effects." Addamax Corp. v. Open Software Foundation, Inc., 152 F.3d 48, 51 (1st Cir. 1998) citing Broadcast Music, Inc. v. Columbia Broadcasting System, 441 U.S. 1, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979).

Accordingly, conduct is[*16] deemed a per se violation only when it is a "manifestly anticompetitive" act or practice. Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723-724, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1998). Addressing what might be considered manifestly anticompetitive, the First Circuit Court of Appeals has noted that there are "only a couple of

'serious candidates' for per se treatment," and that the offenses falling under that classification are an "ever narrowing . . . niche." Addamax Corp., 152 F.3d at 51-52 citing U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589. 593 (1st Cir. 1993). The classic examples of per se violations are agreements to set prices, fix output or engage in horizontal market division. Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001).

While the per se rule applies to a narrow set of alleged antitrust violations, the rule of reason applies to all other alleged violations. The rule of reason consists of a "burdensome multi-part" analysis, which requires a plaintiff to prove, "that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise[*17] had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits." Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004). The Supreme Court has noted that ". . . mergers, joint ventures, and various vertical agreements . . . are judged under a rule of reason, i.e., an inquiry into market power and market structure designed to assess the combination's actual effect." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)(citation omitted).

In the present case, Plaintiff claims that the per se rule should be applied, stating, "PSW is . . . challenging a conspiracy between competing associations of competitors, for which per se analysis is appropriate . . ." Pl.'s Memo at p. 16, n. 35. Defendants, on the other hand, argue that the rule of reason analysis must be applied. After considering the applicable legal standards and reviewing all of Plaintiff's claims, the conduct alleged is simply not "manifestly anticompetitive," and therefore does not fall under the well-defined per se rule. Additionally, MasterCard and Visa, and their rules[*18] and policies, are part of a "larger legitimate economic venture," and therefore must be analyzed under the rule of reason. Courts which have considered antitrust challenges to MasterCard and Visa's policies and procedures have applied the rule of reason. See Paycom Billing Svcs. v. MasterCard Int'l, Inc., 2005 U.S. Dist. LEXIS 4920, 2005 WL 711658, *3 (E.D.N.Y. March 29, 2005)(stating that, "because MasterCard is organized as a joint venture, its policies must be analyzed under the rule of reason."); see also Augusta News, 269 F.3d at 47; and Addamax Corp., 152 F.3d at 52 (internal citation omitted)("Joint venture enterprises . . . unless they amount to complete shams, are rarely susceptible to per se treatment."); and Stop & Shop, 373 F.3d at 61 (joint ventures, "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively.")

Having determined that the rule of reason applies to Plaintiff's antitrust claims, the Court turns to consideration of each of PSW's alleged antitrust injuries.

1. Excessive Chargeback Program/Reserve Account

PSW's first allegation is that the reserve account it was required to [*19]maintain with FFB, and FFB's policy for handling chargebacks are antitrust violations. PSW states that the programs, "substantially and adversely affected competition . . . and thereby caused or contributed to increased prices and/or a reduction in output." FAC P 92. Both the reserve account and the excessive chargeback program were contracted-for conditions of the Merchant Agreement. PSW concedes that the purpose of the reserve account was to guard

against the "potential imposition of penalties" for any excessive chargebacks by PSW. Id. P 83. Similarly, the excessive chargeback program is a series of penalties FFB was permitted to impose on PSW if PSW exceeded a preestablished ratio of chargebacks. Id. P 69-75.

The FAC thoroughly outlines the financial difficulties PSW experienced as a result of the increases to the reserve account and the chargeback penalties imposed by FFB. PSW has failed, however, to allege harm to competition. Ironically, PSW pleads facts that are antithetical to the basic elements of an antitrust case. For example, PSW alleges that the complained-of actions and policies would "impact small merchants most heavily." Id. P 91. [*20] Further, PSW states that the policies and actions would have the "inevitable and intended effect of eliminating all small Aggregators processing for Internet Adult Entertainment Websites and consolidating that business with Aggregators large enough to spread unavoidable friendly and other fraud chargebacks against a sufficiently large volume . . ." Id. P 90 (emphasis added).

The reserve account requirements and the excessive chargeback programs may have harmed or even destroyed PSW's business, but such an allegation, even if true, utterly fails to state an antitrust claim because it alleges no harm or injury to competition. The purpose of the federal antitrust laws is "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)(emphasis added). Moreover, "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition." Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 4 (1st Cir. 2004).

