Smith Development Corporation v. Bilow Enterprises, Inc. et al. McDonald's Corporation v. Bilow Enterprises, Inc. et al.

[NO NUMBER IN ORIGINAL]

Supreme Court of Rhode Island

112 R.I. 203; 308 A.2d 477; 1973 R.I. LEXIS 972

August 15, 1973

PRIOR HISTORY:

CIVIL ACTIONS, consolidated for trial and appellate court determination, before Supreme Court on appeal of certain parties following jury verdicts in Superior Court and entry of judgments by Cochran, J., after denial of motion for a new trial and order for an additur.

DISPOSITION: Heard and appeals sustained, judgments appealed from vacated, and cases remanded to Superior Court for a new trial.

CASE SUMMARY:

PROCEDURAL POSTURE: The actions filed by plaintiffs, franchisor and franchisee (franchisor), against defendants, competitor corporation and competitor shareholder (competitors), alleging tortious interference with a contractual relationship, maintenance, and abuse of process after the competitors sought to delay development of franchisor's restaurant were consolidated. The Superior Court (Rhode Island) entered judgment for the competitors. Franchisor sought review.

OVERVIEW: The franchisor argued that it was error to give certain jury instructions and to exclude evidence regarding lost profits. The court agreed explaining that the primary purpose of instructing a jury was to enable them to reach a proper verdict and that the language had to be appropriately chosen to be helpful to lay persons. The court found that the language of the instructions was contradictory, was not tailored to lay persons, did not define the elements needed for the torts alleged, and did not associate the various rules of law given in the instructions to each alleged tort. The court determined that the jury instructions were confusing because the jurors were told both that the franchisor had to prove a malicious interference and that there was no need to prove malice. The court concluded that the confusing, contradictory, and erroneous nature of the charges required a retrial. The court noted that excluding evidence of the lost profits was erroneous because the requisite evidentiary basis had been established so that the jury could with reasonable certainty make a determination of the profit loss sustained as the result of the competitors' actions.

OUTCOME: The court vacated the judgment and remanded the case for a new trial.

CORE TERMS: malice, malicious prosecution, abuse of process, restaurant, malicious, drive-in, abutters, rules of law, planning board, contractual relationship, tortious interference, conspiracy, plat, new business, instructing, jurors, new trial, interfering, lease, prospective profit, unjustified, requisite, proven, proposed subdivision, issuance of process, public hearing, record keeper, contradictory, consolidated, contractual

LexisNexis(R) Headnotes

Civil Procedure: Trials: Jury Trials: Jurors: General Overview
Civil Procedure: Trials: Jury Trials: Jury Instructions: General Overview
[HN1] Instructing the jury is one of the most important functions of a trial court. The primary purpose of instructing a jury is to assist the jurors in the discharge of their responsibility for finding the facts in issue and then in applying the facts found to the applicable rules of law to enable them to reach a proper verdict. It is the trial justice's obligation to instruct the jury with preciseness and clarity as to the rules of law that are applicable to the issues raised at trial so that the jury is neither misled nor confused. Instructions should be attuned to the ears and understanding of the jurors. The language used in instructing the jury must be appropriately chosen to be helpful to such a group. Furthermore, even though a trial justice is not required to sum up the evidence, he must, if he is to assist the jury, do something more than give a bare statement of legal principles. Rather, he should indicate to the jury how these principles apply to the facts claimed to have been proven.

Torts: Business Torts: Commercial Interference: Contracts: General Overview
[HN2] An intentional and malicious interference with a contractual relationship is actionable in Rhode Island. It is now well established that the terms malicious and malice do not mean that proof is required of a defendant's malevolence, spite, or ill will towards the contracting party or parties, but rather that the words malicious and malice signify an unjustified interference by one with the contractual relationship of others.

Civil Procedure: Trials: Jury Trials: Jury Instructions: General Overview
[HN3] R.I. Super. Ct. R. Civ. P. 51(b) is not to be viewed with an eagle eye as a vehicle for overlooking trial errors. No particular formality is required so long as it is clear that the trial justice had been alerted to possible errors in his charge.

Torts: Business Torts: Commercial Interference: Contracts: Elements
[HN4] There are four basic elements of a claim based on a tortious interference with a contractual relationship. Recovery can be had by showing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. The burden of proving sufficient justification for interference is upon the defendant.

Torts: Damages: Compensatory Damages: Lost Income: General Overview
[HN5] The basic requirement for the recovery of loss of profit is that such loss must be established with reasonable certainty. In attempting to meet the requirement of certainty, the plaintiff has various means at his disposal. As

with other rules of reasonableness, the degree to which such proof will succeed in establishing the reasonable certainty of profits must depend in a large measure upon the circumstances of the particular case and thus will escape the hard and fast rules of general applicability.

Torts: Damages: Compensatory Damages: Lost Income: General Overview
[HN6] Unquestionably, one of the ways of establishing a loss of profits is by showing the past history of a successful and profitable operation of the business. Although courts have sometimes refused to permit recovery of lost profits on the grounds that the profits of a new business are necessarily too speculative, others have recognized that the question in each case is whether or not the prospective profit loss can be proven with reasonable certainty.

Torts: Damages: General Overview
[HN7] Where the existence of a loss is established, absolute certainty in proving its quantum is not required. All that is required is that the court or jury be guided by some rational standard.

COUNSEL: Moore, Virgadamo, Boyle & Lynch, Francis J. Boyle, for plaintiffs.

Arcaro, Belilove & Kolodney, Kenneth M. Beaver, for defendants.

JUDGES: Roberts, C. J., Paolino, Powers and Kelleher, JJ. Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Joslin and Mr. Justice Doris did not participate.

OPINION BY: KELLEHER

OPINION: [*204] These cases were consolidated for argument her just as they were consolidated for a jury trial in the Superior Court. The plaintiffs are Smith Development Corporation and McDonald's Corporation. Smith Development is a Rhode Island corporation and the owner of a parcel of land located on the easterly side of West Main Road in Middletown. McDonald's is a Delaware corporation and franchises the operation of a nationwide chain of drive-in restaurants. The defendants are Bilow Enterprises, Inc., a Rhode Island corporation, and its [*205] treasurer and a holder of a substantial amount of the corporation's stock, Louis Bilow. The corporate defendant holds a franchise for "Carroll's Hamburgers." It operates a drive-in restaurant on leased land in Middletown on West Main Road just about a mile away from the Smith Development parcel. Hereafter, we shall from time to time refer to the corporate plaintiffs as "Smith" and "McDonald's" respectively, the corporate defendant as "Carroll's" and the individual defendant as "Bilow."

After an extended trial, the jury brought back verdicts for Smith against Carroll's in the amount of $ 26,500 and against Bilow for $ 15,000. McDonald's was awarded nominal damages in its suits. The trial justice denied McDonald's motion for a new trial, affirmed the $ 26,500 award and ordered an additur of $ 11,500 in Smith's suit against Bilow. Carroll's Bilow and McDonald's have appealed.

On September 5, 1962 plaintiffs entered into a lease agreement with McDonald's whereby Smith would erect on a portion of its property a drive-in restaurant which would be tailored to the plans and specifications provided by McDonald's. In return, Smith would receive an annual rental of $ 9,000 for a

period of 20 years with the lease calling for two renewals of five years each. The lease was conditioned upon Smith's obtaining a $ 45,000 construction mortgage. The Rhode Island Hospital Trust Company had conditionally approved the mortgage upon Smith's obtaining approval of the Middletown Planning Board for the proposed endeavor. The bank's counsel was of the opinion that since the lease involved a subdivision of Smith's real estate, approval of the planning board was a necessity.

Smith submitted the proposed subdivision to the planning board. The board considered the plat at a series of meetings held beginning in December, 1962. At one point, the board gave its preliminary approval. However, when [*206] the plans came before the board on August 12, 1963 for final approval, there was a public hearing at which abutting property owners appeared with counsel and expressed their objections. The objectors voiced concern for the safety of the children who attended a nearby elementary school. On August 26, a majority of the planning board voted to disapprove the plat. Most of those voting in the negative rested their decision on the "safety factor."

Smith took an appeal to the Middletown Planning Board of Review. Another public hearing was held. There was another split vote. This time the majority voted to approve the proposed subdivision and permit its recordation. The board gave its approval on October 24, 1963. The abutters then filed a bill of complaint under the provisions of G. L. 1956, @ 45-23-20, which authorizes the Superior Court to review decisions of planning boards of review. A justice of that court issued an ex parte restraining order prohibiting the recording of Smith's plat. After hearings were held in January and February, 1965, the trial justice dismissed the bill of complaint on the basis that the abutters have failed to prove that the recording of the plat would adversely affect the value or use of their land. On February 23, 1966, we affirmed the dismissal. n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Paterson v. Corcoran, 100 R. I. 475, 217 A.2d 88 (1966).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Within six months thereafter, Smith and McDonald's initiated this litigation. Since there is error in the instructions given to the jury which is prejudicial to defendants and because there is an erroneous exclusion of evidence in the suit brought by McDonald's, we shall forego any extensive review of the evidence.

The record shows that legal expenses incurred by the abutters in their effort to keep McDonald's Golden Arches out of Middletown were paid by the corporate defendant. The firm that represented the abutters before the planning board,

the board of review, the Superior Court and this [*207] court owns stock in the corporate defendant. One of the members of the firm is Bilow's first cousin, and the secretary of Carroll's.

In their complaint, plaintiffs sought damages on three different grounds -- (1) tortious interference with their contractual relationship; (2) maintenance; and (3) abuse of process.

The plaintiffs submitted to the trial justice 39 requests to charge. The defendants presented 28 requests. The trial justice began his charge by giving the "boiler plate." He elucidated on such routine matters as the jury's duty to apply the law as given to them by the court to the facts as they might find them, their right to draw inferences, the burden of proof, and the necessity for a unanimous and impartial verdict. The trial justice had now reached the point in his charge where he was to discuss the law applicable to the issues. At this juncture, he then proceeded to give an almost verbatim reading of 34 of plaintiffs' 39 requests, immediately followed a recitation of 20 of defendants' 28 requests. When the reading was finished, the jury was dispatched to the jury room to begin their deliberations.

[HN1] Instructing the jury is one of the most important functions of a trial court. The primary purpose of instructing a jury is to assist the jurors in the discharge of their responsibility for finding the facts in issue and then in applying the facts found to the applicable rules of law to enable them to reach a proper verdict. Pfeiffer v. Salas, Mass., 271 N.E.2d 750 (1971). It is the trial justice's obligation to instruct the jury with preciseness and clarity as to the rules of law that are applicable to the issues raised at trial so that the jury is neither misled nor confused. Anter v. Ambeault, 104 R. I. 496, 245 A.2d 137 (1968); Macaruso v. Massart, 96 R. I. 168, 190 A.2d 14 (1963). Instructions should be attuned to the ears and [*208] understanding of the jurors. They are not attorneys but are persons who are selected at random from the community and from all walks of life. They possess varying degrees of academic achievement. The language used in instructing the jury must be appropriately chosen to be helpful to such a group. Pfeiffer v. Salas, supra. Furthermore, even though a trial justice is not required to sum up the evidence, he must, if he is to assist the jury, do something more than give a bare statement of legal principles. Rather, he should indicate to the jury how these principles apply to the facts claimed to have been proven. Vita v. McLaughlin, 158 Conn. 75, 255 A.2d 848 (1969).