PSW's failure to allege an injury to competition is fatal to its[*21] antitrust claim. The injury to competition requirement is at the heart of the determination of whether there is antitrust injury and antitrust standing. The antitrust injury requirement merely requires an allegation of loss or damage of the type the antitrust laws are intended to prevent and that flows from the allegedly unlawful acts. See Atlantic Richfield Co. V. USA Petroleum Co., 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990). Under these rules, the "removal of one or a few competitors need not equate with injury to competition." Lee, 829 F. Supp. at 536.

In Paycom Billing, the United States District Court for the Eastern District of New York considered and dismissed similar antitrust claims brought by an aggregator against MasterCard. 2005 U.S. Dist. LEXIS 4920, 2005 WL 711658 (E.D.N.Y. March 29, 2005). One of the claims alleged that MasterCard's chargeback policy was an antitrust violation. Applying Fed. R. Civ. P. 12(b)(6), the Court rejected that claim, stating, "plaintiff has merely shown that MasterCard's 'chargeback system' harms plaintiff because it increases its costs." 2005 U.S. Dist. LEXIS 4920, [WL] at *4. The Court noted that the plaintiff failed to[*22] demonstrate that the complained-of policies harm competition. The same reasoning applies here. Therefore, for all the reasons stated, I conclude that PSW's antitrust claim stemming from the reserve account and the chargeback program fails to state a claim as a matter of law. I therefore recommend that all antitrust claims regarding the chargeback penalties and reserve account be dismissed.

2. Registration Policy

Next, PSW claims that the Visa Internet Payment Service Providers ("IPSP") program and the MasterCard Member Service Providers ("MSP") programs are anticompetitive and violate Section One of the Sherman Act. Despite PSW's claim that the programs are related, the only common feature pled by PSW is that the programs seek to gain certain basic registration information about a website prior to authorizing the website to accept Visa or MasterCard payment cards. Visa's IPSP, for example, requires that a web site client pay a registration fee of $ 750.00, and provide Visa with the "name, physical address, financial information, and URL for each website client . . ." FAC P 92(a). MasterCard's MSP, on the other hand, mandates a higher one-time registration fee of $ 1,000.00[*23] from the website client, and a "change in display format" among other requirements. PSW notes that there is a "substantial fine" for non-compliance with these programs. Id. P 92(a).

Having described the harm alleged and the programs underlying Plaintiff's claimed harm, the Court turns to the task of analyzing whether an antitrust claim is alleged. Once again, the Court credits each of PSW's allegations, however this second pass at an antitrust claim fares no better than the first. In short, as PSW alleges, these registration programs applied to "all aggregators/ merchants." Yet, despite PSW's claim that programs applied equally, PSW makes no analogous claim of equal harm to all competitors. The Court must accept these facts as true and conclude that these registration programs which were equally applied to all potential website clients resulted in harm only to PSW. Such allegations are insufficient to state an antitrust claim under the Sherman Act, and I also recommend these antitrust claims be dismissed.

3. Boycott List Programs

Like the previous claim, PSW's next claim is aimed at separate programs of MasterCard and Visa which apparently have similar goals. PSW alleges[*24] that Visa and MasterCard have created programs to monitor the names of "merchants who have been terminated or declared to be an Excessive Chargeback Merchant." Id. P 92(b). Visa's program is entitled the "Terminated Merchant's File" program and MasterCard's is called the MATCH file program. The effect of these programs is to create a black list for terminated and high risk merchants.

PSW's antitrust claim regarding these "boycott" programs fails for a variety of reasons. First, PSW's allegations related to this claim are inconsistent and contradictory. At first, PSW claims that as a result of being placed on the MasterCard and Visa blacklists, its clients were unable to secure another aggregator, and the clients were forced out of business. Id. P 97. Later, however, PSW states that it lost approximately 85% of its clients to competitors. Id. P 145. The Court's mandate to accept all of Plaintiffs allegations as true does not reach a sensible conclusion as to these claims.

The conflicting allegations trouble the Court, but the Court nonetheless concludes that the harm to PSW (if any exists) is ancillary to the chargeback program and does not allege an antitrust injury to[*25] competition on its own. See Paycom Billing, 2005 U.S. Dist. LEXIS 4920, 2005 WL 711658, *3. Moreover, it is evident that the party directly injured by the boycotting program is the black-listed merchant, and not PSW. For all these reasons, I recommend that the antitrust claims regarding the boycott programs be dismissed.

4. Geographic Market Divisions or Cross-Border Restrictions

The next policy challenged by PSW is MasterCard's and Visa's rules which prohibit cross-border processing by acquiring banks. PSW states, "MasterCard and Visa established and enforced rules prohibiting the processing of domestic transactions by offshore Acquiring Banks and/or processors," as well as the "processing of foreign transactions by a domestic [Acquiring Bank]." FAC P 92(c). Although PSW claims its website clients were harmed by this policy, PSW does not sufficiently allege how this policy harmed competition in PSW's relevant market. Once again, the directly injured party, if any, is PSW's website client, which would have fewer acquiring banks with which to contract.