There were only two issues that could properly be determined by the jury. As noted earlier, the complaints in these actions listed three counts -- tortious interference with contractual relations, maintenance, and abuse of process. No instructions were given relative to the maintenance count. The instructions did, however, embrace two torts not in the case, conspiracy and malicious prosecution. At no time did the trial justice, in his reading of the 34 rules of law given him by plaintiffs, specifically allude to the tort of wrongful interference with contractual rights, define it, and then associate the various rules of law he was reading to that particular tort. The same was true of the count concerning abuse of process.

Over a quarter of a century ago this court said that [HN2] an intentional and malicious interference with a contractual relationship is actionable. Local Dairymen's Cooperative Ass'n v. Potvin, 54 R. I. 430, 173 A. 535 (1934). While

the court in Potvin made no effort to define the term "malicious," it is now well established that the terms "malicious" and "malice" do not mean that proof is required of a defendant's malevolence, spite, or ill will towards the contracting party or parties, but rather that the words "malicious" and "malice" signify an unjustified interference [*209] by one with the contractual relationship of others. Prosser, Torts @ 129 at 927-28 (4th ed. 1971).

At two points in his charge the trial justice correctly defined the term "malice" as being synonymous with "unjustified" but then went on to read, during various portions of the charge, the following statements of law:

"Ill will or malice on the part of the actor toward the person injured is not an essential condition of liability for interfering with another's business relationship.

"* * *

"Malice or ill will is not essential to liability for damages caused by the wrongful initiation of legal proceedings.

"* * *

"If you find either or both defendants guilty of interfering with the contract between McDonald's Corporation and Smith Development Corporation, then I charge you to return a verdict for plaintiffs to compensate them for all of the consequences growing out of defendants' acts."

This last statement marked the conclusion of plaintiffs' requests so far as they were applicable to the tortious interference count.

The reading was not presented to a meeting of the bar association. It was given to a group of laymen. The question is not how the instructions read. It is how they sound. We are cognizant of the rule that a charge must be considered in its entirety, but we see no need to put in writing all the rules given to the jury. The charge sounds contradictory. At several points the jurors were told that plaintiffs had to prove a malicious interference, and at other points, they were told that there was no need of proving malice.

The jury was also told that "[a] corporation as well as an individual may participate in a conspiracy and may be held liable for damages caused by acts committed pursuant [*210] thereto * * *." There is no count concerning a conspiracy. At this moment, the identity of the conspirators is unknown. Are they the defendant corporation and the abutters, or are they the corporation and its law firm? Apart from the identity question, there is another reason for faulting this portion of the charge and it involves fair play. The term "conspiracy," when it is not germane to a case, suggests sinister criminal activity. The reference to conspiracy was erroneous and prejudicial.

At still another part in the charge, the following instruction was read:

"You will find that the defendants had no right to rely upon the advice of their attorney because he himself was interested in the result of the

proceedings as attorney, stockholder and officer of the defendant Bilow Enterprises, Inc."

This instruction is based upon certain language found in a comment following @ 675 of the First Restatement of Torts. The section deals with the necessity, when suing for malicious prosecution, of showing the absence of probable cause for the issuance of process. The jury, however, was never told that this instruction concerned malicious prosecution. n2 An examination of the comment shows that it speaks of an attorney who is hired on a contingent fee basis. There is no evidence that defendants' attorney's fee was a contingent one. There was no caveat that the allusion to the attorney's interest was to be considered solely as it related to the issue of malicious prosecution -- even assuming that the count was properly before the jury. The attorney in question was Bilow's cousin. He testified at [*211] trial. His testimony was directed to the counts set forth in the complaints. The mandatory language used by the trial justice could be construed by the jury as an adverse comment on the cousin's credibility. This type of instruction points out the danger of using a string of legal principles which may be correct and proper in the abstract but which has no relevancy to the facts in the actual case being tried or which can mislead and puzzle the jury.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 It should be emphasized that there is a difference between a claim based upon malicious prosecution and one seeking relief because of an abuse of process. The gist of malicious prosecution is the commencement of an action or the issuance of process without probable cause, while abuse of process concerns itself with process properly issued but used for an end it was not designed to accomplish. See Manufacturers Supply Co. v. Parker, 103 R. I. 426, 238 A.2d 616 (1968).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The confusing, contradictory, and erroneous nature of the charge requires a retrial. The plaintiffs have argued that defendants cannot now be heard to complain about the charge because of their failure, when lodging their objections to the charge, to distinctly state the grounds for their objections. Super. R. Civ. P. 51(b). Nevertheless, [HN3] Rule 51(b) is not to be viewed with an eagle eye as a vehicle for overlooking trial errors. No particular formality is required so long as it is clear that the trial justice had been alerted to possible errors in his charge. Wright & Miller, Federal Practice & Procedure: Civil @ 2554 at 648 (1971 ed.). Here, it should have been obvious to the trial justice from the remarks of defense counsel as he listed his objections that the charge had strayed far off target.

Since a new trial is in the offing, we think it proper to list [HN4] the basic elements of a claim based on a tortious interference with a contractual relationship. Recovery can be had by showing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. The burden of proving sufficient justification for interference is upon the defendant. Long v. Newby, 488 P.2d 719 (Alaska 1971); Stephenson v. Plastics Corp. of America, 276 Minn. 400, 150 N.W.2d 668 (1967); Prosser, supra, @ 129 at 942. We shall conclude this phase of the [*212] litigation by quoting the following excerpt from 84 A.L.R. 43, 52:

"'Interference with Contract Relations,' includes not merely the procurement of a breach of contract, but all invasion of contract relations, so that any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee, may fall within its scope, it may be said that, the interest in a contract being a property right, a party thereto has a right of action against persons who are by their conduct substantially interfering with the performance thereof."

In its suit McDonald's seeks redress for a loss of potential profits it could have earned during the time the fate of its Middletown enterprise was immersed in litigation. The trial justice ordered all testimony concerning the loss of expected profits stricken from the record. We believe that he erred.

[HN5] The basic requirement for the recovery of loss of profit is that such loss must be established with reasonable certainty. McCormick, Damages @ 26 at 99-100 (1935). "In attempting to meet the requirement of certainty, the plaintiff has various means at his disposal. * * * As with other rules of reasonableness, the degree to which such proof will succeed in establishing the reasonable certainty of profits must depend in a large measure upon the circumstances of the particular case and thus will escape the hard and fast rules of general applicability." 64 Harv. L. Rev. 317, 318-19 (1950).

The defendants, in seeking to uphold the exclusionary ruling of the trial justice, refer us to Main Realty Co. v. Blackstone Valley Gas & Electric Co., 59 R. I. 29, 193 A. 879 (1937), where the court alluded to the so-called "new business" rule which holds that, where the business is new, expected estimated profits cannot be recovered as damages. [*213] This statement was pure dicta since the business involved in that case was an established business.

[HN6] Unquestionably, one of the ways of establishing a loss of profits is by showing the past history of a successful and profitable operation of the business. Although courts have sometimes refused to permit recovery of lost profits on the grounds that the profits of a new business are necessarily too speculative, others have recognized that the question in each case is whether or not the prospective profit loss can be proven with reasonable certainty. Brenneman v. Auto-Teria, Inc., 260 Ore. 513, 491 P.2d 992 (1971); Ferrell v. Elrod, 469 S.W.2d 678 (Tenn. App. 1971); Standard Machinery Co. v. Duncan Shaw Corp., 208 F.2d 61 (1st Cir. 1953) ; n3 11 Williston, Contracts @@ 1346, 1346A at 249 (3d ed. 1968).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Standard Machinery Co. v. Duncan Shaw Corp., 208 F.2d 61 (1st Cir. 1953) , involved a Rhode Island contract. The Circuit Court, in pointing out that Rhode Island had no explicit case law which ipso facto bars recovery for loss of profits from a new business undertaking, cited Zuromski v. Lukaszek, 67 R. I. 66, 20 A.2d 685 (1941), where it was said that where a defendant's wrongful act caused injury to a plaintiff's business, the fact that the plaintiff cannot prove his damages with mathematical certainty will not defeat his right to recover whatever damages the circumstances might "reasonably warrant." The court held that it would not draw a line between the old and new businesses but would look at the record to determine whether or not the prospective profit loss had been shown with the requisite reasonable certainty.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

McDonald's marketing research manager had testified. He described the uniformity of procedures utilized at all McDonald's restaurants, its training and national advertising programs, and the efforts made to maintain standards and quality. This witness informed the judge and jury that while in 1962 there were 800 units in operation, this number had increased at trial time to 1,200. He also reported an amazing record of successes -- not one restaurant has failed. The trial justice ordered this testimony be stricken.

[*214] Also excluded was the testimony of the record keeper for McDonald's Eastern Regional Office. She was prepared to introduce earnings and expense figures from McDonald's drive-ins that are situated within a 25-mile radius of the Middletown site. McDonald's was to be paid 9.2 per cent of the gross sales made in Middletown.

The trial justice refused to permit a college professor whose specialty was the business sciences to project and evaluate the sales made in the four Rhode Island-oriented McDonald's drive-ins and then give an estimate as to the loss sustained by McDonald's inability to operate in Middletown. Testimony was introduced to show that the educator's methods are the type relied on and acted upon by the business community.

[HN7] "[Where] the existence of a loss is established, absolute certainty in proving its quantum is not required." 1 Sedgwick, Damages @ 170A (9th ed. 1912). All that is required is that the court or jury be guided by some rational standard. McCormick, The Recovery of Damages for Loss of Expected Profits, 7 N. C. L. Rev. 235, 239 (1929). Many years ago, this court in Simmons v. Brown, 5 R. I. 299 (1858), recognized that loss of profits, when properly established, could be the proper basis for the award of damages; so, too, we say in the case of McDonald's and its loss of prospective profits.

Having in mind America's acceptance of McDonald's method of merchandising, we believe the requisite evidentiary basis had been established so that the jury could with "reasonable certainty" make a determination of the profit loss sustained as the result of McDonald's lengthy preoccupation, with litigation, rather than the distribution of hamburgers, at its Middletown location. The rulings made in regard to the research manager, the record keeper, and the educator were erroneous.

The appeals of McDonald's, Bilow and Carroll's Hamburgers [*215] are sustained, the judgments appealed from are vacated and the cases are remanded to the Superior Court for a new trial.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Joslin and Mr. Justice Doris did not participate.

STANDARD MACHINERY CO. et al. v. DUNCAN SHAW CORP. et al.

No. 4722

UNITED STATES COURT OF APPEALS FIRST CIRCUIT

208 F.2d 61; 1953 U.S. App. LEXIS 3023

November 16, 1953

CASE SUMMARY:

PROCEDURAL POSTURE: Defendants, director and corporations, sought review of an order from a Rhode Island district court, which awarded damages in favor of plaintiff corporation. Defendants challenged the amounts awarded to plaintiff and against each defendant in a breach of contract and breach of fiduciary duty action.