Moreover, the rule restricts the number of acquiring banks in the market, and it is the acquiring banks which compete with PSW and other[*26] aggregators, so this policy arguably benefits PSW, and does not harm it. In addition to the lack of alleged harm to competition, the federal antitrust laws do not allow recovery for potentially advantageous "injuries." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 583, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). For all these reasons, I recommend that Plaintiff's antitrust claims regarding the cross-border rules be dismissed.

5. Exclusivity Rules

Next, PSW lodges a challenge against Visa's and MasterCard's exclusivity rules. The exclusivity rules are "parallel programs whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited them from issuing general purpose cards of the competing networks, American Express and Discover . . ." Id. P 92(d). The complained-of rules do not restrict PSW from contracting with American Express or Discover. The rules, rather, only prohibit acquiring banks like FFB from issuing Discover or American Express cards if they also issue Visa or MasterCard payment cards. PSW concedes that American Express has decided not to process transactions involving Internet adult[*27] entertainment. Id. P 50. PSW does not allege that it is unable to accept Discover-branded cards. Id. P 162.

These exclusivity rules were the subject of a Department of Justice action in United States v. Visa, USA, Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2nd Cir. 2003). PSW argues that collateral estoppel prevents Defendants from contesting the "holding or facts" decided in that case. Then, PSW contends that on the basis of the United States v. Visa Court's holding, PSW has suffered cognizable antitrust harm. This Court notes that the exclusivity rules were invalidated because they caused harm to cardholders and banks, because fewer payment cards were available with fewer benefits. 163 F. Supp. 2d at 340-341. The holding in the United States v. Visa case, therefore, is not relevant or applicable in the absence of any harm to PSW, its competitors or the relevant market. PSW, in short, alleges the existence of the United States v. Visa case, and then claims on the basis of the Court's finding in that case and the nature of its business, that it is entitled to recovery under the federal antitrust[*28] statutes. Such a claim is unjustified.

The Paycom Court addressed this issue and reached a sound conclusion applicable in the present dispute. That Court rejected the claimed damages as a result of the United States v. Visa litigation and held that the Plaintiff-aggregator lacked standing because its claimed injury was highly speculative and derivative of the injury already being claimed by American

Express and Discover. See Paycom Billing, 2005 U.S. Dist. LEXIS 4920, 2005 WL 711658 at 13-14 ("Plaintiff is a remote party and allowing it to recover under this theory could result in punishing [Visa] multiple times for the same offense"). In addition to failure to claim harm to competition in its market, Plaintiff is a remote party, seeking derivative and speculative damages. For all these reasons, the claim of antitrust violations stemming from the United States v. Visa litigation fails to state a claim, and I recommend that it be dismissed.

6. Price Fixing

Plaintiff's final claim under Section One of the Sherman Act relates to an alleged parallel pricing scheme by MasterCard and Visa. PSW claims Defendants undertook a "parallel pricing scheme . . . in conjunction with their[*29] member banks, whereby, inter alia, higher interchange and discount fees and chargeback related and other penalties are charged to [Aggregators]." FAC P 92(e). PSW claims that the "inevitable and intended" effect of the pricing scheme was to eliminate aggregators, however, PSW also claims that larger aggregators have survived. See FAC P 90. For all the reasons outlined previously, this pass at an antitrust claim fails to state a cognizable injury or any harm to competition.

In addition to the insufficient allegation of a larger injury to competition, there are several other deficiencies in this attempted price fixing claim. First, PSW claims that aggregators have "no practical alternative" but to do business with MasterCard and Visa. After a thorough reading of the FAC, this statement is patently incorrect. PSW could still deal with Discover, and high prices could potentially invite American Express to enter or reenter the market. Second, it is undisputed that MasterCard's chargeback policies and penalties are much more onerous than Visa's policies and penalties. The fact that their penalties materially differ undermines any price fixing claim. See Paycom, 2005 U.S. Dist. LEXIS 4920, 2005 WL 711658[*30] at *4, n.5 ("plaintiff's claim that the MasterCard banks are engaged in a . . . price fixing for internet transactions appears on its face to lack merit. These same banks are handling Visa payment card transactions with less stringent chargeback policies.") Because the alleged price fixing scheme fails to state a claim, I recommend that it be dismissed.