OVERVIEW: The parties entered into a joint venture to manufacture locks by stamping out the parts instead of casting the parts. Defendants secretly offered to sell the project to a competitor. Defendants argued that net profits were not a valid part of the award for the breach of contract action because the venture was too new for net profits to be ascertained. On appeal, the court affirmed in part and reversed and remanded in part. The court found that the district court's award against defendant corporations was within the limits of the evidence. The court held that defendant corporations could not have escaped all liability simply because plaintiff was unable to prove the precise amount of damages for which the corporations were responsible, and the district court properly assessed damages based upon the reasonable inferences to be drawn from the facts. The court determined, however, that there was insufficient proof to support the damages assessed against defendant director. The court remanded that action for a determination of whether defendant director unjustly enriched himself, and if so, to what the extent.

OUTCOME: The court affirmed in part and reversed and remanded in part. The court affirmed the district court's award against defendant corporations, but reversed and remanded for proof of the award against the director in a breach of contract and breach of fiduciary duty action.

CORE TERMS: breach of contract, fiduciary duty, awarding, hardware, reasonably incurred, assessing, concede, Law Inst, original opinion, future profits, estimate, breach of fiduciary duty, reasonable expenses, breach of trust, injured party, gross amount, new business, civil action, rule of law, defendants-appellants, beneficiary, compensate, launched, stamping, venture, builders'

LexisNexis(R) Headnotes

Contracts Law: Remedies: Compensatory Damages: General Overview
[HN1] Reasonable expenses of preparation for performance of a contract are generally recognized to be an element of damages in actions of assumpsit.

Contracts Law: Remedies: Compensatory Damages: General Overview
Evidence: Inferences & Presumptions: General Overview
[HN2] A person who has violated his contract cannot escape all liability simply because the injured party cannot prove the precise amount of the damages for which the violator is responsible. The actual damages sustained by an injured party in a contract action may, and often do, rest upon reasonable inferences to be drawn from the facts, circumstances and data furnished by the evidence.

Estate, Gift & Trust Law: Trusts: Trustees: General Overview
Governments: Fiduciary Responsibilities
Torts: Intentional Torts: Breach of Fiduciary Duty: Remedies
[HN3] Damages may be assessed in favor of a beneficiary against a defaulting trustee either to compensate the beneficiary for such loss as he may have sustained as a result of the breach of trust, or to prevent the faithless trustee from unjustly enriching himself as a result of his breach of fiduciary duty.

COUNSEL: [**1]

Henry M. Leen, Boston, Mass. (Thomas E. Goode and Burns, Blake & Rich, Boston, Mass., on brief), for appellants.

William H. Edwards, Providence, R.I. (John L. Clark and Edwards & Angell, Providence, R.I., on brief), for appellees.

JUDGES: Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and WYZANSKI, District Judge.

OPINION BY: WOODBURY

OPINION: [*62]

On the previous appeal in this case reported in 1 Cir., 1952, 196 F.2d 147, to [*63] which reference may be had for the facts, we disagreed with the District Court and held that Rhode Island law did not prevent the plaintiffs from recovering on the contract on which they had brought suit. We therefore remanded the case for further proceedings consistent with our opinion. Pursuant to that mandate the District Court held several informal hearings, at which counsel were heard orally and briefs were submitted but no new evidence was introduced, and following those proceedings, without making any further findings of fact, or adding to its original opinion, it entered the judgment from which the present appeal is taken awarding the plaintiff Duncan Shaw Corporation damages of $ 37,855.84 against the defendant Standard Machinery[**2] Company; awarding the plaintiff Shaw Standard Corporation damages of $ 46,942.17 against the same defendant, and awarding the latter plaintiff damages of $ 5,000 against the individual defendant, Robert F. Moyer; each award carrying interest and costs.

The defendants-appellants concede that the law and the evidence warranted the District Court in awarding damages against Standard Machinery Company in favor

of Duncan Shaw Corporation to the extent of $ 12,855.84 and in favor of Shaw Standard Corporation to the extent of $ 21,942.17, or damages in the gross amount of $ 34,798.01, that being the sum of the expenses reasonably incurred by each plaintiff in the performance of the contract as found by the court below in its original opinion. Their contention is that any award of damages against Standard Machinery Company in excess of the gross amount stated above is not warranted, and furthermore that there is no warrant for assessing any damages at all against Moyer.

Naturally evidence of the plaintiffs' damages was introduced at the trial. This included evidence of the plaintiffs' expenses of performance, and also evidence from which it could reasonably be found that each corporate[**3] plaintiff had lost a net profit substantially in excess of $ 25,000 as a result of the breach. But the District Court in its first and only opinion in this case had no occasion to consider the issue of damages in any detail because it was of the view that the plaintiffs were barred from recovery by the law of Rhode Island. It did, however, in addition to finding the amount of the plaintiffs' expenses reasonably incurred in performing their part of the contract, to which we have already alluded, take occasion to say that were it not for its view that Rhode Island law prevented any recovery, its findings of facts would lead it to award substantial damages to the plaintiffs.

Although we have only the judgment itself to go on, it seems obvious that as a result of the hearings held in response to our mandate the court below affirmed its original finding as to the reasonable expenses incurred by each plaintiff in preparing to perform the contract; that it allocated those expenses between the plaintiffs in the amounts set out above, and we may assume with the corporate appellant that the court then added the amount of $ 25,000 to each award of expenses in order to compensate each plaintiff[**4] for its loss of profits. n1 But on this assumption it is clear that the court below did not accord face value to the plaintiffs' evidence of lost profits substantially in excess of $ 25,000 for it is apparent that only that amount was added to the expenses of performance which it found were reasonably incurred by each plaintiff.

It is difficult to see the logical basis for allowing a plaintiff's reasonable expenses of preparations for performance as an element of damages for breach of contract. Nevertheless, it is well settled, as the defendants-appellants concede, [*64] that [HN1] such expenses are generally recognized to be an element of damages in actions of assumpsit. 5 Williston, Contracts (Rev. Ed.) Sec. 1363A. Thus, on the corporate appellant's assumption that the $ 25,000 item added by the District Court to each plaintiff-appellee's expenses of performance was added as compensation for lost profits, the problem on this appeal, so far as it is concerned, narrows down to whether lost net profits may be considered an element of the plaintiffs' damages.

Appellants' counsel contend that lost net profits cannot be taken into account in assessing the plaintiffs' damages for[**5] the reason that the contract launched the parties to it on a new business undertaking, and they say that it is an established rule of law that profits from such a venture are always so uncertain that they can never be recovered in a civil action sounding in contract. We do not agree.

Perhaps some authority exists for the proposition that as a matter of law there can be no recovery in a civil action for breach of contract for loss of

anticipated profits from a new business undertaking. But the corporate appellant concedes that there is no direct authority for that proposition in Rhode Island, and the indirect authorities from that state upon which it relies have far too little pertinence to warrant our drawing the conclusion that it has been adopted by the Supreme Court of Rhode Island. Thus we are free to resort to general principles and authority elsewhere, and on that basis we conclude that the rigid rule of law contended for by the appellant, Standard Machinery Company, is too broad a generalization from the basic principle that there can be no recovery for remote and speculative profits. Certainly no authority need be cited for the broad proposition that prospective profits, [**6]if proved, are an element of a plaintiff's damages for breach of contract, or for the further proposition that evidence of past profits from an established business provides a reasonable basis for estimating future profits from the business. On the other hand, however, it may well be that estimates of the future profits of a business which has just been started, or one which has only recently been launched, are likely to be much too speculative to afford an adequate basis for an award of damages. See 5 Williston, Contracts (Rev. Ed.) Sec. 1346A, paragraph 2 footnote 3 appended to that section, appearing on page 3782. But we do not think the latter proposition is necessarily always true. Thus as we see it a sharp line of distinction should not be drawn between old and new businesses, but recourse should be had in both situations to the basic question whether a prospective loss of net profits has been shown with reasonable certainty. See Am. Law Inst., Restatement, Contracts, Sec. 221(1), and Comment d., Illustration 6, thereunder; Burks v. Sinclair Refining Co., 3 Cir., 1950, 183 F.2d 239. We think the evidence here is adequate to show a reasonable certainty of lost net profits[**7] from the joint venture undertaken by the three corporations.

Certainly all three parties to the contract embarked on their enterprise in the expectation of profits for all concerned. In this situation it hardly lies in the mouth of one of them, the defendant-appellant Standard Machinery Company, to say that there is no sufficient evidence of profits to support a finding. See Burks v. Sinclair Refining Co., supra, footnote 1. And this is emphasized by the evidence that Moyer acting for Standard, in breach, it is said, of his fiduciary duty as a director of Shaw Standard, secretly offered to sell the entire hardware project to competitive interests for $ 100,000, which he testified was an 'attractive proposal' which could not be duplicated for $ 30,000 above that figure.

Furthermore, although the venture was in a sense a new one in that the parties contemplated manufacturing locks and other builders' hardware by stamping out the component parts instead of [*65] casting the parts and filing them to fit as had been the old method of manufacture, nevertheless Duncan Shaw, the prime mover in the corporation which carried his name, was an old hand at the builders' hardware business, [**8] having been associated in high executive positions for some twenty-five years with several long established firms in that field, and the defendant Standard Machinery Company had been engaged in the business of stamping out small metal parts for a substantial period of years.

In our opinion the foregoing circumstances are enough without more to warrant a finding of some loss of profits by the plaintiffs as a result of the corporate defendant's breach of contract. This being so, proof of the actual amount of the profits lost by each plaintiff is not essential, for, as the Supreme Court of Rhode Island said in Zuromski v. Lukaszek, 1941, 67 R.I.

66, 20 A.2d 685 686:

[HN2] 'A person who has violated his contract cannot escape all liability simply because the injured party cannot prove the precise amount of the damages for which the violator is responsible. The actual damages sustained by an injured party in this type of cases may, and often do, rest upon reasonable inferences to be drawn from the facts, circumstances and data furnished by the evidence. The above-expressed views are amply supported by authority.'

Thus Standard has no valid basis for complaint about an award for lost net [**9]profits of $ 25,000 to each plaintiff. The award being well within the limits allowed by the evidence, that appellant can not be heard to complain of the lack of any specific evidence pinpointing each plaintiff's lost profits at exactly $ 25,000. The court below may well have taken the plaintiffs' evidence of over $ 100,000 of lost profits each with a grain or two of salt and trimmed down what it thought a too rosy estimate to an amount which it considered fairly compensatory.

The personal liability of the individual defendant, Moyer, remains for consideration. He was charged with, and found liable for, breach of his fiduciary duty as a director of the intermediary corporation, Shaw Standard, and the extent of his liability was fixed at $ 5,000. We do not know how that figure was arrived at. We must of necessity, therefore, turn to the general principals governing the assessment of damages against a fiduciary for breach of his trust to see if any basis can be found for assessing damages of $ 5,000 against Moyer.

It is fundamental that [HN3] damages may be assessed in favor of a beneficiary against a defaulting trustee either to compensate the beneficiary for such loss as he may have[**10] sustained as a result of the breach of trust, or to prevent the faithless trustee from unjustly enriching himself as a result of his breach of fiduciary duty. Am. Law Inst., Restatement, Trusts, Sec. 205; Scott, Trusts, Sec. 205. We are not here concerned with compensatory damages to Shaw Standard. We must assume that is has already been fully compensated by the damages awarded to it from Standard Machinery Company for whatever losses it may have sustained by reason of the latter corporation's breach of contract, which it is asserted Moyer brought about in breach of his fiduciary duty as a director of Shaw Standard. The only question, therefore, is whether Moyer unjustly enriched himself, and if he did to what extent, from his breach of fiduciary duty to Shaw Standard.