II. Count 2 -- Sherman Act / Monopolization, 15 U.S.C. @ 2

In Count 2 of the FAC, Plaintiff claims that Defendants violated Section Two of the Sherman Act. Section Two makes it unlawful for a party to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. @ 2. Plaintiff claims all four Defendants violated Section Two of the Sherman Act by monopolizing, attempting to monopolize, conspiring to monopolize and combining to monopolize the "general purpose card market and/or network services for general purpose cards." See FAC PP 40-43.

First, any claim under Section Two requires evidence that, "the defendant has monopoly power and the defendant 'has engaged[*31] in impermissible exclusionary practices with the design or effect of protecting or enhancing its monopoly position.'" CCBN.Com. Inc. v. Thomson Fin., Inc., 270 F. Supp. 2d 146, 156-157 (D. Mass. 2003) citing Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 195-96 (1st Cir. 1996)(emphasis added)(citations

omitted). The first issue before the Court, therefore, is whether each Defendant has monopoly power. Monopoly power, also referred to as market power, has been defined as the "power to control prices or exclude competition." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992). Importantly, monopoly power is measured based on the "relevant market," which Plaintiff claims is the "general purpose card . . . and debit card market." FAC P 40. See United States v. Grinnell Corp., 384 U.S. 563, 570-571, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966).

To start, the Court considers whether FFB or FDMS has sufficient market power in the general purpose card and debit card market. In short, the FAC is silent on this issue, and Plaintiff has not alleged that it competes in the self-defined relevant market of the general[*32] purpose and debit card market. Plaintiff states various ways in which it asserts that Visa and MasterCard have attempted to, or have actually obtained, a monopoly in the relevant market. On the other hand, there are absolutely no allegations that FFB or FDMS had sufficient market power, that they conspired or had specific intent to monopolize or could realistically attain sufficient market power to monopolize a relevant market. Accordingly, without any sufficient allegations whatsoever against FFB/FDMS other than Plaintiff's conclusory allegations of violation of Section Two, the Court recommends that the Section Two claim against FFB/FDMS be dismissed.

Proceeding with the analysis of the Section Two claim as applied to Visa and to MasterCard, the Court considers each entity's market power. In this regard, the Court notes an additional relevant consideration in any calculation of market power under Section Two -- market power is determined on the basis of each individual defendant. In simpler terms, in order to state any claim under Section Two's actual or attempted monopoly clauses, a claimant is required to assert that the individual market power of a defendant is sufficient[*33] to constitute a monopoly, in this analysis, the combined monopoly power of competitors is irrelevant and insufficient. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Similarly, in order to state a claim for an attempted conspiracy under Section Two, a claimant must, at a minimum, allege an attempt to form a single monopolizing power, not merely that two entities may share monopoly power.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In the present case, PSW claims that Visa's "current share of the general purpose card . . . and debit card market is nearly 60%, while MasterCard's share . . . is 33% to 36%." FAC P 40. Additionally, Plaintiff claims that Visa and MasterCard "control over 73% of the volume of transactions on general purpose cards in the United States . . . [and] about 85% of the market" for cards issued. Id. P 41. The alleged market power, assuming it to be accurate, is still not sufficient to state a claim for a monopoly under Section Two. First, the

allegations of shared power must be ignored. It is well-established that an allegation of "shared monopoly" is simply insufficient[*34] to satisfy the test for monopoly power. See Santana Prods. v. Bobrick Washroom Equip., Inc., 249 F. Supp. 2d 463, 518-19 (M.D. Pa. 2003)(collecting cases). In Sun Dun, Inc. v. Coca-Cola Co., 740 F. Supp. 381, 390 (D. Md. 1990), the District Court dismissed a Section Two claim pursuant to Fed. R. Civ. P. 12(b)(6) in which the plaintiff had asserted that defendants "together . . . monopolize the market." That Court stated that the Complaint "alleges facts amounting to oligopoly and then simply applies a monopoly label to these facts in an effort to state a Section 2 claim." Id. The Court noted that, "an examination of the history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete domination of a market by a single economic entity." Sun Dun, 740 F. Supp. at 391; See also Consol. Terminal Sys., Inc. v. ITT World Communications, Inc., 535 F. Supp. 225, 229 (S.D.N.Y. 1982)("a shared monopoly, does not in itself violate Section 2 of the Sherman Act; rather, in order to sustain a[*35] charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.")