The District Court did not make any finding as to how much Moyer actually profited personally by his breach of trust. It found that Moyer as a substantial stockholder in Standard stood to profit from the liquidation of the latter corporation, which it was alleged and found he engineered in order to break the contract in breach of his fiduciary duty. But it was not found, nor could it be found on the evidence[**11] produced, that Standard ever was actually liquidated with a consequent profit in any amount whatever to Moyer. In this state [*66] of the proof the judgment against Moyer cannot stand.

The judgment of the District Court is affirmed in part and set aside in part and the case is remanded to that court for the entry of a judgment in conformity with the opinion; no costs on appeal.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1. The appellees suggest that the $ 25,000 item of damages may have been awarded by the District Court to each appellee as compensation for destruction of its business. This may be so, but since it is just as probable that the item was added for lost profits we shall decide this case on the corporate appellant's assumption to that effect.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**611 A.2d 820; Troutbrook Farm v. DeWitt;**



**TROUTBROOK** FARM, INC. V. MARY DEWITT.

No. 91-52-Appeal.

Supreme Court of Rhode Island.

June 12, 1992.

Stud farm brought suit against owner of horse for owner's failure to return horse after veterinary examination, pursuant to letter agreement. The Superior Court, Providence County, Gibney, J., entered default judgment in favor of farm, and owner appealed. The Supreme Court, 540 A.2d 18, found that the default judgment was in excess of damages prayed for in farm's complaint. On remand, the Superior Court, Almeida, J., denied owner's motion to set aside default judgment and vacated contempt order against owner, and owner and farm appealed. The Supreme Court, Fay, C.J., held that: (1) trial court did not have authority to reconsider removal of default judgment; (2) farm did not prove damages for lost profits; (3) trial court's ruling vacating contempt order against owner was proper; and (4) awarding damages to farm in lieu of sanctions against owner was permissible.

Affirmed in part; reversed in part and remanded.



William R. Grimm, Hinckley, Allen, Snyder & Comen, Mary Kathryn Miluski, Hinckley, Allen, Snyder & Comen, Providence, for plaintiff.

Lauren Jones, Jones Associates, Providence, for defendant.

OPINION

FAY, Chief Justice.

This case comes before the Supreme Court on the appeals of both the defendant, Mary DeWitt (DeWitt), and the plaintiff, **Troutbrook** Farm, Inc. (**Troutbrook**). DeWitt appeals from the Superior Court's denial of her motion to vacate the default and from the court's award of compensatory damages to **Troutbrook**. **Troutbrook** cross-appeals from that portion of the trial justice's order that denied contempt sanctions against DeWitt. We affirm the decision of the trial justice in part and reverse in part.

DeWitt is the owner of a champion Morgan stallion named Waseeka's In Command (In Command). In 1976 DeWitt leased In Command to **Troutbrook** for breeding purposes. In 1982 a controversy arose between DeWitt and **Troutbrook** concerning the manner in which **Troutbrook** was managing In Command's services. DeWitt learned that as a result of In Command's reduced ability to breed naturally, **Troutbrook** was utilizing artificial insemination in order to breed the stallion. DeWitt also believed that **Troutbrook** had not been paying her the share of breeding fees to which she was entitled pursuant to their lease agreement. Fearing that **Troutbrook** was causing harm to In Command, DeWitt attempted to terminate her lease with **Troutbrook**. DeWitt also brought suit in Superior Court, seeking the return of

In Command and the payment of money due her pursuant to the lease agreement.

During the pendency of this action DeWitt, pursuant to a letter agreement, transferred In Command to Cornell University in order to have the stallion examined by a veterinary physician. The agreement required DeWitt to return In Command to **Troutbrook** upon completion of the examination. However, DeWitt did not return the stallion to **Troutbrook**; instead she placed In Command at Fiddler's Green Farm (Fiddler's Green).

Although DeWitt's action against **Troutbrook** was pending in the Superior Court, in January 1984 **Troutbrook** filed a separate action seeking injunctive relief, arguing that DeWitt's failure to return In Command violated the parties' letter agreement. The Superior Court issued an ex parte temporary restraining order requiring DeWitt to return In Command to **Troutbrook**. The restraining order was superseded by a preliminary injunction after a hearing at which DeWitt did not appear. **Troutbrook** then amended its complaint, alleging harm to its business reputation and loss of income as a result of DeWitt's failure to return In Command. The amended complaint sought damages in the amount of $300,000.

On March 28, 1984, a Superior Court justice adjudged DeWitt in contempt of the restraining order, imposed a $175-per-day fine, and enjoined DeWitt from prosecuting the civil action she had filed until she complied with the court's order. When DeWitt failed to file an answer to Troutbrook's complaint, **Troutbrook** successfully moved for entry of default. After a hearing on the damages, the trial justice entered a default judgment in the amount of $662,-300. With the addition of interest and costs this judgment totaled $721,955, and execution was issued in that amount.

Thereafter, pursuant to Rule 60(b) of the Superior Court Rules of Civil Procedure, DeWitt moved to vacate the default judgment on the ground of excusable neglect. In support of this motion, DeWitt filed an affidavit asserting that she had been confused by the documents served upon her and believed that they were all part of the original action. After a hearing the trial justice concluded that DeWitt had not established excusable neglect and therefore denied DeWitt's motion. DeWitt appealed

**Page 822**

from the denial of her motion to vacate the default judgment.

In *Troutbrook Farm, Inc. v. DeWitt*, 540 A.2d 18 (R.I.1988) (*Troutbrook I*), this court affirmed the trial justice's judgment in part and reversed in part. We concluded that "'[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment.'" *Id.* at 20. The judgment entered by the trial justice was in excess of the $300,000 damages sought by **Troutbrook** in its amended complaint. Therefore, we remanded the case for a reassessment of damages within the limit set forth in Troutbrook's amended complaint. We did not disturb the trial justice's determination that DeWitt had failed to establish excusable neglect. We noted that the trial justice could impose sanctions upon DeWitt "for her failure to obey prior orders of the Superior Court. However, this may be done as part of the reassessment of damages upon remand." *Id.* at 20--21.

Upon remand DeWitt filed both a motion to set aside the default and a motion for relief from the contempt order. The trial justice held evidentiary hearings to redetermine damages. At the hearing **Troutbrook** presented its case through several affidavits as well as the live testimony of James Anderson (Anderson) and Leo Picard (Picard). DeWitt did not appear or offer evidence; however, her attorney cross-examined Anderson and Picard.

Picard, president of **Troutbrook** Farm since 1968, testified that he had been in the business of breeding Morgan horses for over eighteen years. He stated that In Command was a dominant show horse and was considered to be the premier sire of the Morgan horse breed.(fn1) The records kept by **Troutbrook** indicate that during the eight years In Command was at **Troutbrook** Farm, the stallion was bred to a total of 186 mares.

Picard suggested that as a result of In Command's preeminence as a Morgan sire, **Troutbrook** lost substantial earnings when DeWitt did not return the stallion. Picard testified concerning the stud fees that **Troutbrook** intended to charge between 1984 and 1987.(fn2) **Troutbrook** had charged $2,500 per mare in 1983 and planned to charge $5,000 in 1984 and 1985 and $6,500 in 1986 and 1987. Pursuant to the lease agreement, DeWitt and **Troutbrook** would equally divide the total amount of stud fees earned each year. Picard stated that the outside mares that were bred with In Command stayed at the farm an average of 102 days. Picard also asserted that **Troutbrook** would have charged mare-care fees of $10 per day in 1984 and 1985 and $11 per day in 1986 and 1987.(fn3) **Troutbrook** projected that during the years 1984 to 1987, it would have leased between seven and twelve mares each year to breed with In Command. Pursuant to the lease agreements, **Troutbrook** would have been entitled to retain the first foal produced by each leased mare. In addition **Troutbrook** would have one mare leased continuously from 1984 to 1987. The foals produced by this mare would have solely belonged to **Troutbrook**. **Troutbrook** asserted that it could have produced additional income from selling these foals.(fn4) In Picard's opinion the average minimum value of each foal sired by In Command would have been $25,000. Picard asserted that as a result of DeWitt's failure to return In Command, **Troutbrook**

**Page 823**

sustained a total of $420,640 in damages.(fn5) In computing its damages, **Troutbrook** utilized the actual settling rate accomplished by In Command while at Fiddler's Green during the years 1984 through 1987.(fn6)

**Troutbrook** submitted an affidavit by Anderson, the owner and operator of a training stable in Massachusetts. On cross-examination Anderson testified that he had been involved in the sale of sixteen of In Command's offspring. Attached to his affidavit was an exhibit listing the sales of In Command's offspring in which Anderson had been personally involved. The selling prices of the offspring ranged from $4,500 to $130,000, with an average price in excess of $29,000. However, Anderson indicated that these figures were sales prices and did not take into account any costs incurred in selling the offspring.

The trial justice, relying upon the original trial justice's determination that DeWitt had not proved excusable neglect, denied DeWitt's motion to set aside the default. The trial justice also disagreed with DeWitt's assertion that Troutbrook's damage estimate was based upon speculation and lacked evidentiary support. He found "the historical breeding record of the stallion to be a rational and reliable standard to calculate Troutbrook's damages." The trial justice concluded that it was reasonable to believe that In Command would have bred an average of twenty mares per year between 1984 and 1987, resulting in a net stud-fee loss to **Troutbrook** of $75,750. He concluded that **Troutbrook** had lost $19,890 in mare-care profits. However, the trial justice rejected Troutbrook's valuation of the selling price for In Command's offspring. He determined that $4,500 was a more reasonable value per foal for assessing foal profits. Using $4,500 per foal, the trial justice determined that **Troutbrook** was unable to capitalize on lost-foal profits of at least $58,500. According to the trial justice, **Troutbrook** had established damages in the amount of $154,140. As a result of the amount of damages awarded, the trial justice denied Troutbrook's motion for assessment of contempt sanctions.

DeWitt appealed from this decision, arguing that the trial justice had abused his discretion in

denying her motion to set aside the default. DeWitt contends that our decision in ***Troutbrook I*** essentially erased the default judgment, and therefore, on remand "the procedural posture of the case * * * was returned to that point in time in which a default had been entered by plaintiff pursuant to Rule 55 (a) of the Superior Court Rules of Civil Procedure." DeWitt argues that the question of whether to set aside a default under Rule 55(c) requires a separate and distinct legal analysis from that required for determining whether to grant relief from a default judgment under Rule 60(b).(fn7) DeWitt contends that on remand it would have been proper for the trial justice to grant her motion to set aside the default for good cause pursuant to Rule 55(c). We disagree with DeWitt's arguments.

**[1, 2]** We have often held "that a motion to vacate a default judgment is within the discretion of the trial justice before whom the motion is brought." *Phoenix Construction Co. v. Hanson*, 491 A.2d 330, 332 (R.I.1985). Absent a showing of abuse of discretion, we shall uphold the decision

**Page 824**

of the trial justice. In ***Troutbrook I*** we stated that "this court will not disturb [the trial justice's] determination in respect to the removal of the default." 540 A.2d at 20. We remanded the case for a reassessment of the damages.