Second, after ignoring the shared monopoly allegation, neither Visa nor MasterCard has a share of the market which is sufficient to state a claim for a monopoly. For example, PSW states that Visa enjoys "nearly 60%" of the relevant market and that MasterCard has "33% to 36%" of the relevant market. These figures simply do not constitute monopoly power. Courts have stated that "70% to 90% of the sales in a well-defined marketplace [are] indicative of monopoly power." Town of Concord v. Boston Edison Co., 915 F.2d 17, 30 (1st Cir. 1990)(citations omitted); see also United States v. Aluminum Co. of N. Am., 148 F.2d 416, 424 (2nd Cir. 1945)(stating that a 90% market share "is enough to constitute a monopoly" but that 60% is probably, and 30% is "certainly," not enough).

Based on PSW's failure to sufficiently pled the individual market power of any one of the Defendants, all the claims for monopoly under Section Two should be dismissed. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Although the above analysis is sufficient to support a dismissal of the Section Two claim, the Court will also address PSW's reliance on United States v. Visa. That case held that MasterCard and Visa, both jointly and separately, have market power within the network services market. 344 F.3d at 239-40. In that case, however, there was no Section Two monopolization claim made, and the finding of market power was only made in connection with a Section One claim. In particular, it was found that the parallel exclusivity rules resulted in an unreasonable restraint of trade in the general purpose card market. The fact that the market power finding was made in connection with the Section One claim is significant since monopoly power under Section Two requires something greater than market power under Section One. See Kodak, 504 U.S. at 481. Thus, United States v. Visa does not support PSW's monopoly claim.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*36]

III. Count 3 -- Rhode Island Antitrust Act (R.I. Gen. Laws @ 6-36-5)

Plaintiff's claim under Count 3 of the FAC for violation of the Rhode Island Antitrust Act, R.I. Gen. Laws @ 6-36-5, suffers from the same flaws as does its Sherman Act claims. The Rhode Island Antitrust Act mirrors the Sherman Act. See ERI Max Entm't v. Streisand, 690 A.2d 1351, 1353 n.1 (R.I. 1997); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 239 F. Supp. 2d 180, 186-187 (2003) ("the provisions of the Rhode Island Antitrust Act mirror those of @@ 1-2 of the Sherman Act . . . and are construed in the same manner as the federal statutes.") Because the Court has recommended the dismissal of PSW's Sherman Act claims, I also recommend that the analogous state law claims be dismissed.

IV. Count 4 -- First Amendment / Bivens

In Count 4 of the FAC, PSW alleges that Defendants violated its rights under the First Amendment to the United States Constitution. Plaintiff brings this claim pursuant to the Supreme Court's decision in Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). The crux of PSW's claim is that[*37] Defendants violated PSW's First Amendment rights by reviewing and screening the content of PSW's adult website clients and that Defendants acted due to coercion and/or encouragement by "unknown" federal officials. FAC PP 168, 184.

In Bivens, the Supreme Court held that a federal officer acting under color of federal law can be liable for damages for violating the constitutional rights of another. See Bivens, 403 U.S. at 397. Subsequently, the Supreme Court described Bivens as a "limited holding," which it has "consistently refused to extend . . . to any new context or new category of defendants" for the last twenty-five years. Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66-68, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001). Specifically, the Supreme Court subsequently held that Bivens does not confer a right of action against "private entities acting under color of federal law." Id; see also Sarro v. Cornell Corr., Inc., 248 F. Supp. 2d 52 (D.R.I. 2003); Stoutt v. Banco Popular de P.R., 320 F.3d 26 (1st Cir. 2003); and Meuse v. Pane, 322 F. Supp. 2d 36 (D. Mass. 2004). In this case, PSW has claimed that Defendants, all of which[*38] are private entities, violated Bivens. Although there is an assertion that the Defendants acted at the behest of some "unknown" federal officials, PSW concedes that it has no support or further evidence regarding these claims.

Even assuming, arguendo, that a private entity could be sued under Bivens, PSW has failed to allege facts establishing a nexus between the federal actor and the challenged action. PSW merely states "on information and belief that Defendants violated its First Amendment rights due to coercion and/or encouragement by "unknown" federal officials. FAC PP 168, 184. Such conclusory and vague allegations cannot withstand a motion to dismiss. See Gerena v. P.R. Legal Servs., Inc., 697 F.2d 447, 450 (1983); Contemporary Mission, Inc. v. U.S. Postal Servs., 648 F.2d 97, 106-107 (1981); and Ostrer v. Aronwald, 567 F.2d 551, 553 (1977). Because PSW has not alleged sufficiently that some identifiable federal official was involved in any claimed screening, I recommend that the Bivens count be dismissed.

V. Counts 5 and 6 -- Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

Counts 5 and[*39] 6 of the FAC are claims for breach of contract and breach of the covenant of good faith and fair dealing. These claims relate to the parties' actions under the Merchant Agreement. Consistent with its other claims, these two counts are broadly asserted against all four Defendants. Although MasterCard and Visa are not signatories to the Merchant Agreement, PSW claims they were a party to the Merchant Agreement, or were "at least in privity of contract with PSW relative thereto." FAC P 173.