**[3]** Our decision in ***Troutbrook I*** upheld that portion of the trial justice's decision that denied DeWitt's motion to vacate the default. Therefore, on remand the trial justice did not have the authority to reconsider the removal of the default, nor was he empowered to consider DeWitt's arguments on the underlying merits of her case. ***Troutbrook I*** merely set aside the amount of damages assessed by the trial justice; it did not vacate the default judgment. Because the trial justice on remand only had the power to reassess the amount of damages, we conclude that he was correct in denying DeWitt's motion to set aside the default.

DeWitt contends that **Troutbrook** did not sustain any damages because she allegedly terminated their lease agreement. She argues that the trial justice failed to consider "whether the effectiveness of an option of one party to terminate a lease is dependent upon the existence of a similar option on the part of the other party." We need not address the argument asserted by DeWitt concerning the lease agreement because the default judgment and Troutbrook's damages flow from DeWitt's failure to return In Command pursuant to the terms of the letter agreement entered into by the parties, not the lease agreement.

DeWitt also asserts that the trial justice erred by awarding compensatory damages to **Troutbrook** for lost profits because **Troutbrook** failed to meet its burden of establishing its net lost profits and because Troutbrook's claim of damages is too uncertain and speculative to support the trial justice's award of damages.

**[4]** We have recognized that lost profits are a proper element of damages in cases in which a business has been interrupted. *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 195 (R.I.1984). However, in order to recover, a plaintiff must establish with reasonable certainty the net lost profits he or she suffered as a result of the defendant's failure to perform. *National Chain Co. v. Campbell*, 487 A.2d 132, 135 (R.I.1985). In order to meet this burden, a plaintiff needs to prove lost revenue as well as costs and expenses involved in the generation of that revenue.

The trial justice determined that **Troutbrook** had met its burden of establishing its damages, finding the historical breeding record of In Command to be a rational and reliable standard with which to calculate Troutbrook's damages. He found that **Troutbrook** had proven lost stud fees in the amount of

$75,750 and lost mare-care profits of $19,890 with reasonable certainty. However, the trial justice concluded that **Troutbrook** had not adequately established its lost foal profits and therefore reduced the amount sought by **Troutbrook** to $58,500.

**[5]** **Troutbrook** had the burden of proving the amount of net profits it lost as a result of DeWitt's failure to return In Command to **Troutbrook**. Although **Troutbrook** did produce evidence in the form of exhibits concerning its stud-fee proceeds, mare-care revenue, and foalsale income, we believe that **Troutbrook** failed to meet its burden of proving its net lost profit. The financial data introduced by **Troutbrook** appears solely to reflect the anticipated revenue **Troutbrook** would have earned had DeWitt returned In Command. No evidence was introduced with regard to the ordinary expenses and costs it incurs in breeding In Command.

In order for the trial justice properly to award damages to compensate **Troutbrook** for its net lost profits, **Troutbrook** needed to provide the trial justice with information on the expenses it would have incurred in the operation of its stud farm had In Command been returned. Although we do not profess to be experts in the stud-farm business, we believe that there must be a great deal of expense involved in running this type of business, especially since **Troutbrook** registered a net profit in only two of the seven years of operation during which In Command was with **Troutbrook**. For

**Page 825**

example, the trial justice was not presented with evidence concerning the cost of stabling and feeding In Command or the expense of the artificial-insemination procedure used to breed the stallion. Although **Troutbrook** contended that it would lease a number of mares each year to breed with In Command, **Troutbrook** did not offer evidence regarding the cost of stabling and feeding these mares. Troutbrook's estimation of its damages also does not appear to take into consideration the fact that pursuant to their lease agreement, DeWitt was entitled to one-half of all fees collected from breeding In Command to outside mares. Because **Troutbrook** failed to provide evidence concerning the expenses and costs associated with its business, the trial justice could not properly award damages. We therefore set aside the trial justice's determination of damages and remand for a reconsideration of Troutbrook's net lost profits.

**Troutbrook** argues that the trial justice erred by vacating the contempt order that required DeWitt to return In Command and by improperly awarding damages in lieu of, rather than in addition to, sanctions. We disagree with Troutbrook's contentions.

**[6]** We have held that civil contempt "is remedial and designed to reimburse complainants for the wrong done as a result of the noncompliance with a valid order of the court." *Nelson v. Progressive Realty Corp.*, 81 R.I. 445, 450, 104 A.2d 241, 243 (1954). A court may use contempt sanctions to coerce a defendant into complying with a court order and/or to compensate the complainants for losses caused by a defendant's failure to comply with the court's order. *Ventures Management Co. v. Geruso*, 434 A.2d 252, 254 (R.I.1981); *School Committee of Pawtucket v. Pawtucket Teachers Alliance*, 101 R.I. 243, 254--55, 221 A.2d 806, 813 (1966).

In February 1984 the Superior Court issued an injunction that required DeWitt to return In Command to **Troutbrook**. As a result of her failure to return In Command, the trial justice found DeWitt to be in contempt of the injunction and imposed a fine in the amount of $175 per day until such time as she complied with the court's order. In ***Troutbrook I*** we stated that it was within the trial justice's authority on remand to impose sanctions upon DeWitt, but we suggested that this could "be done as part of the reassessment of damages upon remand."

**[7, 8]** On remand the trial justice did not impose additional sanctions on DeWitt. Because of In Command's complete inability to breed and Troutbrook's financial problems, after 1987 **Troutbrook** no longer sought the return of the stallion. Therefore, any coercive element of the contempt order had been eliminated. **Troutbrook** will be fully reimbursed for any loss it suffered as a result of DeWitt's failure to comply with the court's order to return In Command by the trial justice's award of damages. Thus the trial justice satisfied the compensatory element of the contempt order. In ***Troutbrook** I* we determined that it was within the trial justice's discretion to impose sanctions upon DeWitt. In light of his award of damages, we conclude that the trial justice's decision not to impose further sanctions is not an abuse of his discretion.

Consequently we conclude that **Troutbrook** did not meet its burden of proving its net lost profits with reasonable certainty. DeWitt's appeal is sustained. Troutbrook's appeal is denied and dismissed. The judgment appealed from is affirmed in part and reversed in part. The papers of this case are remanded to the Superior Court for further proceedings consistent with this opinion.

Footnotes:

1. In Command had a number-one-living-sire rating in Page's Sire Rating, a rating that is commonly relied upon by the American Morgan Horse Association and its members.

2. Stud fees are fees charged by **Troutbrook** to breed In Command with "outside mares" who are not owned by **Troutbrook** and consist of a booking fee, a departure fee, and a foal fee.

3. Mare-care fees are those charged for stabling, bedding, and feeding the mares as well as cleaning stalls. According to Picard, of the $10 charged per day in 1984 and 1985, $5 was profit. Six dollars was profit of the $11-per-day fee **Troutbrook** was going to charge in 1986 and 1987.

4. **Troutbrook** could have generated foal income from (1) the sale of the foals immediately at birth or after they had matured, (2) the stud fees generated by the foals after they had matured, and/or (3) the sale of subsequent foals that could have been produced by breeding the new foals after their maturity.

5. **Troutbrook** claims its damages were $180,995 in 1984, $122,965 in 1985, $99,396 in 1986, and $17,284 in 1987. The total-damages figure is a compilation of the lost stud fees, mare-care profits, and foalsale profits. **Troutbrook** estimated that as a result of DeWitt's failure to return In Command, it lost $75,750 in stud fees, $19,890 in mare-care profits, and $325,000 in foal-sale profits.

6. The settling rate is a percentage calculated by dividing the number of foals produced in a year by the number of mares bred in a year. The settling rate indicates the percentage of mares impregnated during the year.

7. Rule 55(c) of the Superior Court Rules of Civil Procedure permits a trial justice to set aside a default "[f]or good cause shown * * * and, if a judgment by default has been entered, [the court] may likewise set it aside in accordance with Rule 60(b)." A default judgment will be removed when the defaulting party establishes that his or her "neglect was occasioned by some extenuating circumstances of sufficient significance to render it excusable." *King v. Brown*, 103 R.I. 154, 157, 235 A.2d 874, 875 (1967); *see also* Super.R.Civ.P. 60(b).

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is

provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

Scott Weaver v. American Power Conversion Corporation.

No. 2004-44-Appeal.

SUPREME COURT OF RHODE ISLAND

863 A.2d 193; 2004 R.I. LEXIS 201

December 15, 2004, Opinion Filed

PRIOR HISTORY: [**1] (PB 01-3080).

DISPOSITION: Affirmed. Record remanded.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff former employee sued defendant corporation for breach of contract, unjust enrichment, estoppel, misrepresentation, and negligence, all stemming from the corporation's alleged failure to honor an agreement to provide him with stock options. The Rhode Island superior court entered summary judgment in favor of the corporation. The employee appealed.

OVERVIEW: The corporation's sales manager sent the employee a letter offering him an option to purchase 2,000 shares of the corporation's stock if he accepted a position there. The employee accepted the offer but was later told the board could not grant the option because his name had not been included on a nominee list. The corporation later offered him an option to purchase 6,000 shares, but in view of the fluctuating values of the stock, he felt this did not match the original offer and did not sign the option agreement. However, the corporation credited him for 6,000 shares in his employee account; he exercised the options and eventually sold most of the stocks he bought. The appellate court held that the employee presented insufficient evidence to create a genuine issue of material fact as to whether the parties intended the second agreement to be anything other than a novation or accord and satisfaction of the prior promise. Statements set forth in his affidavit, drawn specifically to frustrate summary judgment, did not suffice as they did not square with his previous testimony, and he gave no satisfactory explanation of why the testimony changed.

OUTCOME: The judgment was affirmed.

CORE TERMS: stock, summary judgment, accord and satisfaction, novation, stock option, replacement, nominated, substituted, option to purchase, offering, manifested, favorable, genuine issue of material fact, deposition, board of directors, deposition testimony, original offer, correspondence, confirmation, promised, e-mail, subjective intent, nonmoving party, right of action, contract theory, matter of law, inconsistencies, extinguished, contractual, formation

LexisNexis(R) Headnotes

Civil Procedure: Summary Judgment: Standards of Review
[HN1] An appellate court reviews a grant of summary judgment on a de novo basis. Accordingly, if its review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and if it concludes that the moving party was entitled to judgment as a matter of law, it shall sustain the trial justice's granting of summary judgment.

Civil Procedure: Summary Judgment: Burdens of Production & Proof
[HN2] A party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN3] The purpose of the summary-judgment procedure is to identify disputed issues of fact necessitating trial, not to resolve such issues.

Contracts Law: Performance: Accord & Satisfaction
Contracts Law: Performance: Assignment & Novation
[HN4] An " accord and satisfaction " is an agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance. The doctrine of accord and satisfaction provides that when two parties agree to give and accept something in satisfaction of a right of action which one has against the other, and that agreement is performed, the right of action is subsequently extinguished. A novation, on the other hand, is generally defined as the act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party. A novation is therefore a species of accord and satisfaction. A novation has also been characterized as a "substituted contract." Because the two concepts are essentially intertwined, the Rhode Island Supreme Court has manifested a concern with substance rather than form in this fuliginous corner of the law, and has hesitated to draw fine lines between these two closely allied kinds of contracts where no necessity exists for doing so.