The Merchant Agreement states that it shall be governed and construed under New York law. The essential elements of an action for breach of contract under New York law are (1) formation of a contract between the parties, (2) plaintiff's performance, (3) defendant's failure to perform, and (4) resulting damages to plaintiff. Guity v. Martinez, 2004 U.S. Dist. LEXIS 9158, 03 Civ. 6266 (LAP), 2004 WL 1145832, at *5 (S.D.N.Y. 2004). In the FAC, PSW satisfies all elements of this prima facie test as to FFB/FDMS. First, it identifies the Merchant Agreement as the contract formed between the parties. Second, PSW claims it performed under the conditions of the contract, but that FFB/FDMS failed to perform. Finally, [*40] PSW sets forth various claimed damages. On the basis of these allegations, PSW has stated a claim for breach of contract against FFB/FDMS.

The Court notes that PSW sets forth twelve particular ways in which it alleges the Merchant Agreement was breached. See FAC P 175. Although some of the allegations go to the reasonableness or fairness of the contract, rather than breach (such as assessment of "commercially unreasonable" fines and "permitting fraud"), others state specific breach allegations (such as "wrongfully terminating" the Merchant Agreement and improperly directing PSW to "terminate processing" of a non-adult account). The Court does not comment on PSW's ultimate success on the merits of each of the allegations. However, applying the Fed. R. Civ. P. 12(b)(6) standard of review, the breach allegations set forth by Plaintiff are sufficient at this stage to allow PSW to pursue its breach of contract claim as to FFB and FDMS; thus, I recommend that FFB and FDMS' Motion to Dismiss the breach of contract claim be denied.

The next issue is whether PSW states a prima facie breach of contract claim against Visa and MasterCard, entities[*41] which are not signatories to the applicable contract. PSW alleges that Visa and MasterCard are liable for breach of contract, claiming a principal/agent relationship exists between FFB/FDMS and Visa and MasterCard, FAC P 32, by which the Visa and MasterCard are "in privity" with PSW under the contract. Again, although this Court has serious doubts as to the ultimate merits of this claim, there appears to be some legal support for this position under New York law.

New York law holds that a non-signatory to a contract can be named as a defendant in a breach of contract action only if the party has "assumed or been assigned" the contract. See Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 215-16 (S.D.N.Y. 1997)(citations omitted); see also Perma Pave Contracting Corp, v. Paerdegat Boat & Racquet Club, Inc., 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989))(noting that it is "well settled that a [plaintiff in a breach of contract action] 'may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in

privity.'")(citation omitted).

An allegation that a principal-agent relationship exists[*42] is sufficient to establish "the requisite privity for [a] cause of action to survive the motion to dismiss." See Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island, 59 Misc. 2d 268, 298 N.Y.S.2d 824 (Dist. Ct. Suffolk County 1969)(holding principal liable for the authorized contracts made by his agents with a third party)(citing Restatement, 2d, Agency, @ 146). This is true even if the principal was undisclosed. See Industrial Mfrs., Inc. v. Bangor Mills, Inc., 283 A.D. 113, 121, 126 N.Y.S.2d 508 (1st Dept.1953)("plaintiff . . . has the right to hold the principal liable when finally disclosed")(citing Restatement, 2d, Agency, @ 186). Since Plaintiff has sufficiently pled a principal-agent relationship between FFB/FDMS and MasterCard and Visa, the Court cannot dismiss the breach of contract claims against Visa or MasterCard applying Fed. R. Civ. P. 12(b)(6). Though they were not signatories to the Merchant Agreement, PSW sufficiently alleges that Visa and MasterCard were in privity of contract with it and thus PSW has stated a claim under[*43] New York law. Thus, I recommend that Visa and MasterCard's Motions to Dismiss the breach of contract claim be denied.

Next, the Court considers Plaintiff's allegation that Defendants breached the Covenant of Good Faith and Fair Dealing. The covenant is implied in all contracts under New York law. See Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291-92 (1995). The Court determines whether the covenant has been breached by examining the "intent and reasonable expectations" of the parties entering into the contract "as long as those expectations are consistent with the express terms of the contract." Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502(2nd Cir. 1989); see also Dalton, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289. The "purpose of the implied covenant of good faith is to further an agreement by protecting a promisee against 'breach of the reasonable expectations and inferences otherwise derived from the agreement.'"ARI and Co., Inc. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 521-522 (S.D.N.Y. 2003) citing TVT Records and TVT Music, Inc. v. Island Def Jam Music Group, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003).[*44] The covenant is "not distinct" from the underlying contract. Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369, No. 97 Civ. 0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997); see also Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983).