Contracts Law: Performance: Accord & Satisfaction
Contracts Law: Performance: Assignment & Novation
[HN5] It matters not whether a court refers to as transaction as an accord and satisfaction or as a recission followed by the formation of a new contract (novation); the significant and essential element in either instance under the substituted contract theory is a factual determination that the original contractual rights and obligations of both parties are extinguished and new contractual rights and liabilities created for each, all by their mutual agreement.

Contracts Law: Formation: Offer
Contracts Law: Performance: Accord & Satisfaction
Contracts Law: Performance: Assignment & Novation
[HN6] The process of making an accord, of interpreting the words and acts of the parties, and of determining the legal effect thereof, is the same as in the case of other contracts. There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand,

that the performance is offered to him as full satisfaction of his claim and not otherwise. Similarly, it is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge. It is wholly a question of intention, to be determined by the usual processes of interpretation, implication, and construction.

Contracts Law: Formation: Acceptance
Contracts Law: Formation: Offer
[HN7] For parties to form a valid contract, each must have the intent to be bound by the terms of the agreement. Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed. For any contract to be enforceable, however, the parties must manifest their objective intent to be bound to the agreement.

Civil Procedure: Summary Judgment: Burdens of Production & Proof
Civil Procedure: Summary Judgment: Supporting Papers & Affidavits
[HN8] A novation need not be expressly stated but can be shown by inference from the facts and from the conduct of the parties. To determine the intent of the parties to a substituted contract or an accord and satisfaction, the court engages in an external interpretation of the party's or parties' intent as manifested by, among other things, actions, words, prior practice between the parties, practice in the trade or profession, and any statements made during negotiations.

Civil Procedure: Summary Judgment: Standards of Review
Civil Procedure: Summary Judgment: Summary Judgment Standard
Civil Procedure: Summary Judgment: Supporting Papers & Affidavits
[HN9] In considering a motion for summary judgment, the court does not pass upon the weight and credibility of the evidence, but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion. The purpose of summary judgment is issue finding, not issue determination. However, naked and conclusory assertions in an affidavit are inadequate to establish the existence of a genuine issue of material fact and thus do not afford a basis for reversal of a trial justice's ruling granting a motion for summary judgment. The obvious rationale for this rule prevents a party from dodging summary disposition with factual assertions in tailor-made affidavits designed solely to create a mirage of material issues.

Civil Procedure: Summary Judgment: Supporting Papers & Affidavits
[HN10] When a party has given answers to unambiguous questions in discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, unless there is a satisfactory explanation of why the testimony has changed.

JUDGES: Present: Williams, C.J., Goldberg, Flaherty, Suttell, and Robinson, JJ.

OPINION: [*195] PER CURIAM. This matter came before this Court for oral argument on October 27, 2004, pursuant to an order directing the parties to appear and show cause why the issues raised by this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and that the case should be decided at this time.

Facts and Procedural History

The plaintiff, Scott Weaver, appeals from a Superior Court entry of summary judgment in favor of defendant, American Power Conversion Corporation (APC or defendant). The plaintiff contends that summary judgment was improper because a genuine issue of material fact existed as to whether plaintiff, a former employee of defendant corporation, accepted a stock option offering from defendant to satisfy a preexisting obligation owed him by the corporation. The plaintiff also asserts that the motion justice misconstrued the doctrines of accord and satisfaction and novation in the summary disposition of his claim. [**2] For the reasons set forth herein, we deny plaintiff's appeal and affirm the judgment of the Superior Court.

In June 1991, APC offered plaintiff a position as a "sales application engineer" at its Rhode Island headquarters. Because plaintiff was residing in Colorado at the time of the offer, APC sales manager Asa Davis (Davis) telephoned plaintiff and informed him of the compensation and benefits for the position, which included an option to purchase 2,000 shares of APC stock if he left his current employment to accept the position at APC. Davis confirmed that offer in a letter sent to the plaintiff on June 19, 1991. In that letter, Davis wrote, in pertinent part:

"this position involves an annual salary of $ 43,000. Salary reviews will occur at your first six-month anniversary of employment, with annual reviews thereafter. You will also be nominated [sic] to the Board of Directors to receive options to purchase 2,000 shares of APC stock under our Incentive Stock Option Program. This program gives you the option to purchase APC stock over a 4-year period at a price which is fixed at the closing price on the day you begin work at APC. Actual inclusion in the program is[**3] determined by a vote of the Board of Directors." n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 At his deposition in this matter, Davis testified that APC employees were nominated to receive stock options as both a reward for exceptional job performance and as an inducement for prospective employees to join the company. Davis also testified that he was unaware of any employee who had worked for him being denied a stock option once that employee had been nominated to the board of the directors.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The plaintiff accepted the offer and began work at APC on or about July 1, 1991. Later that fall, Davis informed plaintiff that he could expect paperwork for the option within the upcoming months. By December 1991, however, not having received [*196] any confirmation to that effect, plaintiff confronted

Davis and asked about the status of his stock option. Davis informed him that his option was pending before the board and was probably "tied up in the lawyer's[,]" but assured plaintiff that it was forthcoming. In May 1992, still not having received any notification, [**4] plaintiff asked APC Chief Executive Officer Roger Dowdell about the status of his options. According to plaintiff, Dowdell "acted like he had no idea what I was talking about." Troubled with Dowdell's reaction, Weaver again contacted Davis, who promised him that he would look into the situation.

In June 1992, Davis informed Weaver that the APC board would be unable to grant the stock option as set forth in the June 19, 1991 letter because Weaver's name had not been included on the nominee list previously submitted to the board. To compensate plaintiff for that mistake, however, Davis ensured Weaver that he would be nominated at the next board meeting to receive an option to purchase 6,000 shares of APC stock. Davis testified that the offer for 6,000 shares was intended to "help [plaintiff] feel better" for not receiving the options earlier, considering that the stock had split two for one in December 1991.

The plaintiff was unhappy with Davis's offer and believed that it was not commensurate with the original proposal outlined in the June 19, 1991 letter confirming his employment. After preparing a spreadsheet detailing the fluctuating values of the stock, Weaver concluded that[**5] 12,000 options were necessary to equal the original offer and he informed Davis that he would "be willing to settle for" 12,000 shares if the new option grant was intended to be replacement for the original offer. On July 13, 1992, however, Davis e-mailed the following response: "Scott, I wish I had a better answer, but the best I can do is what I've outlined already. I think that, given time, the higher number of shares [6,000] will mean a much better result, especially over the long run."

In May 1992, APC tendered an Incentive Stock Option Agreement granting Weaver the option to purchase up to 6,000 shares of APC stock at $ 27.75 per share. Although plaintiff did not sign the stock option agreement, APC credited him for 6,000 shares in his employee account. Weaver thereafter began exercising his options, and he sold a vast majority of the stocks that he bought pursuant to the agreement, turning a profit of $ 394,958.96 in the process. Weaver terminated his employment with APC in September 1997 and commenced this action in June 2001.

The plaintiff's five-count amended complaint alleged breach of contract, unjust enrichment, estoppel, misrepresentation, and negligence, all stemming [**6]from defendant's failure to honor the promise made in the July 15, 1991 letter. In response, APC moved for summary judgment on two specific grounds. First, defendant maintained that the "second" offer of the option to purchase 6,000 shares was intended by APC to be a replacement for its original 2,000-share commitment, and plaintiff's exercise and acceptance of the 6,000-share option thus created an accord and satisfaction or a novation of the original contract between the parties. Secondly, defendant asserted that even if there was no accord and satisfaction or novation, the offer confirmation letter was insufficient to create a binding legal obligation on APC to grant plaintiff stock options for 2,000 shares. On that point, defendant argued that the letter fixed no date upon which plaintiff would be nominated to the board and specifically conditioned any stock option award on the vote of the board of directors. According to defendant, the letter [*197] merely guaranteed that plaintiff would be nominated to receive stock options. The

motion justice granted defendant's motion on the first ground, finding that the series of negotiations between the parties indicated that APC's 6,000-share [**7]offer was "in lieu of," "instead of," and "in place of" the original 2,000-share agreement, and that plaintiff's exercise of the options constituted a valid accord and satisfaction or novation of the previous agreement. The plaintiff filed a timely appeal to this Court.

Standard of Review

[HN1] "This Court reviews a grant of summary judgment on a de novo basis." Johnson v. Newport County Chapter for Retarded Citizens, Inc., 799 A.2d 289, 291 (R.I. 2002) (citing Marr Scaffolding Co. v. Fairground Forms, Inc., 682 A.2d 455, 457 (R.I. 1996)). "Accordingly, if our review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and if we conclude that the moving party was entitled to judgment as a matter of law, we shall sustain the trial justice's granting of summary judgment." Id. (quoting Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1225 (R.I.1996)). [HN2] "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on[**8] allegations or denials in the pleadings or on conclusions or legal opinions." Accent Store Design, Inc., 674 A.2d at 1225. [HN3] "The purpose of the summary-judgment procedure is to identify disputed issues of fact necessitating trial, not to resolve such issues." Rotelli v. Catanzaro, 686 A.2d 91, 93 (R.I. 1996).

Analysis and Discussion

The critical question in this case is whether plaintiff presented evidence sufficient to create a genuine issue of material fact as to whether the 6,000-share stock option agreement was intended by the parties to act as anything other than an accord and satisfaction or a novation of APC's original promise to nominate plaintiff to receive options to purchase 2,000 shares of APC stock. Because plaintiff has failed to present any such evidence, we are of the opinion that APC was entitled to summary judgment.

Black's Law Dictionary defines [HN4] an " accord and satisfaction " as "an agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance." Black's Law Dictionary 17 (7th ed. 1999). This Court has recognized that[**9] the "doctrine of accord and satisfaction provides that when two parties agree to give and accept something in satisfaction of a right of action which one has against the other, and that agreement is performed, the right of action is subsequently extinguished." ADP Marshall, Inc. v. Brown University, 784 A.2d 309, 313 (R.I. 2001). A novation, on the other hand, is generally defined as "the act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party." Black's Law Dictionary 1091 (7th ed. 1999). A novation is therefore a "species" of accord and satisfaction. Long v. Weiler, 395 S.W.2d 234, 237 (Mo. Ct. App. 1965). See also 66 C.J.S. Novation @@ 1-32 (1998). This Court has also characterized a novation as a "substituted contract." Salo Landscape & Construction Co. v. Liberty Electric Co., 119 R.I. 269, 274, 376 A.2d 1379, 1382 & n.2 (1977) (Salo Landscape) (citing 6 Corbin on Contracts, @ 1293 at 189-90 (1962)).

[*198] Because the two concepts are essentially intertwined, this Court has been described as having "manifested[**10] a concern with substance rather than form in this fuliginous corner of the law, hesitating to draw fine lines between these two closely allied kinds of contracts where no necessity exists for doing so." In re Newport Plaza Associates, L.P., 985 F.2d 640, 644 (1st Cir. 1993). Thus, in Salo Landscape, we overlooked fine common law distinctions between the two concepts:

[HN5] "it matters not whether we refer to this transaction as an accord and satisfaction or as a recission followed by the formation of a new contract [novation]; the significant and essential element in either instance under the substituted contract theory is a factual determination that the original contractual rights and obligations of both parties were extinguished and new contractual rights and liabilities created for each, all by their mutual agreement." Salo Landscape, 119 R.I. at 273, 376 A.2d at 1382.