Because the covenant does not exist apart from the underlying contract, there is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." ARI and Co., 273 F. Supp. 2d at 521-522 citing Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2nd Cir. 2002); see also Butvin v. DoubleClick Inc., 2001 U.S. Dist. LEXIS 2318, No. 99 Civ. 4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001). Therefore, under New York law, a claim for breach of the covenant will be dismissed as "redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract." TVT, 244 F. Supp. 2d at 277; see also Alter, 1997 U.S. Dist. LEXIS 17369, 1997 WL 691332 at *7 ("Every court faced with a complaint brought[*45] under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative"). In ARI and Co., the Court noted that "a breach of the implied covenant of good faith claim can survive a motion to dismiss 'only if it is based on allegations different than those underlying

the accompanying breach of contract claim.'" 273 F. Supp. 2d at 522 (citation omitted). That court also noted that, "where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is 'intrinsically tied to the damages allegedly resulting from the breach of contract,' there is no separate and distinct wrong that would give rise to an independent claim." Id. (internal citation omitted).

Applying these rules to this case, the Court must determine if the allegations related to the claim for breach of the covenant of good faith and fair dealing are intrinsically tied to the claims made for breach of contract. After review, the Court has determined that each of the claims alleged in Count 6 (breach of covenant of good faith and fair dealing) is tied to the damages claimed in Count 5 for[*46] breach of contract. The first two alleged ways in which Defendants breached the covenant relate expressly to the termination of the Agreement. FAC P 176(a) and (b). The next four alleged breaches of the covenant relate to the excessive chargeback programs, registration programs, fines and the reserve account. Id. P 176(c), (d), (e) and (f). The final claim is that the covenant was breached as a result of a First Amendment violation. Id. P 176(g). As previously noted, PSW has failed to properly state a claim for a First Amendment violation. Each of the other claims are independently pursued in the breach of contract claim, and therefore none of them form a separate basis for a claim for breach of the covenant. For these reasons, I conclude that under New York law, there is not a separate, cognizable cause of action for a breach of the implied covenant of good faith and fair dealing, and I therefore recommend that Defendants' Motions to Dismiss this claim be granted.

VI. Counts 7, 8 and 9 -- Tortious Interference Claims

Counts 7, 8 and 9 are claims alleging tortious interference with contractual relations. In Count 7, PSW claims that Defendants tortiously interfered with [*47]its contracts with its website clients. Count 8, which is stated in the alternative, alleges that MasterCard and Visa, if determined not to be party to the Merchant Agreement, tortiously interfered with that Agreement. Finally, Count 9 claims all Defendants "wrongfully interfered with Plaintiff's prospective economic advantage as it relates to a reasonable business expectancy of acquiring and continuing contracts with website clients and/or otherwise continuing to derive . . . ."

1. Count 7

Rhode Island broadly defines the tort of tortious interference. The test requires the plaintiff to demonstrate "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor (sic) of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Mortgage Guar. & Title Co. v. Commonwealth Mortgage Co., 730 F. Supp. 469, 471-472 (D.R.I. 1990) citing Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986). The same test is applied to both claims of existing interference and prospective interference.

In Count 7, PSW alleges[*48] that all Defendants tortiously interfered with PSW's contracts with its website clients. Because of the broad definition of this tort, and accepting PSW's assertions as true pursuant to Fed. R. Civ. P. 12(b)(6), PSW has sufficiently pled a claim of tortious interference with contractual relations. PSW has broadly alleged the existence of its contracts

with its clients, that the Defendants were aware of those contracts, that they intentionally interfered and that their interference caused harm to Plaintiff, which suffered damages. Although PSW's claims may not ultimately survive summary judgment, the only issue at this stage is whether they have alleged all of the elements of the claim. For these reasons, I recommend that the Defendants' Motions to Dismiss Count 7 be denied.

2. Count 8

Under Count 8, PSW alleges that if MasterCard and Visa are not ultimately deemed to be in privity of contract with PSW under the Merchant Agreement, that in the alternative, PSW asserts that they tortiously interfered with the Merchant Agreement. The Court applies the same test and standard of review outlined above. If MasterCard and Visa are ultimately[*49] deemed to not be in privity of contract with PSW under the Merchant Agreement, PSW may have a claim for tortious interference. At this early stage, the Court cannot conclusively determine that a viable claim fails to exist under Count 8. However, this claim should be dismissed in the event that the Court ultimately determines that MasterCard and Visa are in privity with PSW as to the Merchant Agreement. Therefore, the Court also recommends that Defendants' Motions to Dismiss Count 8 be denied at this stage.