It is universally recognized that [HN6] "the process of making an accord, of interpreting the words and acts of the parties, and of determining the legal effect thereof, is the same as in the case of other contracts." 6 Corbin on Contracts, @ 1277 at 117 (1962). "There[**11] must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise." Id. at 118. (Emphasis added.) Similarly, "it is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge * * *." Id. @ 1293 at 190. "It is wholly a question of intention, to be determined by the usual processes of interpretation, implication, and construction." Id.

This Court has established that [HN7] for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement. Rhode Island Five v. Medical Associates of Bristol County, Inc., 668 A.2d 1250, 1253 (R.I. 1996). "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed." Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989). For any contract to be enforceable, however, the parties must manifest their objective intent to be bound to the agreement. See McGrath v. Rhode Island Retirement Board By and through Mayer, 906 F. Supp. 749 (D.R.I. 1995),[**12] aff'd, 88 F.3d 12 (1st Cir. 1996); National Education Association - Rhode Island v. Retirement Board of Rhode Island Employees' Retirement System, 890 F. Supp. 1143 (D.R.I. 1995); Smith v. Boyd, 553 A.2d 131 (R.I. 1989). Moreover, we have held that [HN8] a novation "need not be expressly stated but can be shown by inference from the facts and from the conduct of the parties." Jewel Co. of America, Inc. v. George, 118 R.I. 372, 375, 373 A.2d 1200, 1202 (1977). Accordingly, to determine the intent of the parties to a substituted contract or an accord and satisfaction, this Court engages in an external interpretation of the party's or parties' intent as manifested by, among other things, actions, words, prior practice between the parties, practice in the trade or profession, and any statements made during negotiations. Smith, 553 A.2d at 133-34.

In the matter before us, the motion justice determined that plaintiff failed to present evidence sufficient to create a genuine issue of material fact as to whether the parties intended the second agreement to be anything other than a substitute for the previous[**13] obligation. We agree. This Court has

firmly established that "in opposing [*199] a motion for summary judgment, the nonmoving party may not rest upon the mere allegations, conclusions, or denials in her pleadings, but rather [he or] she has 'an affirmative duty to set forth specific facts that show that a genuine issue of fact exists to be resolved at trial.'" Tavares v. Barbour, 790 A.2d 1110, 1112-13 (R.I. 2002) (quoting General Motors Acceptance Corp. v. Johnson, 746 A.2d 122, 123 (R.I. 2000)).

Even reviewing the evidence in the light most favorable to the non-moving party, we hold that plaintiff failed to meet his burden. First, plaintiff's deposition testimony indicates that the 6,000-share offering was contemplated by both parties as a replacement for the original offer. Discussing his initial correspondences with Davis, plaintiff made the following statements:

"[Davis] called me and said that [he had] good news and bad news. The bad news was that he couldn't get me the first option plan because it would mean restating earnings and they didn't want to do that. Earnings per share. So, he said, the good news was I got you a plan for[**14] more shares, three times the number of shares. And I said, great; so let's see; the stock has split, that's 4,000 shares, so you got me 12,000 shares. And he said, no. So, I said, so that means its only [fifty] percent more. And he said, yes, 6,000 shares. * * * And I told him, that doesn't sound like it's comparable to my original plan." (Emphasis added.)

Thereafter, the following exchange took place between defendant's counsel and plaintiff:

"Q: All right. I didn't mean to suggest that you agreed that it was a substitute, but you understood, did you not, that APC was giving you [the second plan] as a substitute? Mr. Magratten: Objection.

"A: I don't know exactly what APC or Roger Dowdell or Asa Davis were thinking. In my opinion they thought that that's what they were doing.

"Q: Yes. I understand. * * * The context of their offer to you of these 6,000 shares was as a replacement for the shares that had been promised you in your offer letter; isn't that fair?

Mr. Magratten: Objection.

"A: No. * * *

"Q: My question is a more practical one. Let me try it this way: You don't believe that you would have been offered 6,000 options in[**15] June or July of 1992 were it not for the fact that you hadn't been given the 2,000 options per your offer letter.

Mr. Magratten: Objection.

"A: My answer is, why not?

"Q: So you think that those options would have been offered to you anyway?

"A: Could have been, sure.

"Q: And the fact that you were comparing the new plan and old plan, using your terms, that was just for purposes of comparison? Why were you comparing them?

* * *.

"A: If I accepted the second plan as a replacement, then I wanted to have a comparison, yes."

Despite plaintiff's attempts to avoid providing direct answers to counsel's questions, a fair reading of his deposition leads only to the conclusion that plaintiff believed he was receiving the 6,000-share plan as a replacement for the earlier 2,000-share offer, and furthermore, knew that APC intended the second agreement to function to satisfy the outstanding obligation. More importantly, however, plaintiff's deposition is devoid of any evidence [*200] that plaintiff in any way communicated or manifested any contrary intent to APC.

The e-mails and other correspondence between the parties similarly indicate an on-going negotiation[**16] process aimed at providing plaintiff with a replacement stock option scheme. Weaver's spreadsheet used the labels "old" and "new" to describe the two plans, while his e-mail of June 2, 1991 said that "the bottom line is that it really doesn't look like the 6,000 shares you've suggested is going to be very comparable to my original [2,000-share] offer." (Emphasis added.) Even when considered in the light most favorable to plaintiff, this correspondence indicates only that the parties each understood the second plan to be a substitute for the first.

We also have examined the statements set forth in plaintiff's affidavit, which was filed in opposition to defendant's motion for summary judgment. We are cognizant that [HN9] in considering a motion for summary judgment, the court does not pass upon the weight and credibility of the evidence, but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion. Palmisciano v. Burrillville Racing Association, 603 A.2d 317, 320 (R.I. 1992). Moreover, we are mindful that "the purpose of summary judgment is issue finding, not issue determination." Saltzman v. Atlantic Realty Co., 434 A.2d 1343, 1345 (R.I. 1981).[**17] However, we also have held that naked and conclusory assertions in an affidavit are inadequate to establish the existence of a genuine issue of material fact and thus do not afford a basis for reversal of a trial justice's ruling granting a motion for summary judgment. Roitman & Son, Inc. v. Crausman, 121 R.I. 958, 959, 401 A.2d 58, 59 (1979) (mem.); Harold W. Merrill Post No. 16 American Legion v. Heirs-at-Law of Smith, 116 R.I. 646, 648, 360 A.2d 110, 112 (1976). The obvious rationale for this rule prevents a party from dodging summary disposition with factual assertions in tailor-made affidavits designed solely to create a mirage of material issues. In this case, plaintiff claimed in his affidavit that he understood the option granted in May 1992 to be an "incentive" for him to remain with APC, "and not in satisfaction of the option promised in [the original] July 19, 1991 letter." Yet, at no time during his deposition, upon repeated questioning about his impressions of the 6,000-share offering, did plaintiff make that assertion. Furthermore, irrespective of the subjective intent contended by the plaintiff in his affidavit, plaintiff offered[**18] no evidence indicating an actual manifestation of that intent to APC. The critical issue in this case is whether there was any objective manifestation of intent

to create or repudiate an accord and satisfaction or a novation of the original agreement. It is apparent that plaintiff failed to embody the subjective intent referred to in his affidavit with any outward sign whatsoever. Therefore, his statement that he subjectively believed that the 6,000-share offering was an incentive for him to remain with the company did not create an issue of material fact capable of overcoming summary determination.

In addition, the statements set forth in Weaver's affidavit, drawn specifically to frustrate summary judgment, do not square with his previous testimony. The United States Court of Appeals for the First Circuit has firmly established that [HN10] when a party has given answers to unambiguous questions in discovery, that party cannot "'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a 'satisfactory explanation of why the testimony [has] changed.'" Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000) [**19] (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)). [*201] We are in full agreement with the holding of the First Circuit on this issue. The plaintiff's deposition testimony, which is replete with evasions and inconsistencies, does not contain a single reference to his contention that the 6,000-share plan was an incentive to remain with the company, as he states in the affidavit. The stark inconsistencies between plaintiff's deposition testimony and subsequently drafted affidavit thus presented defendant with a "constantly moving target" designed to make summary disposition impossible. Hernandez-Loring, 233 F.3d at 54. Furthermore, plaintiff has offered no explanation for the apparent change in his testimony. Accordingly, we hold plaintiff's affidavit both ineffectual and insufficient to establish the existence of a genuine issue of fact in this case.

In our opinion, APC was entitled to summary judgment as a matter of law. From our examination of the record, it is clear that the actions, words, and dealings of the parties manifested a mutual intent to bargain toward an acceptable replacement plan. Since the record contains [**20] no evidence that the plaintiff outwardly communicated a contrary intent to APC, we are of the opinion that a fact finder could conclude only that the 6,000-share offering was intended to be a substitute for the original 2,000-share agreement, and that the plaintiff accepted and took advantage of the substitution after prolonged discussions and e-mails with Davis to that effect. Because we reach this conclusion, we need not address the defendant's contention that the employment confirmation letter was insufficient to create a binding legal obligation on APC.

Conclusion

For the foregoing reasons, we affirm the Superior Court judgment and remand the record in this case thereto.

Source: Legal > / . . . / > **Restatement 2d, Contracts - Rule Sections**
TOC: Restatement 2d, Contracts - Rule Sections > / . . . / > Topic 2- Substituted Performance, Substituted Contract, Accord and Account Stated > **§ 281 Accord and Satisfaction**
Terms: **(LexisNexis Provided Search)**

*Restatement of the Law, Second, Contracts, § 281*

Restatement of the Law, Second, Contracts
Copyright (c) 1981, The American Law Institute

✦ Case Citations

Rules and Principles

Chapter 12 - Discharge by Assent or Alteration

Topic 2 - Substituted Performance, Substituted Contract, Accord and Account Stated

Restat 2d of Contracts, § 281

§ 281 Accord and Satisfaction

**(1) An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty.**
**(2) Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.**
**(3) Breach of the accord by the obligee does not discharge the original duty, but the obligor may maintain a suit for specific performance of the accord, in addition to any claim for damages for partial breach.**

**COMMENTS & ILLUSTRATIONS: Comment:**

*a. Nature of an accord.* An accord is a contract under which an obligee promises to accept a substituted performance in future satisfaction of the obligor's duty. Because an accord is a contract, it differs from a mere revocable offer by the obligee to accept a substituted performance in satisfaction of the duty (§ 278). The typical accord involves an exchange of promises (Illustration 1), although an accord may also take the form of an option contract (Illustration 2). It is the essence of an accord that the original duty is not satisfied until the accord is performed, a result that is sometimes suggested by use of the term "executory accord." See Comment e.

*b. Suspensory effect.* The accord entitles the obligor to a chance to render the substituted performance in satisfaction of the original duty. Under the rule stated in Subsection (2), the obligee's right to enforce that duty is suspended subject to the terms of the accord until the obligor has had that chance. If the obligor is under a duty to perform the accord, his performance discharges both his original duty and his duty under the accord (§ 235). If, however, there is such a breach of the accord by the obligor as discharges the obligee's duty under the accord to accept the stated performance in satisfaction, he is no longer bound by the accord. He may then choose between enforcement of the original duty and any duty under the accord. Whether a breach by the obligor discharges the obligee's duty under the accord is governed by the rules stated in Chapter 10, Performance and Non-Performance.