3. Count 9

Count 9 alleges that Defendants have harmed PSW's business, and some expectancy of prospective clients. The allegations are not entirely clear. In the FAC, for example, PSW has not sufficiently identified the prospective "economic advantage" with which it alleges that Defendants interfered. Rather, PSW states in a conclusory fashion that the "economic advantage . . . relates to a reasonable business expectancy of acquiring and continuing contracts with website clients and/or otherwise continuing to derive business advantages from the operation of its business." FAC P 189. These claims are insufficient to state a claim for interference with prospective business. [*50] See Solar Travel Corp. v. Nachtomi, 2001 U.S. Dist. LEXIS 7549, 2001 WL 641151 *10 (S.D.N.Y. 2001)(conclusory allegations of "lost business from its customers" and other "lost prospective business" did not sufficiently identify third parties or plaintiff's dealings to state a tortious interference claim). See also Ed Peters Jewelry Co. v. C&J Jewelry Co., 51 F. Supp. 2d 81, 102 (D.R.I. 1999). ("Plaintiff needs more than a hope at some prospective contract to state such a claim."); Moran v. Norrell Health Care, Inc., 1993 R.I. Super. LEXIS 56, No. PC 89-4262, 1993 WL 853860, at *3 (R.I. Super. Sept. 15, 1993); New England Multi-Unit Hous. Laundry Ass'n v. Rhode Island Hous. & Mortgage. Fin. Corp., 893 F.Supp. 1180, 1193 (D.R.I. 1995)(same). Accordingly, I also recommend that the tortious interference claim under Count 9 be dismissed.

VII. Counts 10 and 11 -- Conversion / Embezzlement

Both Counts 10 and 11 relate to PSW's claim that Defendants misappropriated PSW's "funds." Whether PSW wants to call it conversion or embezzlement, either allegation is simply a disguised breach of contract claim.

Turning first to the conversion claim, Rhode Island does recognize a [*51]claim for conversion of money. In the present case, however, the test is not satisfied. In order to prove a claim for conversion of money, the plaintiff must demonstrate, "the defendant is under [an] obligation to deliver

specific money to the plaintiff." DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996)(emphasis added); see also Traffix Inc v. Herold, 269 F. Supp. 2d 223, 225 (S.D.N.Y. 2003)(no conversion claim when money is placed in a reserve account and subsequently withheld from plaintiff.) In the present case, there are absolutely no allegations that Defendants failed to deliver "specific" money to PSW. Moreover, at oral argument on the issue, Plaintiff's counsel conceded, "I think it is an embezzlement rather than a conversion." This Court will not search for a cause of action, where none is apparent, and the party concedes that it does not believe the claim exists. Accordingly, I recommend that Defendants' Motions to Dismiss be granted and that the claim for conversion be dismissed.

Turning next to the embezzlement claim, the Court is again struck by several inconsistencies in the factual allegations contained in the FAC. The Court's [*52]review starts with the general embezzlement allegation in Count 11, that "Defendants . . . appropriated and converted to their own use Plaintiff's funds in the reserve account . . ." Id. P 191. Presuming this to be true is contradictory to earlier allegations the Court is also required to credit as true. Earlier in the FAC, in support of its breach of contract claims, PSW makes several allegations related to the reserve account including a claim that the Merchant Agreement was breached by "failing or refusing to release to PSW or otherwise account for the [balance] in PSW's reserve account . . . ." See FAC PP 175(h), (i) and (k). (emphasis added). Similarly, PSW alleges that at the time of the filing of the Complaint, "approximately $ 1.6 million was being held in PSW's reserve account" and that Defendants had not "authorized the release of these funds" nor had they "otherwise accounted to PSW." Id. P 153 (emphasis added). PSW cannot have it both ways. Their detailed allegations do not allege that any money has been removed from the reserve account, until they make the conclusory allegation in Count 11 that the funds have been appropriated and converted. Construing[*53] the FAC in its entirety, Plaintiff does not sufficiently pled an embezzlement claim against Defendants. Accordingly, I recommend that Defendants' Motions to Dismiss the embezzlement claim be granted and that such claim be dismissed.

Conclusion

For the reasons discussed, I recommend that Defendants' Motions to Dismiss Counts 1, 2, 3, 4, 6, 9, 10 and 11 be GRANTED and that these counts be dismissed as to all Defendants. I recommend that Defendants' Motions to Dismiss Counts 5, 7 and 8 be DENIED as to all Defendants. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

LINCOLN D. ALMOND
United States Magistrate Judge
February 3, 2006