**Illustrations:**

1. A owes B $ 10,000. They make a contract under which A promises to deliver to B a specific machine within 30 days and B promises to accept it in satisfaction of the debt. The contract is an accord. A's debt is suspended and is discharged if A delivers the machine within 30 days.

2. A owes B $ 10,000. In consideration of $ 10 paid by A, not as part of the debt, B promises to accept in satisfaction of the debt a specific machine from A within 30 days. The contract is an accord. A's debt is suspended for 30 days and is discharged if A delivers the machine within 30 days, although A is under no duty to deliver the machine.

3. A, B and C, who are creditors of D, enter into a voluntary composition with D under which D promises to pay and A, B and C promise to accept 50% of their debts in full satisfaction. The composition is an accord. D's debts are suspended and are discharged if D pays the 50%.

4. The facts being otherwise as stated in Illustration 1, A fails to deliver the machine within 30 days and tells B that he will not deliver it. B can enforce either the original $ 10,000 debt or the duty to deliver the machine.

*c. Effect of obligee's breach.* If a breach of the accord by the obligee prevents the obligor from performing the accord, the original duty is not discharged, but the obligor has a claim for damages for total breach of the accord. However, the obligor's damages cannot be measured simply by his original duty, but must take account of what he has saved by not performing. To avoid imposing on the innocent obligor the burden of proving these damages, specific performance of the accord will be granted unless for some reason that remedy is inappropriate. In addition, the obligor may have a claim for damages for partial breach.

**Illustration:**

5. The facts being otherwise as stated in Illustration 1, A tenders the machine within 30 days, but B refuses to receive it. If B then sues on the original $ 10,000 debt, A can obtain a decree of specific performance providing for the concurrent delivery of the machine and the discharge of the debt.

*d. Validity of accord.* The enforceability of an accord is governed by the rules applicable to the enforceability of contracts in general. The obligee's promise to accept the substituted performance in satisfaction of the original duty may be supported by consideration because that performance differs significantly from that required by the original duty (§ 73) or because the original duty is in fact doubtful or is believed by the obligor to be so (§ 74). It may also be supported by the obligor's reliance even in the absence of consideration (§ 90). A recurring situation involves the creditor who indorses and cashes a check sent by the debtor and marked "payment in full." The debtor then argues that the creditor, by exercising dominion over the check, has made an accord under which he has promised to accept payment of the check in satisfaction of the debt. Assuming that the transaction is not subject to objections such as those based on the absence of consideration (§§ 73, 74), on lack of good faith and fair dealing (§ 205) and on unconscionability (§ 208), such a notation by the debtor, if prominent enough to meet the requirements of § 19(2), may form the basis of an enforceable accord pursuant to the general rule stated in § 69(2). The creditor cannot generally avoid the consequences of his exercise of dominion by a declaration that he does not assent to the condition attached by the debtor. Uniform Commercial Code § 1-207, providing for acceptance of performance under reservation of rights, need not be read as changing this well-established rule. See Comment *a* to § 278.

**Illustration:**

6. A contracts with B to have repairs made on A's house, no price being fixed. B sends A a bill for $ 1,000. A honestly disputes this amount and sends a letter explaining that he thinks

the amount excessive and is enclosing a check for $ 800 as payment in full. B, after reading the letter, indorses the check and deposits it in his bank for collection. B is bound by an accord under which he promises to accept payment of the check as satisfaction of A's debt for repairs. The result is the same if, before indorsing the check, B adds the words "Accepted under protest as part payment." The result would be different, however, if B's claim were liquidated, undisputed and matured. See § 74.

e. *Substituted contract distinguished*. Because the obligor's original duty is not satisfied until the accord is performed, an accord differs from a substituted contract, under which a promise of substituted performance is accepted in satisfaction of the original duty. See § 279. Whether a contract is an accord or a substituted contract is a question of interpretation, subject to the general rules stated in Chapter 9. In resolving doubts in this regard, a court is less likely to conclude that an obligee was willing to accept a mere promise in satisfaction of an original duty that was clear than in satisfaction of one that was doubtful. It is therefore less likely to find a substituted contract and more likely to find an accord if the original duty was one to pay money, if it was undisputed, if it was liquidated and if it was matured. Compare Illustration 1 with Illustration 1 to § 279.

**REPORTERS NOTES:** This Section is based on former § 417. See 6 Corbin, Contracts §§ 1268-92 (1962 & Supp. 1980); 15 Williston, Contracts §§ 1837-56 (3d ed. 1972).

*Comment b*. Subsection (2) rejects, as did former § 417, the view that an executory accord is not a defense. See Shepherd, The Executory Accord, 26 Ill. L. Rev. 22 (1931); Gold, Executory Accords, 21 B.U.L. Rev. 465 (1941). Illustrations 1 and 2 are based on Illustrations 1 and 2 to former § 417; see also American Textile Mach. Corp. v. United States, 220 F.2d 584 (6th Cir. 1955). Illustration 3 is based on Massey v. DelValley Corp., 46 N.J. Super. 400, 134 A.2d 802 (1957). Illustration 4 is based on Illustration 3 to former § 417 and on Plant City Steel Corp. v. National Mach. Exch., 23 N.Y.2d 472, 297 N.Y.S.2d 559, 245 N.E.2d 213, (1969); cf. Atria v. Geist, 64 Ill. App.3d 88, 21 Ill. Dec. 11, 380 N.E.2d 1187 (1978).

*Comment c*. Illustration 5 is based on Illustrations 4 and 5 to former § 417; see also Union Central Life Ins. Co. v. Imsland, 91 F.2d 365 (8th Cir. 1937); Corrigan v. Payne, 312 Mass. 589, 45 N.E.2d 829 (1942); Dobias v. White, 239 N.C. 409, 80 S.E.2d 23 (1954).

*Comment d*. This Comment is based in part on former § 420, which stated that a creditor's acceptance of a performance tendered as satisfaction was not prevented from operating as satisfaction by his "manifested refusal so to regard it." That rule is not restated here because it is implicit in the general rule now stated in § 69. As to the effect of a check marked "payment in full," see Gold, Accord and Satisfaction by Estoppel, 27 Iowa L. Rev. 31 (1941). Illustration 6 is based on Illustration 1 to former § 420; Mullinax v. Shaw, 143 Ga. App. 657, 239 S.E.2d 547 (1977). Compare Roman v. Delta Air Lines, 441 F. Supp. 1160 (N.D. Ill. 1977); Tabani v. Hester, Ind. App. , 366 N.E.2d 193 (1977). In support of the general rule that the creditor cannot avoid the consequences of his exercise of dominion by a declaration that he does not assent to the condition attached by the debtor, see Eppling v. Jon-T Chemicals, Inc., 363 So.2d 1263 (La. App. 1978); Graffam v. Geronda, 304 A.2d 76 (Me. 1973); Laganas v. Installation Specialties, 291 A.2d 187 (D.C. Ct. App. 1972); Boohaker v. Trott, 274 Ala. 12, 145 So.2d 179 (1962); Wilmeth v. Lee, 316 P.2d 614 (Okl. 1957).

That Uniform Commercial Code § 1-207 should not be applied to the situation described in this Comment, see Rosenthal, Discord and Dissatisfaction: Section 1-207 of the Uniform Commercial Code, 78 Colum. L. Rev. 48 (1978); Brown v. Coastal Truckways, Inc., 44 N.C. App. 454, 261 S.E.2d 266 (1980); Jahn v. Burns,593 P.2d 828 (Wyo. 1979); Hawkland, The Effect of U.C.C. § 1-207 on the Doctrine of Accord and Satisfaction by Conditional Check, 74 Comm. L.J. 329 (1969); Comment, 11 Creighton L. Rev. 515 (1977); Comment, 38 Ohio St. L.J. 921 (1977); Comment, 18 Buffalo L.J. 539 (1969); Teledyne Mid-America Corp. v. HOH

Corp., 486 F.2d 987, 993 n.6 (9th Cir. 1973) (dictum). That it should be, see Miller v. Jung, 361 So.2d 788 (Fla. Dist. Ct. App. 1978); Scholl v. Tallman, 247 N.W.2d 490 (S.D. 1976); Simpson v. Norwesco, Inc., 442 F. Supp. 1102 (D.S.D. 1977) (applying Scholl); Lange-Finn Constr. Co. v. Albany Steel & Iron Supply Co., 94 Misc.2d 15, 403 N.Y.S.2d 1012 (Sup. Ct. 1978) (dictum); Hanna v. Perkins, 2 UCC Rep. 1044 (N. Y. Co. Ct. 1965) (dictum); Baillie Lumber Co. v. Kincaid Carolina Corp., 4 N.C. App. 342, 167 S.E.2d 85 (1969) (alternative holding); White and Summers, Handbook of the Law Under the Uniform Commercial Code § 13-21 (1972). The authorities applying § 1-207 tend to ignore the contrary arguments. The Supreme Court of Oregon, however, did review the authorities on both sides, and, in dictum, hinted support for the application of § 1-207, but left the issue undecided. Kilander v. Blickle Co., 280 Or. 425, 571 P.2d 503 (1977). There is, however, a much larger number of cases decided under the Code that, without referring to § 1-207, hold that the debt is discharged despite the creditor's expression of disagreement with the debtor's condition. See, e.g., Laganas v. Installation Specialties, supra; Graffan v. Geronda, supra; Rosenthal, supra, 78 Colum. L. Rev. at 67. In Fritz v. Marantette, 404 Mich. 329, 273 N.W.2d 425 (1978), the Supreme Court of Michigan, after reviewing both positions, refused to interpret § 1-207 either way, and applied common law principles to set aside a defense of accord and satisfaction. The case is severely criticized in Harris, Commercial Transaction, 1979 Annual Survey of Mich. Law, 26 Wayne L. Rev. 469 (1980), which supports the view that UCC § 1-207 does not affect the result.

*Comment* e. This Comment is based on former § 419. See Goldbard v. Empire State Mut. Life Ins. Co., 5 A.D.2d 230, 171 N.Y.S.2d 194 (1958); National American Corp. v. Federal Republic of Nigeria, 448 F. Supp. 622, 642-44 (S.D.N.Y.), aff'd, 597 F.2d 314 (2d Cir. 1978); cf. Leschorn v. Xericos, 121 Ariz. 77, 588 P.2d 370 (Ct. App. 1978).

**CROSS REFERENCES:** ALR Annotations:

Vendee's liability for use and occupancy of premises, where vendor disaffirms an unenforceable land contract. 49 A.L.R.2d 1169.

Digest System Key Numbers:

Accord and Satisfaction 1 et seq.

Source: Legal > / . . . / > **Restatement 2d, Contracts - Rule Sections**
TOC: Restatement 2d, Contracts - Rule Sections > / . . . / > Topic 2- Substituted Performance, Substituted Contract, Accord and Account Stated > **§ 281 Accord and Satisfaction**
Terms: **(LexisNexis Provided Search)**
View: Full
Date/Time: Tuesday, May 22, 2007 - 3:44 PM EDT

LexisNexis About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.